Exhibit 1

# IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON

## IN AND FOR THE COUNTY OF THURSTON

STATE OF WASHINGTON        )        **WDFW Case # 15 -007473**
           vs.             )        **Affidavit for Search Warrant**
**PUGET SOUND SEAFOOD DIST.**
**LLC., Defendant**        )        NO . 16-313
**Anthony Edwin Paul, Defendant**  )
**Hazen Graham Shopbell,**    )
**Defendant**               )

**FILED**

MAY 1 3 2016

Superior Court
Linda Myhre Enlow
Thurston County Clerk

The undersigned by oath states:        I believe that:  In Pierce, Snohomish, and Thurston County, Washington, during the period between March 27, 2015 and January 8, 2016, the following crimes did occur:

(X)        Evidence of the crime(s) of RCW 77.15.260 Unlawful Trafficking in the First Degree-a Class B Felony, RCW 77.15.630 Unlawful Catch Accounting in the First Degree-a Class C Felony, RCW 69.30.110 Possession or Sale in Violation of Chapter

(X)        Contraband, the fruits of the crime, or things otherwise criminally possessed, is/are located in, on, or about the following described premises, vehicles or person:

**2615 East N Street, Suite 1, Tacoma, WA, 98421.**  This is primary business location. The property is located in an industrial area just west of I-5 and north of the Tacoma Dome. The entrance to the property is south-facing, on the north side of East N Street. It is fenced with chain link.  There is a large warehouse structure located on the north end of the property with a door on the left side, facing east.  There are also several garage-bay doors that face south.  A concrete loading platform juts out from the garage-bay doors. The platform is covered by an extension of the roof.  There is an office on the second floor of the building, accessed by an interior staircase.  There is a separate lean-to style structure on the east side of the property.  The property is next to a Subway restaurant and the sign for Subway sits within the boundary of the property.  The formerly occupying fish buying company, United Pacific, still has its sign underneath Subway's sign. Several plastic fish totes are stored in the open area to the south of the main warehouse.  The parcel number is 4715011231 and is owned by Nicoli Bruno according to Pierce County Assessor Records.  Financial records indicate Puget Sound Seafood Dist. LLC pays rent to the Bruno's on a monthly basis.



**3607 197th Ave Ct E, Lake Tapps, WA, 98391.** The home is a single-family, two story dwelling located within the gated community of Tapps Island on Lake Tapps. The house is brick and gray paint with a three-car garage. The garage doors are painted white. A large balcony window is set above the garage doors. The roof is a dark gray tile. The property is fenced with a black wrought-iron style fence that rolls to allows access. The house number, 3607, is displayed over the front door entryway. There is a driveway on the left side of the property with a fence and tree line that separate it from the next house to the north. The parcel number is 8996030750 and Pierce County Assessor Records indicate the home is owned by Anthony E. Paul.



**8213 21St Ave NW, Apt B, Tulalip, WA, 98271.** The home is a two-story, duplex structure, white in color, with upper and lower front decks, framed in unpainted wood. There is a single garage associated with the home. The specific apartment, B, is on the right-hand side of the structure. There is a covered side-porch on the far right side of the home. The house number, 8213, is located between the garages for apartments A and B, just above the electrical box. "B" is displayed over the door of the home. The parcel number is 30042300302100 and Snohomish County Assessor Records indicate the property is owned by the Tulalip Tribe.



20000019.02
Exhibit 1

**VEHICLES:**
**C10113D-**a white 1995 Ford Van, VIN 1FDKE37F2SHA67690, registered to Puget
Sound Seafood Dist. LLC, with an address of 3607 197th Ave CT E, Bonney Lake, WA
98391.
**C21785C-**a white 1999 Isuzu CB Truck, VIN JALE4B144X7900956, registered to Puget
Sound Seafood Dist. LLC, with an address of 2615 E N St, Tacoma, WA 98421.
**B79126U-**1998 GMC Savana, VIN 1GTFG25R0W1040199, registered to Hae Jun Park,
with an address of 1414 S 303rd St, Federal Way, WA 98003, but stored at 2615 E N St,
Tacoma, WA.

**Officer Wendy Willette, being first duly sworn on oath, deposes and says:**

I, Wendy Willette, am a fully commissioned General Authority Peace Officer,
holding the rank of Detective, employed by the Washington Dept. of Fish and Wildlife
(WDFW) and have been so employed for over thirteen years. I attended the Washington
Police Corps Academy from the fall of 2001 through the spring of 2002. I met all
training requirements at the police academy and graduated with a certificate of
completion. While I have been an officer in the field, I have received specialized training
in a number of areas, including but not limited to: Covert Wildlife Investigations
including installation and management of GPS tracking devices, Interview and
Interrogation Techniques, Managing Confidential Informants, Marine Fish and Shellfish
Identification, Aquaculture Regulation, Wildlife Investigators Covert Academy, Social
Media Investigations, and Financial Investigations. My membership in the Statewide
Marine Division exposed me to numerous commercial fisheries. I have regularly
inspected businesses that participate in the buying and selling commercial fish and
shellfish products and I am familiar with the record keeping and catch accounting
requirements through WDFW as well as Department of Health rules and regulations.

In addition, I have written and successfully executed numerous search warrants
during my career, many of which involved commercial catch accounting fraud and illegal
shellfish harvest and sales.

**Circumstances Supporting Probable Cause:**

The Washington State Department of Fish and Wildlife (WDFW) is tasked with
managing fisheries in the State of Washington to ensure that catch amounts do not exceed
sustainable levels for fish and shellfish populations. In order to maintain accurate data on
the various fisheries in the state, WDFW and the Northwest Indian Fish Commission
(NWIFC), co-managers respectively, require that all commercial wild fish and shellfish
harvest, both state and tribal, be documented on Fish Receiving Tickets (FRTs). Those
documents include vital information and are signed under penalty of perjury by licensed
fishers and fish buyers. WDFW maintains a database for all licensed fish buyers and
wholesale dealers that operate within Washington State. Only licensed wholesale dealers
are issued Fish Receiving Ticket books. Fish receiving tickets are required to be
submitted to WDFW and the NWIFC within six business days of completion. The
reporting requirements and specific rules for FRTs are set forth in WAC 220.69. Failure

3

to accurately and legibly complete an FRT is a violation of law and inhibits these two entities' abilities to accurately manage catch accounting harvest data. As such, FRT investigations are a paramount function of WDFW Enforcement, specifically the Statewide Investigative Unit.

The National Shellfish Sanitation Program (NSSP) is the federal/state cooperative program recognized by the U.S. Food and Drug Administration and the Interstate Shellfish Sanitation Conference for the sanitary control of shellfish produced and sold for human consumption. The NSSP sets the framework for all states to manage their shellfish industry for the benefit of public health. Each state must comply with the provisions set forth in the model ordinance and adopt statutes and rules to follow as well as penalties for violations of the NSSP. The Washington State Department of Health (DOH) is the agency in charge of ensuring Washington State complies with the Federal Model Ordinance. WDFW aids DOH with the enforcement of the model ordinance through RCW Title 69.30 and WAC Title 246. WDFW Officers are given authority to enforce chapters of RCW Title 69.30. The following excerpts from the National Shellfish Sanitation Program explain in detail the requirements for shellstock dealers as they relate to traceability, licensing and record keeping.

**"Section III Public Health Reasons and Explanations**
**Chapter IX. Transportation**
Certified dealers have three (3) principal responsibilities to assure that the consumer receives a safe product. The first is to purchase only safe and wholesome raw products. The second is to maintain the product in a sanitary manner. The final responsibility is to ship the product under sanitary conditions. The tagging and shipping records requirements, the sanitary shipping practices requirements, and the raw product inspection requirements are necessary to fulfill these responsibilities.

**Chapter X. General Requirements for Dealers**
**.04 Certification Requirements.**
A principal objective of the NSSP has been to provide a mechanism for health officials and consumers to receive information as to whether lots of shellfish shipped in interstate commerce meet acceptable and agreed upon sanitation and quality criteria. Although these requirements pertain only to interstate shipments, it is recommended that the same requirements be imposed on intrastate operations. To accomplish this, the NSSP includes criteria and procedures to assure that producing and processing States receive only product that has been grown, harvested, transported, processed, and/or shipped in compliance with NSSP guidelines. Certification is dependent on a dealer maintaining acceptable operational and sanitary conditions. The State must have adequate legal authority to regulate the sanitary requirements for harvesting, transporting, shucking-packing, and repacking of shellfish to be shipped interstate. This authority may be either a specific law or a regulation. The success with which the State is able to regulate all components of the shellfish industry provides a measure of the adequacy of the statutory authority. State officials who certify dealers must fully comply with the requirements for certification for the process to remain viable. Certification is intended to provide an unbroken chain of sanitation control to a lot of shellfish from the moment of harvest to its sale at the wholesale or retail level. For the certification process to be effective, certified dealers must fully comply with the applicable sanitation requirements pertaining to the type of operation involved."[1]

---

[1] **National Shellfish Sanitation Program (NSSP) Guide for the Control of Molluscan Shellfish: 2013 Revision**

4

**SUMMARY OF INVESTIGATION AND VIOLATIONS:**

- Puget Sound Seafood Dist. LLC is a Washington State-licensed business through both the Department of Revenue and the Secretary of State. UBI #603356740.

- Puget Sound Seafood Dist. LLC is licensed as a Washington State wholesale dealer through the Department of Fish and Wildlife for 2015 and 2016 and is subject to all rules, regulations, and record-keeping requirements regarding the purchase and sale of wholesale fish and shellfish.  WDL #125688.

- Puget Sound Seafood Dist. LLC is owned by ANTHONY EDWIN PAUL, 05/11/78, and managed by HAZEN GRAHAM SHOPBELL, 05/17/81.  This information has been verified through Washington Secretary of State records, through WDFW and DOH records, through review of banking information for the company obtained through previous search warrants, and through observations by WDFW Enforcement staff.

- Puget Sound Seafood Dist. LLC has failed to submit 16 Fish Receiving tickets (FRTS) to WDFW and the NWIFC between 03/12/14 and 01/08/16 and paid for VOIDED FRTs on 03/08/15 and 06/30/15 without submitting a valid FRT to document harvest.  Puget Sound Seafood Dist. LLC back-dated an FRT and company check to a closed-season fisher to conceal an illegal purchase of Dungeness crab on May 23, 2015.

  *Each instance with a value over $250 is a violation of RCW 77.15.630-Unlawful Fish and Shellfish Catch Accounting, First Degree-a Class C Felony.  A total of 8 violations.*

  *Each instance with a value under $250 is a violation of RCW 77.15.630-Unlawful Fish and Shellfish Catch Accounting, Second Degree-a Gross Misdemeanor.  A total of 6 violations.*

- Puget Sound Seafood Dist. LLC is not licensed as a Shellstock Shipper through the Washington State Department of Health nor was the company licensed as such in 2015.  This has been confirmed through the Washington Department of Health. Puget Sound Seafood Dist. LLC has engaged in the commercial buying and selling of bivalve shellfish (cockle, butter, and geoduck clams).  There were 30 documented transactions of cockle and butter clams in 2015 and 15 documented transactions of geoduck in 2015.

  *Each transaction is a violation of RCW 69.30.110-Possession or Sale in Violation of Chapter-a Gross Misdemeanor.  A total of 45 violations.*

- Puget Sound Seafood Dist. LLC underpaid fishers they purchased fish and shellfish from over $244,000 in 2015, based on fish receiving ticket values.  The company retroactively paid fishers a total of about $47,000, leaving about

5

$197,000 still owed to fishers.   This may indicate possible illegal harvests being paid less than what the fish ticket states as financial incentive for assuming risk.

*RCW 77.08.010 (67)"Trafficking" means offering, attempting to engage, or engaging in sale, barter, or purchase of fish, shellfish, wildlife, or deleterious exotic wildlife.*

*RCW 77.15.260 Unlawful Trafficking in Shellfish, 1ˢᵗ Degree-a Class B Felony*

- Puget Sound Seafood Dist. LLC has repeatedly engaged in the unlawful purchase and sale of shellfish.  Each transaction of shellfish made by Puget Sound Seafood Dist. LLC that was in violation of either RCW 77.15 or 69.30, per reporting requirements or licensing requirements, constitutes unlawful trafficking.  Further sale of said illegally purchased shellfish is also classified as unlawful trafficking.

## INVESTIGATION

WDFW Enforcement conducted an investigation into a Tulalip tribal member who was seen by officers harvesting closed-season Dungeness crab and shrimp from the waters of Puget Sound during the spring and summer of 2015 (WDFW Case No. 15-001949). Puget Sound Seafood Dist. LLC was identified as the buyer of 444 pounds of illegally-harvested Dungeness crab on May 23, 2015 by the harvester of said crab during a post-Miranda interview at the conclusion of the investigation.  May 23, 2015 was closed to all harvest of Dungeness crab for both the Tulalip Tribe and for Washington State commercial fishers.  The Tribe had an open commercial crab fishery the day before, May 22, 2015.

An interview of an employee and licensed fish buyer for Puget Sound Seafood Dist. LLC, identified as Hai N. Ly, told officers that he was ordered to buy the illegally-harvested crab from the Tulalip fisher and to back-date the fish receiving ticket used to document the harvest by the company's owner, Anthony E. Paul.  According to Ly, Paul told Ly that if he did not comply with the order to buy the crab, he would lose his job.  Ly also stated that Paul sent Kirby Manzanares, another employee of the company, to the plant to confirm that Ly completed the transaction.

Using a law enforcement investigative tool, I was able to locate three bank accounts for the company with three separate financial institutions.  I obtained a search warrant for financial records for Puget Sound Seafood Dist. LLC based on this information and reviewed the records when they were received.  I was able to locate the check made out to the Tulalip tribal fisherman with the fish receiving ticket number referenced on the note of the check.  It was dated May 22, 2015 and was numbered 1478.  The signature on the check appeared to be that of Kirby Manzanares and matched the signature on Kirby Manzanares' driver's license and bank signature card.  Also, the check number, 1478, was out of sequence with other checks that were dated 05/22/15, indicating that check 1478 was written after that date.  The highest number for a check dated on May 22, 2015 was 1422.

6

20000019.06
Exhibit 1

I located the fish receiving ticket referenced on the check, JK794138. It too was back-dated to May 22, 2015 and was signed by Hai Ly in the buyer section. It showed a purchased of 444 pounds of Dungeness crab to the Tulalip tribal member previously identified. It showed an amount of $1722.72. The check however was only made out for $1222.72, **an underpayment of $500**.

I know based on my experience in the commercial fish industry that a payment for less than what the market value of fish or shellfish demands can indicate that the fish or shellfish being sold may have been harvested illegally. When fish or shellfish is harvested illegally, be it out of season, undersized, or other violation, the fisher will seek to sell that product at a lower cost. The buyer understands the inherent risk of purchasing illegal product and will not pay full market value. The fisher accepts the lower price to be rid of the product. In the case of the illegal Dungeness crab sale listed above, the underpayment of $500 may be indicative of such a transaction.

## FISH RECEIVING TICKET (FRT) ANALYSIS
I made an exhaustive review of all fish receiving tickets submitted by Puget Sound Seafood Dist. LLC for the 2015 year and compared that to the financial record. I was able to do this with some ease, as Puget Sound Seafood Dist. LLC lists the fish ticket number in the note section on most of their checks.

During the analysis, I saw that Puget Sound Seafood Dist. LLC repeatedly **underpaid** the fishermen they purchased shellfish and fish from during the time period in question. I had already seen an example of this during the May 23, 2015 incident, resulting in a $500 underpayment. These underpayments totaled $244,107.86 in 2015. The rates of underpayment were not consistent to develop any patterns; some fishermen were underpaid as little as $25 whereas others were underpaid as much as $6500.

I continued to analyze the financial records, as compared to the fish receiving ticket record and noted the following violations.
- March 8, 2015-FRT JL641604. This ticket was marked **VOID**, thus keeping it from counting toward allotted harvest, however the fisher Dan Pablo, was paid with check #1944 for the amount shown on the fish ticket: $151.20.
- June 30, 2015-FRT JK794461. This ticket was marked **VOID**, thus keeping it from counting toward allotted harvest, however the fisher Mark Hatch, was paid with check #2797. Check 2797 referenced another fish ticket, JK794470, in addition to JK794461. That ticket held a value of $1216.86. Hatch was paid $2331.97. JK794461 had no value listed, but based on the difference between the issued check and other fish ticket, the value should have been $1115.11.
- July 8, 2015-FRT JK761367. **MISSING** from WDFW record. The accompanying check was issued to Lance Williams for $2825.52.
- October 29, 2015, FRTs JK804051, JK804052, JK804053, JK804054. **MISSING** from WDFW record. The accompanying checks were issued to Jason Paul, Samantha Bob, Albert Dan, and Justin Billy. The total value for all four checks was $511.25.

20000019.07
Exhibit 1

- November 23, 2015-FRT JK803768. **MISSING** from WDFW record. The accompanying check was made out to Clyde Williams for $1850.76.
- December 28, 30, 2015 and January 8, 2016. Five checks on three dates made out to Tulalip fishers referencing a total of 1952 pounds of some unknown commodity. No fish receiving ticket referenced in notes. The value referenced in the note is for .90 a pound. Very few species sell even at wholesale for that cost. I was able to locate an open squid fishery for the Tulalip tribe during the dates in question. Squid is a species that could sell at this low value. They are required by both tribal and state law to be recorded on a fish receiving ticket. No squid fish receiving tickets are present for the company.

Voided and missing fish receiving tickets present catch accounting issues for data managers at the Washington Department of Fish and Wildlife (WDFW) and the Northwest Indian Fish Commission (NWIFC), who are co-managers respectively, of commercial fisheries in Washington State. Wholesale dealers are required by law to submit all FRTs with accurate information, in sequential order, within six business days to either the NWIFC or WDFW, depending on whether the FRT is for a treaty fishery or a state fishery. A VOIDED ticket, so marked by the wholesale dealer, usually for a mistake made on the ticket, is not counted toward an overall harvest allotment. Another fish ticket is created with the correct data typically. None of the VOIDED tickets in this case have any other associated fish tickets made out with corrected data. A payment made for a VOIDED ticket indicates that the ticket was not voided in reality, but that fish or shellfish was harvested and sold. Similarly, a missing ticket cannot provide data to managers. However a payment for a missing fish ticket indicates that fish or shellfish was harvested and sold.

What was apparent at the conclusion of the fish receiving ticket audit was that there were vast gaps between what Puget Sound Seafood Dist. LLC had reported they paid the fishers versus what they actually paid their fishers.

## BIVALVE INVESTIGATION-CLAMS AND GEODUCK
Puget Sound Seafood Dist. LLC, nor any of its agents, has ever been licensed as a shellstock shipper by the Washington Department of Health (DOH). There is a check in the financial record to the DOH for $273.00, dated 02/26/15. I contacted the Shellfish Inspection Office to inquire about the check. I was informed that although Puget Sound Seafood Dist. LLC had paid their license fee and completed an application to become licensed, they never followed through with the Department's inspection process. I was provided with documentation that DOH had requested follow-up with the company and had not been re-contacted, hence Puget Sound Seafood Dist. LLC was never licensed. This is a state and federal requirement to engage in the purchase and sale of bivalve shellfish, as referenced earlier in the NSSP excerpt.

## GEODUCK
Despite not being licensed to buy or sell bivalve shellfish, I saw multiple instances of Puget Sound Seafood Dist. LLC engaging in the industry. I saw four companies' checks to Anthony Paul with "geoduck", or an FRT number that detailed a geoduck purchase,

8

written in the note. I also knew those companies to deal primarily in geoduck from my previous inspections and familiarity with the companies. The record is shown in Table 1.

| DATE | CHECK | ACCOUNT | AMOUNT | COMPANY | NOTES | BANK | |
|------|-------|---------|--------|---------|-------|------|---|
| 3/27/2015 | 4814 | 18290007.00 | $9,879.93 | GRAYZONE SEAFOOD | 1567 LBS JK779507 | BOFA | |
| 5/5/2015 | 3042 | 138116145365.00 | $6,669.72 | SEAFOOD EXPRESS | | BOFA Table 1 | |
| 5/19/2015 | 1215 | 7000758053 | $3,075.87 | OPTIMUMS LLC | JK785732 | BOFA | |
| 6/2/2015 | 3040 | 138116145365.00 | $11,139.48 | SEAFOOD EXPRESS | JK779964 | BOFA | |
| 6/4/2015 | 3318 | 8150524788 | $13,898.16 | MERCULAND LLC | 1552 LBS GEODUCK | WELLS FARGO | JK780463 |
| 6/5/2015 | 3349 | 8150524788 | $8,613.29 | MERCULAND LLC | 913 LB GEODUCK | WELLS FARGO | JK780469 |
| 9/11/2015 | 5668 | 220719050.00 | $12,082.32 | SEAFOOD EXPRESS | JK798219 COR | CHASE | |
| 9/18/2015 | 603 | 220719050.00 | $10,685.52 | SEAFOOD EXPRESS | JK798244 | CHASE | |
| 9/22/2015 | 553 | 220719050.00 | $12,873.84 | SEAFOOD EXPRESS | JK798248 | CHASE | |
| 9/23/2015 | 10085 | 138116145365.00 | $7,982.13 | SEAFOOD EXPRESS | JK798101 | BOFA | |
| 9/24/2015 | 10088 | 138116145365.00 | $4,086.61 | SEAFOOD EXPRESS | JK798103 | BOFA | |
| 9/24/2015 | 10089 | 138116145365.00 | $12,082.32 | SEAFOOD EXPRESS | | BOFA | |
| 9/25/2015 | 10097 | 138116145365.00 | $10,207.66 | SEAFOOD EXPRESS | JK798165 ($5000 deficit) COR | BOFA | |
| 9/25/2015 | 10098 | 138116145365.00 | $10,685.52 | SEAFOOD EXPRESS | | BOFA | |
| 9/29/2015 | 1088 | 138116145365.00 | $8,335.21 | SEAFOOD EXPRESS | JK798108 | BOFA | |

Many of the geoduck checks had accompanying fish receiving tickets that I located in their records. These tickets showed Anthony Paul as the harvester for most instances. In one instance however, the harvester was identified as Raymond Fryberg on FRT JK780469. This FRT listed Merculand LLC as the buyer. Fryberg was also paid by Anthony Paul via two checks on September 15 and 20, 2015, with notes for "diving". The total was for $17,038.00. I know this to most likely reference geoduck harvest, as it is a dive fishery. I also know Fryberg to be a geoduck diver. Based on the financial record, it appeared Paul was buying the geoduck that Fryberg harvested and selling it to another wholesale company, Seafood Express, in essence, acting in the capacity of a shellstock shipper, and required to be licensed. There were two other individuals in the financial record that Paul noted "dive" or "diving" to. They were Harold E Joseph Jr. on June 4, 2015 for $7236.36 and Isaac Lafountaine on September 25, 2015 for $13,918.00. Again, I believed that these payments were specifically for geoduck.

Lastly, there were three checks from Seafood Express with no note on the check and no accompanying FRT number. These occurred on May 5, September 24, and September 25, 2015. The values of the checks were $6669.72, $12,082.32, and $10,685.52, respectively. I believe based on the pattern of geoduck sales' values by Seafood Express as shown in the check record, my knowledge that Seafood Express deals primarily in geoduck, and the dates on which these transactions occurred that these three checks were for geoduck purchases. I further know that these purchases were not documented on FRTs, as no record of any concurring FRTs has been located, despite exhaustive search.

## HARDSHELL CLAMS
Puget Sound Seafood Dist. LLC also acted as the buyer and initial receiver, filling out fish receiving tickets to tribal clam harvesters during June and July 2015. The total paid for hardshells clams was $4054.70. Those dates, recipients, sales, and FRT numbers are shown in Table 2.

9

20000019.09
Exhibit 1

| DATE | CHECK# | ACCT | AMOUNT | RECIPIENT | NOTES | FRT AMT | DIFF | SPECIES | TRIBE |
|------|--------|------|--------|-----------|-------|---------|------|---------|-------|
| 6/4/2015 | 1454 | | $112.50 | LEVI PAUL | JK786802 | $112.50 | $0.00 | CLAM | SWIN |
| 6/4/2015 | 1455 | | $96.25 | ALEXANDER CAYOU | JK786803 | $96.25 | $0.00 | CLAM | SWIN |
| 6/4/2015 | 1456 | | $70.00 | ABRIANNA SAMPSON | JK786804 | $70.00 | $0.00 | CLAM | SWIN |
| 6/4/2015 | 1457 | | $163.75 | COLBY JAMES | JK786805 | $163.75 | $0.00 | CLAM | SWIN |
| 6/4/2015 | 1459 | | $97.50 | GREG VAKANAK | JK786806 | $97.50 | $0.00 | CLAM | SWIN |
| 6/4/2015 | 1460 | | $76.25 | JOANNA SPENCER | JK786807 | $76.25 | $0.00 | CLAM | SWIN |
| 6/4/2015 | 1458 | | $228.75 | ROBERT CABUNOC | JK786808 | $228.75 | $0.00 | CLAM | SWIN |
| 6/4/2015 | 1461 | | $71.25 | SAMANTHA BOBB | JK786810 | $71.25 | $0.00 | CLAM | SWIN |
| 6/18/2015 | 1608 | | $121.28 | LEVI PAUL | JK794640 | $121.28 | $0.00 | CLAM | SWIN |
| 6/18/2015 | 1609 | | $51.25 | MADELINE STARR | JK794641 | $51.25 | $0.00 | CLAM | SWIN |
| 6/18/2015 | 1610 | | $253.75 | MADELINE STARR | JK794642 | $253.75 | $0.00 | CLAM | SWIN |
| 6/18/2015 | 1611 | | $37.50 | RICHARD CAYOU | JK794643 | $37.50 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2493 | | $173.95 | INA CAYOU | JK802105 | $115.77 | $58.18 | CLAM | SWIN |
| 7/29/2015 | 2494 | | $434.70 | ROBERT CABUNOC | JK802106 | $434.70 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2495 | | $215.10 | BENARD JAMES | JK802107 | $215.10 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2496 | | $96.50 | JOANNA SPENCER | JK802108 | $96.50 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2497 | | $231.30 | SACHEN MCCOY | JK802109 | $231.30 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2498 | | $164.70 | ABRIANNA SAMPSON | JK802110 | $164.70 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2499 | | $79.20 | ISABELLE KEO | JK802111 | $79.20 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2500 | | $99.90 | WILLIAM KEO | JK802112 | $99.90 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2501 | | $43.20 | SHAWNA STONE | JK802113 | $43.20 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2502 | | $145.80 | CALVIN EDWARDS | JK802114 | $145.80 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2503 | | $188.00 | DAN CAYOU | JK802115 | $188.00 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2504 | | $109.80 | TONY CLADOOSBY | JK802116 | $109.80 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2505 | | $150.30 | WARREN JAMES | JK802117 | $73.80 | $76.50 | CLAM | SWIN |
| 7/29/2015 | 2506 | | $68.40 | MARLENE STONE | JK802118 | $68.40 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2507 | | $46.80 | MARLENE STONE | JK802119 | $46.80 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2508 | | $265.50 | JUSTIN BILLY | JK802120 | $265.50 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2509 | | $142.20 | JORDAN STONE | JK802121 | $142.20 | $0.00 | CLAM | SWIN |
| 7/29/2015 | 2510 | | $153.00 | DEAN DAN | JK802122 | $153.00 | $0.00 | CLAM | SWIN |

Table 2

## REPORT FROM ANONYMOUS SOURCE

On February 29, 2016, Biologist Don Rothaus advised me of a phone conversation he had
had that same day with a state-licensed wholesale dealer. He identified the dealer's name
and business and told me he had had numerous conversations with the man over the
course of years and knew him to be knowledgeable about the commercial crab industry.
Rothaus stated that the dealer asked him if he had heard about what happened to Puget
Sound Seafood Dist. LLC. Rothaus replied that he had not. The dealer then told Rothaus
that several Tulalip tribal crab fishermen had been underpaid by Puget Sound Seafood
Dist. LLC during the course of the last crab season. Rothaus noted that this season was
the October through December 2015 season. The dealer said that Tulalip tribal crab
fishermen told him that they had been paid $0.75 to $1.00 less per pound of crab by
Puget Sound Seafood Dist. LLC than other commercial crab buyers during the same
fishery. The dealer told Rothaus that the fishers had contacted Tulalip Tribal Council to
complain of the underpayments by Puget Sound Seafood Dist. LLC. The dealer said the
tribe then demanded that Puget Sound Seafood Dist. LLC pay back the crab fishermen
that they had shorted. He called these "retro" payments. Rothaus provided me with the
man's name and phone number.

I called the man on March 1, 2016 and identified myself on his voicemail. He called me
a few minutes later at about 1132 hours. I explained who I was and he identified himself.
I asked the man if he was willing to meet with me in person to discuss another seafood
company he may have some information about. The man volunteered Puget Sound
Seafood Dist. LLC without me prompting him. He stated he had pneumonia and did not
want to meet in person, but would discuss the situation with me over the phone. The man

20000019.10
Exhibit 1

expressed his desire to remain anonymous since he still buys crab from tribal members and did not want to jeopardize his position.

He advised me that he had been a commercial crab fisherman and buyer for several years. He said that several Tulalip crab fishermen, six to eight, had called him in December and asked him how much he was paying per pound for Dungeness crab. When the man told the fishers his rate, the fishers told him that Puget Sound Seafood Dist. LLC had been underpaying them as much as $.75 to $1.00 a pound for crab. He said the fishermen told him that they contacted the tribe and that Puget Sound Seafood Dist. LLC was told to pay back the fishermen that they had shorted. The man described these as "retro" payments to the fishermen.

This information was consistent with the check record that I had reviewed from the previous financial search warrants. Several of the checks had "retro" written in the note section. Most of the "retro" noted checks also bore fish ticket numbers. During my financial analysis, I had been able to match up "retro" checks to underpayments to fishermen to the exact fish ticket that was shorted.

The man would not name the fishermen that had told him of the retro payments. He described that when Puget Sound Seafood Dist. LLC had first come into the marketplace, the tribal fishermen had expressed the desire to sell their catch to their own, claiming that since Puget Sound Seafood Dist. LLC was owned by tribal members, they would pay fair market value for the product. The man stated that the fishermen feel there is bias-based pricing for their crab. He said that the tribal members feel they are often underpaid for their product versus what non-tribal crab fishermen are paid by dealers for the same product. The man said that the fishermen were then outraged to find that they had not been paid what was promised by "their own".

The man told me of a specific incident where a buyer for Puget Sound Seafood Dist. LLC, Jamie Torpey, had advertised that she would pay $4/lb during the June 2015 crab season, however when Torpey began buying, she paid fishermen $3/lb. I compared this to fish ticket data to see if the man's claims were accurate. According to the data, Puget Sound Seafood Dist. LLC paid Tulalip fisherman between $3/lb and $3.25/lb for the entire month.

The man described the Tulalip fishermen as being afraid of confrontation. He said that there was an air of intimidation present at the docks when Puget Sound Seafood Dist. LLC and its owners/buyers were present. The man specifically said that Hazen Shopbell makes the fishers feel guilty if they sell their crab elsewhere. The man said that because of the initial desire of the crab fishermen to sell to "their own", a lot of other buyers had opted out from purchasing any crab at all, since no one would sell to them at the offloads. The man stated that his company was only one of a few left that had not succumbed to the apparent monopoly that Puget Sound Seafood Dist. LLC was attempting to create.

After my conversation with the man, I reviewed the financial spreadsheet and fish receiving ticket spreadsheets for Puget Sound Seafood Dist. LLC. I singled out the

11

fishermen that had received "retro" payments.  Below is a table showing the recipients of retro payments, their tribal affiliation, date, species, and the related FRT number.

| DATE | CHECK# | ACCT | AMOUNT | RECIPIENT | NOTES | SPECIES | TRIBE |
|---|---|---|---|---|---|---|---|
| 2/4/2015 | | 7000798053 | $738.63 | ARNOLD WILLIAMS | 7572914 +RETRO 47.50 | CRAB | PUY |
| 2/4/2015 | | 7000798053 | $726.75 | LESLIE NELSON | JK752285 + 4275 RETRO | CRAB | PUY |
| 2/4/2015 | | 7000798053 | $1,479.15 | MARK ARCUIETTE | JK752289 + RETRO 8680 | CRAB | PUY |
| 2/4/2015 | | 7000798053 | $1,170.87 | DONNIE BLACK | JK752290 + RETRO 16.62 | CRAB | PUY |
| 2/4/2015 | | 7000798053 | $1,039.78 | DEREK NELIUS | JK752292 + 127.78 RETRO | CRAB | PUY |
| 2/4/2015 | | 7000798053 | $787.00 | NATHAN MILLER | JK752293 + RETRO 113.05 | CRAB | PUY |
| 2/4/2015 | | 7000798053 | $2,511.30 | TINY BEAN FLORES | JK752294 + RETRO MEL 72.17 + 102.13 TINY | CRAB | PUY |
| 2/4/2015 | | 7000798053 | $2,614.87 | SHAWN CONWAY | JK752295 + RETRO 228 | CRAB | PUY |
| 2/5/2015 | 1709 | 7000798053 | $3,833.45 | WAYNE FLORES | JK752287 + RETRO 157.70 | CRAB | PUY |
| 2/5/2015 | 1706 | 7000798053 | $5,145.20 | BIG BEAN | JK752288 + RETRO 236.08 | CRAB | PUY |
| 2/5/2015 | 1708 | 7000798053 | $5,873.58 | RICKY FLORES | JK752297 + RETRO 66.70 | CRAB | PUY |
| 2/9/2015 | 1721 | 7000798053 | $8,554.36 | PUYALLUP TRIBE | CRAB TAX + RETRO 171.48 | CRAB | PUY |
| 2/11/2015 | 1788 | 7000798053 | $39.75 | KEN CREWS | RETRO | | STATE |
| 2/26/2015 | 1901 | 7000798053 | $204.25 | YESMOWIT MILLS | RETRO PAY 02/03/15 | CRAB | PUY |
| 3/26/2015 | 1927 | 7000798053 | $73.00 | JOSEPH HATCH | RETRO 292 LBS @ 5.25 | CRAB | TUL |
| 5/2/2015 | 2104 | 7000798053 | $4,918.63 | JOSEPH MCCLOUD | JK758295 + 40 RETRO | CRAB | PUY |
| 5/11/2015 | 2058 | 7000798053 | $392.00 | MICHAEL WEICHMAN | J RETRO | CRAB | L ELWHA |
| 9/8/2015 | 2179 | 7000798053 | $333.00 | JASON HUNTER | 08/06/15 RETRO | CRAB | L ELWHA |
| 11/11/2015 | 2964 | 7000798053 | $3,556.73 | ROY PABLO | JK804067 RETRO $252 JK804058/067 | CRAB | TUL |
| 12/18/2015 | 3048 | 7000798053 | $193.00 | DAN PABLO | RETRO JL708332 | CRAB | TUL |
| 12/18/2015 | 3025 | 7000798053 | $29.10 | ANTHONY MARTIN | JL708316 RETRO | CRAB | TUL |
| 12/18/2015 | 3051 | 7000798053 | $177.03 | WILLIAM JONES | RETRO JL708325 | CRAB | TUL |
| 12/18/2015 | 3059 | 7000798053 | $342.90 | GEORGIE FRYBERG | RETRO JL708323 | CRAB | TUL |
| 12/18/2015 | 2946 | 7000798053 | $121.25 | KIRK JONES | RETRO JL708337 | CRAB | TUL |
| 12/18/2015 | 3023 | 7000798053 | $107.67 | MATT MOSES | JL708324 RETRO | CRAB | TUL |
| 12/18/2015 | 3057 | 7000798053 | $208.55 | MORRIS ZACKUSE | RETRO JL708234 | CRAB | TUL |
| 12/18/2015 | 3069 | 7000798053 | $140.17 | SHANE BAKER | JL708330 RETRO | CRAB | TUL |
| 12/18/2015 | 2949 | 7000798053 | $85.80 | ELIDA PARKS | RETRO JL708328 | CRAB | TUL |
| 12/18/2015 | 2948 | 7000798053 | $218.25 | CLARENCE HATCH | RETRO JL708251 | CRAB | TUL |
| 12/18/2015 | 3047 | 7000798053 | $58.69 | BRANDON MOSES | RETRO JL708349 | CRAB | TUL |
| 12/18/2015 | 3053 | 7000798053 | $125.13 | DANNY SIMPSON | RETRO DANNY/JOE JL708346 | CRAB | TUL |
| 12/18/2015 | 3052 | 7000798053 | $337.56 | DANNY SIMPSON | JL708331 RETRO | CRAB | TUL |
| 12/18/2015 | 3065 | 7000798053 | $110.07 | MITCH ZACKUSE | RETRC JL708320 | CRAB | TUL |
| 12/18/2015 | 3060 | 7000798053 | $215.34 | CHRIS JOSEPH | RETRO JL708340 | CRAB | TUL |
| 12/18/2015 | 3054 | 7000798053 | $93.81 | ADAM CEPA | RETRO JL708343 | CRAB | TUL |
| 12/18/2015 | 3056 | 7000798053 | $161.51 | TRISTAN ZACKUSE | JL708335 RETRO | CRAB | TUL |
| 12/18/2015 | 3050 | 7000798053 | $168.30 | TYLER PARKS | RETRO JL708327 | CRAB | TUL |
| 12/18/2015 | 3056 | 7000798053 | $113.01 | CLYDE WILLIAMS | RETRO JL708347 | CRAB | TUL |
| 12/18/2015 | 3063 | 7000798053 | $71.78 | CORY PABLO | JL708322 RETRO | CRAB | TUL |
| 12/18/2015 | 3062 | 7000798053 | $245.51 | ROY PABLO | JL708339 RETRO | CRAB | TUL |

Table 3

## COMPARISON TO OTHER FISH RECEIVING TICKET VALUES

In order to see whether or not Puget Sound Seafood Dist. LLC had been paying less per pound to their fishers compared to other buyers in the region, I prepared another spreadsheet focusing solely on the month of February, 2015.  I used this month because Puyallup fishers were paid twelve "retro" checks during the month of February, 2015.  I separated out the date of the landing, catch area, tribe, and price per pound.  This data set focused only on Dungeness crab purchases.  I then contacted WDFW Biologists Don Rothaus and Don Valesquez, who have access to the FRT data pool, and asked them to compare the price per pound for Dungeness crab from other buyers on the same days and catch area.  I was given another spreadsheet with the additional data showing that in fact, Puget Sound Seafood Dist. LLC paid comparable, if not slightly higher rates as other buyers.  For twelve out 19 crab-buying days in February, Puget Sound Seafood, Dist. LLC paid more per pound than the average price per day overall.

This information was not consistent with the statement made by the anonymous buyer I had spoken to, however the retro checks still exist and therefore must have a purpose.  In most cases, the retro checks have a note listing the associated FRT number.  The majority of the time, the "retro" amount, when added to the amount paid for the FRT written on the note, equaled out to what the FRT payment should have been.  For example, FRT JL708323 was for 638 pounds of Dungeness crab bought from Georgie Fryberg on

12

20000019.12
Exhibit 1

December 16, 2015. The value after tax on the FRT was approximately $4457. The check made out to Georgie Fryberg for that date and FRT was approximately $4114, a difference of about $343. The "retro" check, made out to Georgie two days later, was for about $343. The retro checks, on the whole, appeared to be made out for underpayments paid to fishers and discovered or corrected at a later date. This information makes the price per pound theory irrelevant, but still does not answer the question as to why Puget Sound Seafood Dist. LLC repeatedly underpaid their fishers, totaling over $244,000 in one year. The total "retro" payments made by the company to fishers in 2015 was just over $47,000, a difference of about $197,000.

According to the check record, only 39 fishers were issued retro checks. However, 170 fishers were underpaid overall. Based on the statement of the anonymous buyer, I know that six to eight Tulalip fishers became aware of the underpayments during the Oct-Dec 2015 crab season. It appears that Puget Sound Seafood Dist. LLC made some attempt to repay the fishers what they were owed based on the financial records. The financial record shows that twenty Tulalip fishers were issued 21 retro checks on December 18, 2015. It is not known whether those fishers sought relief through the Tulalip Tribal Council or directly with the company. *Due to strained political relationships and the potential to jeopardize the investigation, the Tulalip Tribal Council will not be contacted regarding this matter until after the service of the search warrants.*

I know based on the financial record that Puget Sound Seafood Dist. LLC sells bait to its fishers. I know that in all of 2015, the company spent about $180,000 on bait. Current industry numbers show that fishers spend an average of about $25,000 per 100,000 pounds of Dungeness crab caught. To compare this to Puget Sound Seafood Dist. LLC's financial record to see if the numbers are within a normal range, I used FRT data from January through August 2015. The company underpaid fishers about $168,000 during this time. They spent about $124,000 on bait during this time. Puget Sound Seafood Dist. LLC claimed to have purchased about 531,000 pounds of Dungeness crab from January to August 2015. By using the formula above, Puget Sound Seafood Dist. LLC should have sold about $133,000 worth of bait. If Puget Sound Seafood Dist. LLC's underpayments to fishermen are explained via the bait theory, there is still a $35,000 discrepancy.

Further, if the bait theory is the explanation for the underpayments, and the "retro" checks cannot be linked to a lower price-per-pound explanation, it is unusual that the Tulalip fishers would demand to be paid what they were owed retroactively and is reasonable to believe there is another unknown reason for the underpayments.

During the May 23, 2015 portion of the investigation, I saw that an illegal shipment of Dungeness crab was purchased by Puget Sound Seafood Dist. LLC. While the fish receiving ticket listed the value at $1722, the actual check was made out for only $1222. It is possible this $500 underpayment was the financial incentive for Puget Sound Seafood Dist. LLC to buy the illegally harvested product. It is possible that the underpayments to fishermen may be for other illegally harvested product and that Puget

20000019.13
Exhibit 1

Sound Seafood Dist. LLC only agreed to buy the product at a reduced cost since they were assuming the risk in purchasing it.

## ADDRESS VALIDATION

In order to establish where Puget Sound Seafood Dist. LLC was primarily receiving its correspondence and holding business records related to its conduct, I contacted local postal officials who confirmed that the business received mail at three locations. The addresses were:

- 2615 East N Street, Suite 1, Tacoma, WA,
- 8213 21st Ave NW, Apt B, Tulalip, WA, and
- 3607 197th Ave Ct E, Lake Tapps, WA.

I know based on my investigation that Hazen G. Shopbell lives at 8213 21st Ave NW, Apt B, Tulalip, WA. I have verified this through online investigative tools, Department of Licensing data, and visual inspection. The property itself is part of a subdivision owned by the Tulalip Tribes. I have verified this through Snohomish County Assessor's Office records. Washington Secretary of State records indicate the Tulalip address as the physical address of Puget Sound Seafood Dist. LLC on the Certificate of Formation, with Shopbell acting as Executor for the business. Current Washington Department of Revenue records indicate that both the mailing and physical address for the business is located at the Tulalip address.

Shopbell is the wholesale dealer applicant with WDFW as well as the first fish buyer for the company. Shopbell's home address is listed on his Fish Buyer's Application. I know he has created fish receiving tickets. I also know that his home is geographically the closest to where Puget Sound Seafood Dist. LLC buys a large amount of their fish and shellfish: the Tulalip Marina. I believe there is a higher likelihood than not that records pertinent to the investigation will be located within his home. I expect these records to include correspondence from financial institutions, specifically Wells Fargo Bank and Ironshore Indemnity, which provided the bond for the WDFW Wholesale Dealer's license and lists Shopbell's home address as the business address on the application. I expect to find state agency correspondence, to include WDFW Fish Buying license information, Secretary of State and Department of Revenue records, all of which list Shopbell's address in their records as an address for the company. I expect to find Fish Receiving Tickets issued to Puget Sound Seafood Dist. LLC since Shopbell is a licensed buyer for the company, as well as notes and other written instruments regarding fishers, and notes and other written instruments regarding wholesale fish and shellfish buyers based on a review of the phone records for Shopbell. I also believe there will be correspondence specifically addressed to Puget Sound Seafood Dist. LLC at Shopbell's home because postal officials have confirmed that mail to the company is sent there.

If WDFW Enforcement is not granted authority to search Shopbell's residence, I believe that the service of the search warrants at Anthony Paul's home and at the facility in Tacoma could cause Shopbell to destroy evidence that may be at his home before WDFW

14

20000019.14
Exhibit 1

Officers can gain authority to search it, should evidence located at the other two locations provide further justification to do so.

I know based on my investigation that Anthony E. Paul owns and resides at 3607 197th Ave Ct E, Lake Tapps, WA. I have confirmed this with Pierce County Assessor's Officer records, phone company billing records, and Washington State Department of Licensing records. I have also seen a vehicle registered to Anthony Paul parked in the driveway of the home. Washington Secretary of State records show the Certificate of Formation record also lists Paul's address as the mailing address for Puget Sound Seafood Dist. LLC, with Paul acting as Executor and Agent for the company. Additionally Puget Sound Seafood Dist. LLC's 2015 Wholesale Dealer's License on file with WDFW, dated January 1, 2015, lists 3607 197th Ave Ct E, Lake Tapps, WA as the company's physical address. WDFW sent recent correspondence to Puget Sound Seafood Dist. LLC, dated February 1, 2016, regarding the expiration of the company's bond to this address. The correspondence was received and replied to. Anthony Paul is the primary signer of checks issued by Puget Sound Seafood Dist. LLC. I expect records at his residence to contain financial data for the company.

I know based on my investigation that the 2615 East N Street, Suite 1, Tacoma address is where the business was physically located. This knowledge is based on previous contact by other officers and detectives, interviews with employees, records on file with WDFW and DOH, and businesses bank account records held at Columbia Bank which list the Tacoma address on company checks. I have seen rent payments to the property owner for 2615 East N Street, Tacoma in the financial records of Puget Sound Seafood Dist. LLC.

The local postal officials also confirmed that all three addresses had received mail correspondence from other industry members such as the Swinomish Indian Tribe, the Tulalip Tribe, and the Port of Anacortes to name a few, addressed specifically to Puget Sound Seafood Dist. LLC. The investigation has shown that Puget Sound Seafood Dist. LLC conducts correspondence and most likely holds records for its business dealings at all three addresses.

## VEHICLES
I have learned during my career that many wholesale fish and shellfish dealers use vans and trucks to transport fish and shellfish from the landing site to their facilities or buyers. These vehicles are often box trucks or cargo style vehicles of medium size. Additionally, many companies will buy and sell vehicles amongst themselves. I have seen companies upgrading to newer vehicles sell their existing vehicles to other known dealers. I have seen companies going out of business sell their vehicles to other dealers, often at a bargain price to unload the inventory of their company. I know this to be the case for potentially two vehicles utilized by Puget Sound Seafood Dist. LLC. I know based on a review of the financial record, that Anthony Paul purchased such a vehicle from Alfonso Tavaglione of Seafood Express in December 2015. Seafood Express has gone out of business. I cannot confirm exactly what vehicle this was, as there was no note on the check, however a vehicle belonging to Seafood Express was contacted on January 26,

15

2016 by a WDFW Officer and the driver of the vehicle stated he had purchased it from Alfonso Tavaglione. The driver had no known association to Puget Sound Seafood Dist. LLC. The plate of the vehicle was C29729A. There is still no report of sale for that vehicle.

I know that on January 29, 2016, a truck with Washington plate B79126U, belonging to Hae Jun Park, owner and licensee holder of Be Happy Seafoods, was parked within the locked yard of Puget Sound Seafood Dist. LLC. I have driven by on several occasions since then and seen the same vehicle parked within the yard.

On May 12, 2016 I spoke with Puyallup Tribal Police Officer Loren Otterson, who informed me that Puget Sound Seafood Dist. LLC was primarily operating out of its vehicles at the present time. He stated that during the Puyallup crab season currently under way, Puget Sound Seafood Dist. LLC had kept at least one of their vehicles, identified as C10113D, at the Chinook Marina in Tacoma, WA. He stated he inspected the company, as part of his routine, earlier in the week, and the buyer he spoke with, identified as Jamie I. Torpey, confirmed they were using the vehicle to transport Dungeness crab to their buyers.

I know based on my experience that wholesale dealers often keep records inside their company vehicles. These records usually include fish receiving tickets, checks, and copies of checks, purchase orders, receipts, and license copies. It is my belief that Puget Sound Seafood Dist. LLC will have such records sought by this warrant stored in vehicles associated with the business. These vehicles may or may not have registration linking the vehicles to the business directly. The warrant only seeks permission to search three vehicles; the two vehicles that are registered to Puget Sound Seafood Dist. LLC and the vehicle registered to Hae Jun Park, currently parked within the locked yard of Puget Sound Seafood Dist. LLC in Tacoma, WA.

**COMPUTERS**

I know based on my experience with wholesale dealer inspections and other search warrants involving wholesale fish and shellfish dealers, that these companies use computers to conduct much of their business. Often, communication with customers is via email or other electronic communication. Financial records are often maintained within computer software programs such as Quickbooks or similar programs. Ledgers, sales journals, and invoices are also typically stored electronically. Companies use these electronic tools to avoid creating large amounts of paper documents requiring storage and tedious organization. Additionally, in today's electronic age, it is most uncommon to find excessive paper records as a preference to electronic records.

I know based on a review of the financial data obtained in prior search warrants for this case that Anthony E. Paul utilizes online banking systems, accessed via the Internet, through BECU and Columbia Bank to conduct business on behalf of Puget Sound Seafood Dist. LLC. I know based on my investigation that Puget Sound Seafood Dist. LLC has a website: www.psseafood.com . There is an email link on the website for contact. I know based on my review of the financial data obtained from prior search

20000019.16
Exhibit 1

warrants that Puget Sound Seafood Dist. LLC uses numbered invoices to track their sales to other seafood companies. I believe, based on my knowledge of wholesale seafood companies' use of software programs like Quickbooks, that these numbered invoices, usually listed in the note sections of checks written to Puget Sound Seafood Dist. LLC, are generated from just such a software program. I believe a search of the computer systems used by Puget Sound Seafood Dist. LLC will show digitally-stored invoices.

I know that in most cases it is impossible to successfully conduct a complete, accurate, and reliable search for electronic evidence stored on a computer or other electronic storage media during the physical search of a search site. This is true for a number of reasons, including but not limited to the following:

(a) Technical Requirements: Searching computers and other electronic storage media for criminal evidence is a highly technical process requiring specific expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in particular systems and applications, so it is difficult to know before a search which expert is qualified to analyze the particular system(s) and electronic evidence found at a search site. As a result, it is impossible to bring to the search site all of the necessary personnel, technical manuals, and specialized equipment to conduct a thorough search of every possible computer system. In addition, electronic evidence search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to ensure its complete and accurate analysis.

(b) Volume of Evidence: The volume of data stored on many computers and other electronic storage media is typically so large that it is impossible to search for criminal evidence in a reasonable period of time during the execution of the physical search of a search site. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

(c) Hidden or Obfuscated Evidence. Computer users can conceal data within computers and electronic storage media through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Similarly, computer users can encode communications to avoid using key words that would be consistent with the criminal activity. Computer users can also attempt to conceal electronic evidence by using encryption technologies. For example, some encryption systems require that a password or device, such as a "dongle" or "keycard," be used to obtain a readable form of the data. In addition, computer users

17

can conceal electronic evidence within another seemingly unrelated and innocuous file using a process known as "steganography." For example, by using steganography, a computer user can conceal text in an image file in such a way that it cannot be read when the image file is opened using ordinary means. As a result, law enforcement personnel may have to search all the stored data to determine which particular files contain items that may be seized pursuant to the warrant. This sorting process can take a substantial amount of time, depending on the volume of data stored and other factors.

(d) <u>Deleted or Downloaded Files</u>. Computers and other electronic storage media allow suspects to delete files to attempt to evade detection or to take other steps designed to frustrate law enforcement searches for information. However, searching authorities can recover computer files or remnants of such files months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. When a person "deletes" a file on a home computer, the data contained in the file do not actually disappear; rather, the data remain on the hard drive until they are overwritten by new data. As a result, deleted files, or remnants of deleted files, may reside in free or "slack" space (i.e., in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space) for long periods of time before they are overwritten. A computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve the residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

(e) <u>Search Techniques</u>. Because of the above-described technical requirements, volume of evidence, and the ability of suspects to delete, download, hide and/or obfuscate evidence, the analysis of electronically stored data may necessitate any or all of several different computer forensics techniques. Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

As noted above, not all evidence takes the form of document and files that can be easily viewed on site. Analyzing evidence of how computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large

20000019.18
Exhibit 1

volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, as one example, and would be impractical and invasive to attempt on-site.

**TELEPHONES**

I know based on a review of the cellular phone data obtained in a prior search warrant for this case (KCSC 16-S1531) that Anthony E. Paul (253-307-1184, Verizon) and Hazen G. Shopbell (425-366-1126, Sprint) utilize cellular telephones to conduct business on behalf of Puget Sound Seafood Dist. LLC. I have seen multiple instances of both individuals calling and texting known fishermen and known agents of other wholesale fish dealing companies. Verizon Wireless can provide a small sampling of text content data when requested via search warrant. However, the extent of the content is quite limited. I received a total of 11 days of text message content, beginning January 27, 2016 and ending February 10, 2016, but excluding January 31, February 1, 2, and 3. Despite the brief snapshot of text details, I was able to see text message content specifically regarding the purchase and sale of shellfish associated with Anthony Paul's phone number. Sprint does not retain text content details, hence no messages were available associated with Shopbell's number. Despite having the call to call and text to text (number to number) details for Paul and Shopbell, additional content related to the business conduct of Puget Sound Seafood Dist. LLC is most likely stored on the phones themselves. I believe a search of the devices themselves will reveal evidence sought in this investigation.

I know from training and experience that people own cellular telephones for the purpose of being able to use them wherever they are, and as such carry them virtually constantly, or are nearly always within the near vicinity of their cell phones and/or portable devices. Criminals often use cellular phones to communicate with accomplices and will sometimes store accomplice's contact or identity information in contact lists, speed dial lists, or other areas of the phone. The communications can occur in many ways, including through typical cellular phone calls, instant messaging, text messages, SMS communications, chat sessions, email and social networking websites. I know that criminals use cellular phones to document and share information about criminal activities through phone calls, email, text messages, instant messages, SMS communications, photographs, videos, notes, and digital or voice memos that depict, discuss, or identify crime scenes, contraband, proceeds, victims, accomplices, or other evidence. Some of these communications are directed to another person or persons. Others are posted and shared more publicly, as happens with chat sessions and social networking websites. Cellular phone users can also use their phones for calendar items, web surfing, and obtaining directions to locations. A cellular telephone typically stores, without action by the user, evidence of this use and activity of the phone in its memory and other onboard or external storage such as SIM card or Micro SD card, as well as information, such as call logs, address books, messages sent and received, images, audio and video files, personal calendars, documents, as well as IP addresses (unique numeric identifiers assigned when a device assesses the internet) and profiles for wireless networks to which they have been connected using wired or Wi-Fi connectivity, which include location as well as internet activity information (files viewed via the internet are typically automatically downloaded onto a computer). These evidentiary records,

20000019.19
Exhibit 1

communications, and images can be retrieved from a cellular telephone, and will also often indicate the date, time, and physical location at which the activity occurred (cell site data and/or GPS coordinates for the phone). As such, a person's use of the phone will reveal where a person has been at particular dates and times relevant to the crimes under investigation in this case, a person's activity at relevant dates and times, and/or places where a person frequents at which that person is likely to be found for arrest or at which the suspect stored or inadvertently left evidence behind.

Based on my training and experience, I know that cellular telephones can store such information for long periods of time, and that the above-referenced information can often be retrieved by a trained forensic examiner months or even years after the data was stored on the phone, even when it has purportedly have been erased or deleted from the phone. Forensic evidence on the phone can also establish how the phone was used, by whom, and when, and the purposes for which it was used. Whether some data on the phone is evidence may depend on other information stored on the phone, and the application of an examiner's knowledge about how a cellular telephone behaves. Therefore, contextual information is necessary to understand the other evidence that falls within the scope of the warrant. Sometimes it might be possible to find data, records, or location information within a cell phone that can be used to corroborate details of an alibi. Other categories of exculpatory evidence might also be available that can help investigators to rule out an individual as a suspect.

Forensic experts with the Bureau of Alcohol, Tobacco, and Firearms in the Seattle Field Office have offered their services with analyzing the computer and cell phone evidence expected to be seized in this case. As such, those agents will be present with Department of Fish and Wildlife Officers at search locations.

## SUMMARY

**Therefore, I am requesting that this Court issue a Search Warrant** for Puget Sound Seafood Dist. LLC, owned and managed by Anthony Edwin Paul and Hazen Graham Shopbell for committing the crimes of:

**RCW 77.15.260 Unlawful Trafficking in Fish, Shellfish, and Wildlife~First Degree, a Class B Felony**
**RCW 77.15.630 Unlawful Catch Accounting, First Degree, a Class C Felony**
**RCW 69.30.110 Possession or Sale in Violation of Chapter, a Gross Misdemeanor**

**I therefore request that a search warrant be issued authorizing the search for and seizure of the following items:**

## RECORDS
  ➢ All records pertaining to the harvesting, buying and selling of all reported, under-reported, or unreported fish and shellfish, including any and all business records, state and tribal license records or sets of records, whether handwritten, printed, typed or contained and stored electronically in a computer, tablet, telephone, or

20000019.20
Exhibit 1

other electronic storage devices belonging to Puget Sound Seafood Dist. LLC, and/or its owners, managers, and employees, specifically identified as Anthony Edwin Paul and Hazen Graham Shopbell.

*The records described are expected to include: financial documents including but not limited to: cash, bank and financial accounts and records such as statements, withdrawal and deposit records, wire transfer documentation, check registers, petty cash journals and memoranda, canceled checks payable to cash, and/or cashier's checks to Puget Sound Seafood Dist. LLC, and/or its owners, managers, and employees, specifically identified as Anthony Edwin Paul and Hazen Graham Shopbell, and other checks or documentation to individuals as yet unknown related to payments for the purchase of fish and shellfish; federal tax returns, credit card account details, account reconciliation records, sales invoices, purchase orders, purchase receipts, books or files of accounts, product inventories, sales and purchase ledgers and journals, and any files relating to income and expenses; employee identification records, including addresses and phone numbers of employees, co-conspirators, harvesters, fishermen, and customers, and other related indicia or memoranda*

*Records are also expected to include fish receiving tickets issued to Puget Sound Seafood Dist. LLC that are voided, used, invalidated, or contain any other information that required them to be submitted to WDFW Headquarters, any DOH Certification tags, any shellstock shipping and receiving reports indicating commercial purchase and sale of bivalve shellstock by Puget Sound Seafood Dist. LLC. Any and all documents related to the shipping, transportation, or movement of fish or shellfish, both domestic and international.*

➢ Any and all unlawfully possessed fish or shellfish.

➢ Any and all keys, combinations, or passwords to computers, cellular phones, or other electronic storage devices, file cabinets, desks, and any locked storage areas, or furniture which is capable of holding the evidence sought by this warrant.

## COMPUTER EQUIPMENT
In order to search for data that fall within the list of items to be seized pursuant to the warrant, law enforcement personnel will seize and search the following items, subject to the procedures set forth above:

➢ Any computer equipment and storage device capable of being used to commit, further, or store evidence of the offense listed above;

➢ Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of the data, including word processing equipment, modems, docking station, monitors, printers, plotters, encryption device, and optical scanners.

➢ Any magnetic, electronic or optical storage device capable of storing data such as floppy disk, hard disks, tapes, CD-ROMS, CD-R, CD-RWs, DVDs, optical disks,

20000019.21
Exhibit 1

printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistances.
➢ Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;
➢ Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware storage devices or data to be searched.
➢ Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data and
➢ Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.
➢ Dominion and Control documents

**TELEPHONES**
Based on all the foregoing information, there is probable cause to believe that evidence of the above-listed crimes, exists in the above-described cellular telephone or digital device and its associated storage media, and that there is probable cause to search the above identified phone/device for the following items:

➢ Documents, records, communications, images, or other data in whatever form, which are or contain evidence of or pertain to the crimes above-listed crime(s), including;
  ➢ Evidence of use of the device to communicate with criminal associates or others about or pertaining to the above-listed crime(s), via incoming or outgoing calls, missed calls, chat sessions, instant messages, text messages, voice memo, voice mail, SMS communications, internet usage, and the like;
  ➢ Other evidence of or pertaining to use of the device in connection with the above-listed crime(s), which may be found in call logs, photographs, images, videos, documents, contact lists, address lists, internet searches, or other data storage within the device;
  ➢ Data, documents, records, images, videos, or other items in whatever form, tending to identify the subscriber of the device, the user of the device, and/or the possessor of the device, and/or dominion and control of the device between the above-listed dates;

Based upon the above facts and information which your Affiant believes to be true and correct to the best of your Affiant's knowledge, a Search and/or Seizure Warrant(s) should be issued for the above location(s), person(s), and/or Personal/Real Property, and that the above evidence, if found, be SEIZED.

_____

AFFIANT
Washington Department of Fish and Wildlife, Fish and Wildlife Detective, W-53

*Subscribed and sworn to before me the* 13 *day of* May , 2016

JUDGE

22

20000019.22
Exhibit 1