UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HAZEN SHOPBELL, TIA ANDERSON, ANTHONY PAUL, NICOLE PAUL,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON STATE DEPARTMENT OF FISH AND WILDLIFE; et al.,<br><br>Defendants. | NO. 2:18-cv-1758<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## I.  INTRODUCTION

Defendants are not entitled to qualified immunity because they acted in willful and reckless disregard for Washington State, Tulalip Tribal, and federal law applicable to state law enforcement officers, in their crusade to ruin the inter-tribal wholesale fish monopoly that Tulalip Tribal member Plaintiffs Hazen Shopbell and Anthony Paul established by late 2015.

## II.  BACKGROUND

**A.  DEFENDANTS REFUSED TO ACCEPT THAT THE ORIGINAL BASIS FOR PROBABLE CAUSE—"ILLEGAL CRAB"—WAS NEVER ILLEGAL.**

In May 2015, Defendant Olson began a misguided criminal investigation of another Tulalip Tribal member—"an investigation not relating to the Plaintiffs in this case." Dkt. #30 at 1.  Defendants contend this gave a reason to investigate Plaintiffs and misrepresent that Plaintiff's company Puget Sound Seafoods Distributors, LLC ("PSSD") bought 444 pounds of "illegal crab" from Joe Hatch, Sr., "one day after the season closed." *Id.*  This is not true.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    Defendants first fail to inform the Court that by November 3, 2015, Tulalip Tribes

2    Shellfish Technician Rocky Brisbois advised Defendant Natalie Hale (then Varous) that

3    "somebody from Puget Sound Seafood" called him on May 22, 2015, to determine if it was legal

4    to purchase the crab.  Declaration of Gabriel S. Galanda In Support of Plaintiffs' Opposition to

5    Defendants' Motion for Partial Summary Judgment ("Galanda Decl."), Ex. 1; Dkt. #34 ¶4.  **Mr.**

6    **Brisbois told Mr. Paul "it was okay for Puget Sound Seafoods to purchase the Dungeness**

7    **crab from Joey Hatch."**  Galanda Decl., Ex. 2 ¶4 (emphasis added).  Mr. Brisbois and Tulalip

8    Tribes Shellfish Program Manager Mike McHugh—each "in their regulatory capacity"—likewise

9    advised Defendant Hale "that it is not uncommon for businesses to call about buying crab a day or

10   two after the season closes."  *Id.*, Ex. 1; *id.*, Ex. 3 at 226.

11   Defendants also fail to inform the Court that Mr. McHugh investigated PSSD's crab

12   purchase—among all other PSSD transactions during the spring 2015 shellfish management

13   periods—and declared: "We have no record of any illegal sales between Tulalip fishers and Puget

14   Sound Seafoods."  *Id.*, Ex. 2 (Ex. 1 at 1).[1]  When asked to reconcile DFW's "illegal crab" position

15   with the Tulalip Tribes' determination "that doesn't show that 444-pound harvest as illegal,"

16   Defendants have simply chose to disagree with "the Tulalip Tribes' sovereign decision that the

17   purchase . . . of the crab involving Joey Hatch on or around May 22nd, 2015, was legal," as they

18   proceeded with their crusade against Plaintiffs.  *Id.* at 210, 223.

19   Defendants' position is that the Tulalip Tribes—despite its co-managerial role per *United*

20   *States v. Washington*, 384 F.Supp. 312 (W.D. Wash. 1974)—"doesn't have the authority to tell

21   [PSSD] it's okay, and from the State's standpoint, it's not okay."  *Id*. at 211.  It is thus immaterial

22   to Defendants that neither the Northwest Indian Fish Commission ("NIFC") nor the Tulalip

23   Tribes ever: (a) "disagree[d] with the information provided to them" by PSSD regarding the crab

---

[1] The Tulalip Tribes specifically validated the 444-pound Dungeness crab transaction, as documented by PSSD Fish Ticket No. JK94138.  Ex. 2 (Ex. 1 at 5 of appended chart "Prepared by Mike McHugh 1/31/2017").

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

purchase on May 22, 2015; (b) investigated that purchase; or (c) declared that purchase illegal. *Id*. at 224. Indeed, DFW never discussed that "discrepancy" or consulted with the NIFC or Tulalip Tribes "in a regulatory capacity to investigate that purchase." *Id*. at 226. At a minimum, the legality of PSSD's crab purchase is a material fact issue precluding summary judgment.

Defendants also fail to advise the Court that after DFW and Defendant Olson convinced the Pierce County Prosecuting Attorney to charge Mr. Paul with a state felony for unlawful fish trafficking on April 8, 2018, the County summarily dismissed the entire Information because it "learned additional information about the circumstances of the case" that Defendants never saw fit to share with the County.[2] *Id.*, Exs. 4, 5. That new information was provided by a letter from Tulalip Tribal Chairwoman Marie Zackuse to the Pierce County Prosecuting Attorney dated May 11, 2018, "express[ing] the Tulalip Tribes' strong objection to [DFW's] referral of Tulalip fisheries related charges to Pierce County for State prosecution" and demanding the County "withdraw or dismiss the charges." *Id.*, Ex. 70 at 1-2. Citing a "Memorandum of Understanding on enforcement protocols" between DFW and Tulalip ("MOU"), the Chairwoman wrote: "It is difficult to understand the motivation for the State prosecution . . . other than to undermine the Tulalip justice system and publicly demean the Tribe and its fishing community." *Id*. She declared that DFW "violate[d] both the spirit and letter of our enforcement agreement [and] orders of the federal court in *US v. Washington (Boldt decision)* regarding treaty fisheries regulation and enforcement." *Id*. at 2. As detailed in the County's "Dismissal Memo," the truth is that the County learned of three sets of "additional information that was not provided" by DFW "prior to considering this case":

> (1) **That Fish and Wildlife had signed an MOU with the Tulalip Tribe. As part of the MOU, it says that Fish and Wildlife must bring cases that involve tribal**

---

[2] Defendant Olson's marital property includes Gravelly Beach Seafoods, a non-Indian clam wholesaler that directly competes with Tribal Treaty fisherpersons and buyers. *Id.*, Ex. 60. DFW knows and has approved of Defendant Olson's outside businesses activities, despite the conflicts it raises with his law enforcement duties. *Id.*, Ex. 61.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

members to the Tribe's Prosecutor first. If that office prosecut[es], plea bargains or uses its discretion in filing or not filing charges, Fish and Wildlife is prohibited from taking the case to another prosecutor's office. Tulalip Tribal Prosecutor's office had been given all the information (including the trafficking) when they filed the case against the Hatches. The Hatches later pled as part of a plea bargain which resolved the case. The Tribal Prosecutor's Office and Tribal Counsel view Fish and Wildlife presenting the case to us as a violation of the MOU that was signed by those parties. The MOU had the parties signature and appears valid. It had the signature of the AAG that we have previously meet with [sic]. The [DFW] Tribal Liaison, who use to work in the Tulalip Tribal Prosecutor's Office, said their practice would be to review the entire case and determine everyone that should be charged and not charged and take action at that time.

(2) Defendant Manzanares is a member of the Puyallup Tribe. The action in Pierce County happened on Puyallup Tribal land and **the case should have been presented to the Puyallup Tribe.** As far as we know that was not done.

(3) **In addition, we learned all defendants have a viable defense that we were not told about.** The shellfish season was only 5/22/15. The Hatches had a boat issue on that day, which Fish and Wildlife confirms. The Hatches claim they had permission to harvest late from the Tribal Shellfish manager because of the boat issue. **Paul and Manzanares also contacted the Tribal Shellfish manager to confirm that could purchase the crab in this case and were given authorization because of the boat issue. Defense presented a letter for the Shellfish manager saying the shellfish tickets were legal in this case.** We are told the Shellfish manager does not specifically remember these conversations and the custom within the tribe is not to physically document. **However, the Shellfish manager and others would say allowing this would not be unusually [sic]. This would be a complete defense in the case.**

*Id.*, Ex. 6 at 1-2 (emphasis added). Pierce County exposed DFW's lack of ethics. *See id.*

B. **DEFENDANTS' "CONFIDENTIAL SOURCE" IS PSSD'S NON-INDIAN COMPETITOR, WHO DFW ADMITTED COULD NOT BE RELIED UPON TO ESTABLISH PROBABLE CAUSE.**

Defendants claim that based on the initial "illegal crab" investigation, "Detective Willette then began an investigation that included discrepancies between the amount of fish purchased by PSSD and the amount accounted for in its required paperwork." Dkt. #30 at 1. This, too, is a misrepresentation. The only "discrepancies" were those falsely claimed by Jonathan Richardson, a non-Indian PSSD competitor and personal friend of Defendant Rothaus—discrepancies that lacked a basis in fact and that Defendants have since recanted. Galanda Decl., Ex. 11 at 3.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

On February 29, 2016, Mr. Richardson called Defendant Rothaus, "ask[ing] him if he had heard about what happened to [PSSD]." *Id.*, Ex. 71 at 10. Defendant "Rothaus replied he had not." *Id*. Mr. Richardson "then told Rothaus that several Tulalip tribal crab fishermen had been underpaid by [PSSD] during the course of the last crab season . . . the October through December 2015 season." *Id*. He lied "that Tulalip tribal crab fishermen told him that they had been paid $0.75 to $1.00 less per pound of crab by [PSSD] than other commercial crab buyers during the same fishery." *Id*. at 10-11; *id.*, Ex. 8 ¶3. He further lied to "Rothaus that the fishers had contacted the Tribal Council to complain of the underpayments by Puget Sound Seafood Dist. LLC" and that "the tribe then demanded that [PSSD] pay back the crab fisherman they had shorted." *Id.*, Ex. 71 at 11. He "called these 'retro' payments." *Id*. There were no complaints about PSSD to or by the Tulalip Council. *Id.*, Ex. 8 ¶¶3-4. Those are "bald-faced lie[s]." *Id*.

Defendant Rothaus provided Defendant Willette with Mr. Richardson's "name and number." *Id.*, Ex. 71 at 11. Defendant Willette testifies she "received notification from a biologist that works in my office that he had heard about an anonymous individual that was reporting information relevant to the retro payments and [PSSD]." *Id.*, Ex. 3 at 112. Defendant Rothaus claim that he had "no personal participation in the facts that give rise to Plaintiffs' alleged civil rights violations," is disingenuous. Dkt. #30 at 16. In early 2016, Defendant Rothaus and Mr. Richardson started the so-called underpayment narrative that escalated into Defendants' "multi-faced operation" against PSSD and Plaintiffs. Dkt. #44 ¶6. Defendant Rothaus' text messages with Mr. Richardson suggest there is more to his role in this story.[3]

---

[3] It appears that during material times, Defendant Rothaus and Mr. Richardson regularly text messaged each other. *Id.*, Ex. 62. By March 31, 2017, Defendant Rothaus text messaged Richardson, complaining about "the situation" they both created. *Id.* By then, "the situation" had escalated into litigation by Mr. Shopbell and Mr. Paul against DFW. *Shopbell v. State of Wash. Dep't of Fish and Wildlife, et al.*, TUL-CV-GC-2016-027 (Aug. 15, 2016); *id.*, Ex. 64. Mr. Richardson, whose identity was the subject of Tribal Court motion practice, felt things "should have never got to this." *Id.*, Ex. 62. Defendant Rothaus sympathized with him: "I understand." *Id.* Things further escalated in 2016 when Plaintiffs sued Mr. Richardson in Tulalip Tribal Court for business interference, trade libel, slander, and defamation. *Shopbell, et al. v. Richardson, et al.*, TUL-CV-9C-2017-0130 (Aug. 15, 2016); *id.*, Ex. 65. DFW

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

On March 1, 2016, Defendant Willette called and spoke with Mr. Richardson, inquiring about "another seafood company he may have some information about." *Id.*, Ex. 71 at 11. He "volunteered [PSSD] without [her] prompting [him]." *Id.* He "expressed his desire to remain anonymous since he stills buys crab from tribal members and did not want to jeopardize his position." *Id.* Having locked arms against Plaintiffs, Defendants maintain Mr. Richardson's anonymity to this day, even under false pretense. *Id.*, Ex. 9.

Mr. Richardson falsely told Defendant Willette "that several Tribal crab fishermen, six to eight, had called him in December and told him that [PSSD] had been underpaying them as much as $.075 to $1.00 a pound for crab." *Id.*, Ex. 71 at 11. He intentionally misrepresented PSSD's business practices to Detective Willette by telling her "the fisherman told him that they had contacted the tribe and that [PSSD] was told to pay back the fisherman they had shorted . . . as 'retro' payments." *Id.* According to Defendant Willette, Mr. Richardson "would not name the fisherman that had told him of the retro payments"—because no PSSD underpayments, or calls to Mr. Richardson, even existed. *Id.*

Mr. Richardson then revealed his true concern, telling Defendant Willette "that because of the initial desire to 'sell to their own'"—*i.e.*, Tulalip fisherman selling crab to PSSD—"a lot of other [non-Indian] buyers had opted out of purchasing any crab at all, since no one would sell to them at the offloads." *Id.* He "stated that his company was one of only a few left that had not succumbed to the apparent monopoly that [PSSD] was attempting to create." *Id.*, Ex. 1 at 11. Mr. Richardson's core concern was that "Tulalip and other tribal fishers account for approximately 60% of his income." *Id.*, Ex. 10 ¶3. Defendant Willette accepted his lies, concluding: "[PSSD] repeatedly **underpaid** the fishermen they purchased shellfish and fish" in

---

eventually paid Plaintiff Shopbell, and Mr. Richardson paid Plaintiffs Paul and Shopbell $15,000, in settlement of their respective cases. *Id.*, Exs. 66, 67. Deflecting any responsibility for having helped start this saga with his friend, Defendant Rothaus calls Plaintiffs' allegations regarding his "conduct in this matter . . . conspiracy theory fabrications." *Id.*, Ex. 63.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

late 2015.  *Id.*, Ex. 1 at 7 (emphasis in original).  Mr. Richardson's narrative fed into how Defendant Willette had already framed her entire investigation of PSSD: "Why is PSSD selling crab to other wholesalers while monopolizing the Tulalip crab fishery? Why has PSSD taken all business from other established buyers?" *Id.*, Ex. 15.

Defendant Willette later admitted under oath to lacking "names of the fisherman the source spoke to, dates when those conversations occurred, or any direct evidence to support his claims." *Id.*, Ex. 10 ¶5.  She further admitted to relying on "purely anecdotal" hearsay for "a potential explanation for the discrepancies in payments" PSSD made to Tulalip fisherman.  *Id*. **DFW eventually recanted the entire "discussion of the apparent underpayments," upon which Defendant Willette relied to "support probable cause" when she "requested warrants relating to Plaintiffs and PSSD in the relevant jurisdictions over the course of the next several months" in 2016.** *Id.*, Ex. 11 at 3; Dkt. #44 ¶4 (emphasis added).  More specifically: "most of the underpayments seen in the financial    records for PSSD can be accounted for as bait sales." Ex. 12 ¶7.  As Defendant Willette now admits, there were no illegal underpayments:

> Q. Other than bait as a commodity being given to fishermen to offset what you believe to be underpayments, were there -- was cash offered to offset those alleged underpayments?
>
> A. I think in some instances, there was cash paid.   There was, I think, gas on a few notes, and maybe some boat work, like mechanic work done in lieu of payment.
>
> **Q. Is there anything illegal about paying somebody in gas, or bait, or mechanical work?**
>
> **A. No.**

*Id.*, Ex. 3 at 108 (emphasis added); *see also id.*, at 114-115 ("Q. So a retro payment is not taking advantage of a tribal fisherman; correct?  A. Not – no, I don't think so.").  DFW otherwise admits that Mr. Richardson's story about "underpayments **is not sufficient to allow any conclusion that these underpayments represent criminal violations**." *Id.*, Ex. 11 at 3 (emphasis added).  Yet Defendant Willette never returned to either the Superior Court or Tribal

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Court "for reevaluation of probable cause." *State v. Maddox*, 152 Wn.2d 499, 508, 98 P.3d 1199 (2004); *see also Lison v. City of Riverside*, 120 F.3d 965, 973-74 (9th Cir. 1996).

In all, Defendants lacked probable cause by way of either the "illegal crab" or so-called underpayments to obtain or "execute the search warrants on three separate locations on June 13, 2016" or the subsequent thirty or more warrants Defendant Willette caused multiple local courts to issue against Plaintiffs by 2017. Dkt. #30 at 3. Taking full advantage of a leadership vacuum in DFW, Defendant Willette sought and obtained those warrants *ex parte* and without seeking advice from any DFW Assistant Attorney General ("AAG"). *See* Dkt. #44.

## C. DEFENDANTS' ARREST, SEARCH, AND SEIZURE AGAINST PLAINTIFFS' PERSONS AND HOMES WAS UNLAWFUL AND INCOMPETENT.

Defendant Willette had obtained search warrants from both the King County Superior Court ("Superior Court Warrant") and Tulalip Tribal Court ("Tribal Court Warrant") by June 9, 2016, for three premises: (1) an industrial building at 2615 East N Street, Tacoma, WA, which PSSD had long since abandoned ("Tacoma Building"); (2) Mr. and Mrs. Paul's home in a gated Lake Tapps bedroom community ("Paul Home"); and (3) Mr. Shopbell and Ms. Anderson's duplex in public housing on Tulalip Indian Reservation trust lands ("Shopbell Home"). Ex. 7 at 1-2; *id.*, Ex. 71 at 1-2; *id.*, Ex. 13 at 1-2. These two warrants gave rise to the "multi-faceted operation" that commenced at 8:00 AM on June 13, 2016, with a briefing that Defendant Willette delivered to 30 DFW and other officers. Dkt. #44 ¶4; Ex. 3 at 178-81, 190. Defendant Willette testifies that both "warrants issued by the King County Superior Court and Tulalip Tribal Court," were executed that day against all three premises. Dkt. #44 ¶8. The operation was incompetent from its very beginning.

### 1. Defendant Willette Abused And Disregarded Tribal Court Warrant Process.

On June 9, 2016, Defendant Willette obtained the Tribal Court Warrant for the search of the Shopbell Home. Galanda Decl., Ex. 13. Failing to cite any provision of Tulalip law for

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Defendants' alleged "illegal crab" and underpayments in her original warrant papers—because there was no Tulalip illegality—and citing instead provisions of state statutes inapplicable at Tulalip, the Tulalip Tribal Court *Pro Tem* Judge forced Defendant Willette to redraft her warrant papers. *Id.*, Ex. 14 at 11. Defendant Willette interlineated a citation to an inapposite Tulalip statute regarding petty theft, in her papers. *See id.*, Ex. 13 at 1. She also misstated dollar amounts and transaction totals for the since-recanted underpayments. *Id.*, Ex. 14 at 14. Defendants later admitted to a "different total underpayment amount" and "an updated number of transactions" than what Defendant Willette first misrepresented to the courts. *Id.*

Further, although Defendant Willette's companion, June 7, 2016, Superior Court Warrant affidavit provided: "*Due to concerns regarding confidentiality, the Tulalip Tribal Council will not be contacted regarding this matter until after service of the search warrant,*" she omitted that Tribal sovereignty affronting language from her affidavit to the Tulalip *Pro Tem* Judge. Dkt. #44-1 at 14 (emphasis in original). Defendant Willette feigns that her confidentiality concerns existed "because there were Tribal Council elections going on." Galanda Decl., Ex. 3 at 155-56. Because, however, elections are held every March—not in June—her excuse rings untrue. *Id.* at 156.[4] Defendant Willette did not trust Tulalip officials with "the information," admitting that "the more people that know about it, the worse when it comes to an investigation." *Id.*

Defendant Willette obtained the Tribal Court Warrant *ex parte*, but failed to cause it to be dated. *Id.*, Ex. 13 at 4. Worse, she failed to leave *anything* on file with either the Tribal Court or Judge *Pro Tem*—not her original set of warrant papers; not her corrected, second set of warrant papers; not even a copy of the signed Tribal Court Warrant. *Id.*, Exs. 16, 17. That left the Tribal Court unable to even ascertain the date of issuance. *Id.*, Ex. 16. Despite clear instruction from Tulalip to file the "original" and "duplicate original warrant," as well affidavit "testimony or

---

[4] *See* CONST. AND BYLAWS OF THE TULALIP TRIBES OF WASH., art. III, § 4, *available at*, https://www.codepublishing.com/WA/Tulalip/?Tulalip02/Tulalip0205.html.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

documentary evidence,"[5] Defendant Willette refused to file *any* warrant papers because if she did, "the entire reservation would know about it by 5 o'clock." *Id.*, Ex. 3 at 176.

On June 13, 2016, Defendants executed the Tribal Court Warrant upon the Shopbell Home, as detailed below. *See* Dkt. #44. That Tribal Court Warrant instructed DFW: "**Promptly return this warrant to [the Judge] or clerk of this court; the return must include an inventory of all property seized.**" *Id.*, Ex. 13 at 3 ¶3. Defendant Willette admits her understanding that the word "promptly" in the search warrant context, means "something like" three days:

> A. "Promptly return this warrant to me or the clerk of this court; the return must include an inventory of all property seized."
>
> Q. And do you have an understanding of what the word "promptly" means? Meaning how quickly you believed you were instructed to return the warrant to the court?
>
> A. I don't know if there's a specific time frame. As quickly as possible is ideal.
>
> Q. Is there a best practice in local law enforcement or of DFW?
>
> A. Is it like three days, something like that maybe.

*Id.*, Ex. 3 at 163. It is in fact three days. *State v. Wallway*, 72 Wn.App. 407, 415, 865 P.2d 531 (1994). Defendant Willette, however, failed to file Tribal Court Warrant return or seized property inventory until July 20, 2016—instead choosing to wait five weeks. *Id.*, Ex. 17.[6]

### 2. Defendant Willette's Superior Court Warrant Lacked Jurisdiction.

On June 7, 2016, Defendant Willette obtained the Superior Court Warrant, also *ex parte*. *Id.*, Ex. 7. The Superior Court Warrant authorized a search of the Shopbell Home on Tulalip Reservation trust lands. *Id.* at 1-2. But Washington State generally lacks jurisdiction to impose its criminal process within Tulalip Indian Country. *State v. Boyd*, 109 Wn.App. 244, 247 n. 2, 34 P.3d 912 (2001). Likewise, having not consulted with any DFW AAG about her warrant papers, Defendant Willette did not comprehend that the only way the Superior Court could *arguably*

---

[5] TTC § 2.25.030(3), *available at*, https://www.codepublishing.com/WA/Tulalip/?Tulalip02/Tulalip0205.html.
[6] Defendant Willette's dereliction as to the Tribal warrant and in its return caused the Tulalip Tribal Council to amend the Tribes' search warrant law in late 2016, to impose specific warrant protocols upon state law enforcement. TTC § 2.25.030(7), *available at*, https://www.codepublishing.com/WA/Tulalip/?Tulalip02/Tulalip0205.html.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

authorize a search of the Shopbell Home was if DFW followed codified Tulalip search warrant process—which, as discussed above, did not at all happen. *State v. Clark*, 178 Wn.2d 19, 308 P.3d 590 (2013). The Superior Court Warrant was and remains "facially overbroad," and currently the subject of the Pierce County Superior Court motion to suppress discussed below. Dkt. #44; *United States v. Michaelian*, 803 F.2d 1042, 1046 (9th Cir. 1986); *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

What is more, each of the eleven Defendants who signed prepared declarations in support of Defendants' Motion—all of which uniformly provide, "I examined the warrants relevant to the investigation of the Plaintiffs here and saw nothing that lead [sic] me to believe the warrants were either properly issued or lacked probable cause in any manner"—failed to acknowledge the jurisdictional defect in Superior Court Warrant, which any officer exercising his or her professional judgment would have appreciated, had they been adequately trained. Dkt. ##31 ¶2; 32 ¶3; 33 ¶3; 34 ¶3; 35 ¶4; 36 ¶3; 37 ¶2; 38 ¶3; 39 ¶3; 43 ¶4; 44 ¶4.

By 2017, under guise of alleged money laundering emanating from the "illegal crab" and so-called underpayments, Defendant Willette obtained dozens of other search warrants for the Pauls' banking, credit card, and other financial records—each that contained a "gag order" which violated the First Amendment Rights of the recipients. Galanda Decl., Ex. 53 at 47-68; *id.*, Ex. 56. DFW vigorously shopped its purported money laundering case to prosecutors in King, Pierce, Snohomish, Kitsap and Skagit Counties, all of whom declined to file any charges. *Id.*, Ex. 3 at 65. It was all a fishing expedition.

### 3. Defendants Searched An Industrial Building On The Puyallup Reservation, Knowing PSSD Had Vacated The Property Months Earlier.

In support of the both the Superior Court and Tribal Court Warrants, Defendant Willette lied under oath by testifying that the Tacoma Building was PSSD's "primary business location." Dkt. ##44-3 at 2, 44-2 at 1. On the morning of June 13, 2016, Defendant Willette also "briefed"

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

her colleagues that at the Tacoma Building, PSSD "[v]ehicles will be parked" and "[b]ait owned by PSSD stored." Dkt. #38 ¶7; Galanda Decl., Ex. 18 at 8. Although PSSD once leased the Tacoma Building, it vacated six months to one year before the operation. *See* Dkt. #44 at 5. While in their Motion Defendants mischaracterize the Tacoma Building as the "PSSD office," Dkt. #30 at 2, and say nothing of the building's location on the Puyallup Indian Reservation, Defendant Willette admits that the search was carried out after DFW knew PSSD had vacated the property months earlier:

> WDFW Sergeant Brian Fairbanks and his team (which consisted of Detective Julie Cook, Officer Justin Maschhoff, Officer Greg Haw, Officer Jake Greshock, Officer Tyler Stevenson, Officer Cory Branscomb, and Evidence Technician Terry Ray-Smith, none of whom are defendants in this case) served a search warrant **at the building that was thought to be PSSD's office**. WDFW officers cut the lock on the gate of the property in order to gain access. At the building, two women (neither of whom is a party in this case) were initially detained, but were later released. Pursuant to the warrant I obtained based on the probable cause developed through my investigation, WDFW Officers searched vehicles that were located on site. **Hae Park, owner of "Be Happy Seafoods," not a party hereto, was interviewed as his business currently occupied the location (as opposed to PSSD)**. . . .

*Id*. After cutting Mr. Park's lock and raiding his business without lawful authority, those eight DFW agents found neither PSSD vehicles nor PSSD bait, and yet they still refused to believe that the Tacoma Building was not occupied by PSSD. Galanda Decl., Ex. 24. Mr. Park explained to Detective Cook: "Mr. Paul was a previous tenant but there had been another tenant here before I got here in January . . . I told them Puget Sound Seafood and Mr. Paul had not been here for several months." *Id*. Nonetheless, DFW took Mr. Park's "business records and searched [his] office and the entire buildings" anyway. *Id*.

### 4. Defendants Falsely Arrested And Unlawfully Detained Plaintiffs During A "Lucrative" Crab Opener.

June 13, 2016 was the day of the Tulalip crab fishery "opener"—a day Defendants knew was a very "lucrative day" for Tulalip crab fisherman and PSSD. *Id.*, Ex. 3 at 190; *id.*, Ex. 18 at

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

12. That was not coincidental.[7] *See id.*, Ex. 3 at 190. By mid-morning and at the direction of either Defendant Willette or Maurstad,[8] Defendants arrested Mr. Paul and Mr. Shopbell at the Port of Everett Marina. Dkt. ##32 ¶5; 35 ¶5; 36 ¶5; 37 ¶¶4-6. Defendants Myers, Jaros, Vincent, and Clementson jointly "detained [them] for questioning," by handcuffing them and placing them into marked DFW patrol cars for transport to the Marysville Jail. *Id*. Those Defendants were previously instructed to read Mr. Paul and Mr. Shopbell their *Miranda* rights, but they did not do so. *See id.*; Galanda Decl., Ex. 18 at 9; *id.*, Ex. 26 ¶2.

Defendants Golden and Cenci soon realized that Mr. Paul and Mr. Shopbell had been falsely arrested; they called Defendant Myers, who in turn advised Defendants Vincent and Jaros, of "a change in plans." *Id.*, Ex. 19 at 1; *see also* Dkt. #36 ¶5. **Admitting to Mr. Paul and Mr. Shopbell's false arrests, Defendants acknowledge "there was a miscommunication with officers about what they were supposed to do."** Galanda Decl., Ex. 3 at 191. Defendants returned Messrs. Paul and Shopbell to the Everett marina, and released them from custody. Dkt. ##32 ¶5; 35 ¶5; 37 ¶¶5-6; Galanda Decl., Ex. 20 ¶8. But they seized both Mr. Paul and Mr. Shopbell's cell phones without serving them with any warrant papers. Dkt. #44 ¶12; Ex. 20 ¶3.

Critically for summary judgment purposes, Defendants Myers, Jaros, Vincent, Clementson, Golden, and Cenci all provide conflicting stories of what happened when they unlawfully detained and questioned Plaintiffs. For example, some of the Defendants thought they had probable cause to arrest, while others did not. Dkt. ##31 ¶5, 35 ¶6. Defendants also give conflicting accounts of where Plaintiffs' interviews occurred. Dkt. ##35 ¶7, 2 ¶5. Some Defendants report telling Plaintiffs that they were free to leave, while others recount they told Plaintiffs they were not free to leave. Dkt. ##33 ¶5, 35 ¶5, 32 ¶4. Some Defendants say they

---

[7] Defendant Willette previously delayed the execution of the warrants over concerns (having nothing to do with Plaintiffs) about "salmon harvest," but saw no reason to wait until even the day after the lucrative, June 13, 2016, crab fishery opener to conduct her sting against Plaintiffs.. Ex. C at 57.
[8] Without further discovery, this fact remains unclear.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

handcuffed Plaintiffs while others say that they did not. Dkt. ##35 ¶6, 32 ¶5, 37 ¶5, 43 ¶5. It also remains unclear who instructed these Defendants to interview Plaintiffs, and what those instructions were. Dkt. ##31 ¶5, 32 ¶4-5, 35 ¶¶5-6, 37 ¶4.

### 5. Defendants "Rifled Through" Plaintiffs' Homes.

By late that morning, Defendants executed both the Superior Court and Tribal Court Warrants on each of the Paul and Shopbell Homes. Dkt. #44 ¶8. Defendants Cenci, Golden, Olson, Hale, and other unknown officers searched the Paul home. Dkt. ##31 ¶5, 34 ¶7. At that time, Mrs. Paul was seven months pregnant, as Defendants were briefed that morning, and was accompanied by her two year-old son and four year-old daughter, as they were also briefed. *Id.*, Ex. 23 ¶12; *id.*, Ex. 18 at 8. While driving, she received a call from an alarm company with word that her home alarm had been set off. *Id.*, Ex. 23 ¶2. She returned home to find eight DFW vans and at least 10 DFW officers "in bullet-proof vests," with some wearing "black and camouflage uniforms." *Id*. ¶¶2-12. She felt "overwhelmed by panic, nausea and dizziness," not "know[ing] why Anthony would be arrested." *Id.* ¶12. Defendants seized her cell phone and when her 65-year-old father arrived to care for her and his grandchildren, they also "searched both him and his car for weapons." *Id*. ¶16. Mrs. Paul described Defendants' entire operation as "chaotic." *Id*. ¶8.

Around the same time, Ms. Anderson received a call while driving from a neighbor who told her police officers were at the Shopbell Home. *Id.*, Ex. 21 ¶2. She was with her six month-old son, while her four other young children were at school. *Id*. She arrived home to "several tribal police, plain-clothed, drug task force members, and four WDFW officers." *Id*. ¶3. Defendants Maustrad, Peters, Vincent, Jaros, and other unknown officers searched the Shopbell home. Dkt. #35 ¶8. Ms. Anderson "observed WDFW officers riffling through everything in [the] home, including a box of family photos" and "all of our electronic devises, including [the] children's tablets." *Id*. ¶7. She left the home with her son during the search, rather than having

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"to remain in a single room under the supervision of an officer." *Id.* ¶8. When she returned to the Shopbell Home, she found their "personal and business papers intermingled and thrown on a bed in the spare room." *Id.*

In September of 2016, after Mr. Paul filed a replevin action against DFW in Thurston County and Mr. Shopbell filed a companion complaint against DFW in Tribal Court, DFW voluntarily returned some—but not all—of the property Defendants illegally seized from Plaintiffs.[9] Galanda Decl., Ex. 64; *id.*, Ex. 28. But, in keeping with the incompetent and reckless searches, Defendants misplaced and destroyed several items of Plaintiffs' property.

**6. Defendants Lost And Destroyed Plaintiffs And PSSD's Properties.**

Defendants seized a personal safe from the Paul Home that was not authorized by either the Superior Court or Tribal Court Warrants. *See id.*, Exs. 7, Ex. 13, Ex. 25 ¶3. Mr. Paul's lawyer immediately advised Defendant Olson that no warrant existed for the safe; Defendants seized it anyway. Dkt. #38 ¶19. Then, again without seeking advice from any DFW AAG, Defendant Willette and Property Evidence Custodian Greg Dutton sawed open the $700 safe, destroying it. Galanda Decl., Ex. 3 at 259; Dkt. #44 ¶11; *id.*, Ex. 25 ¶3. DFW later returned the illegally seized safe's contents. *State v. VanNess*, 186 Wn. App. 148, 154, 344 P.2d 713 (2015).

Defendants also seized from the Paul Home—and destroyed—two Apple Macbook Pro laptops, valued together at $3,000 together. Galanda Decl., Exs. 21, 22. Defendants copied the hard-drives to those two laptops before returning them to Plaintiffs. *See id.* "Each of the screens are damaged" now and "it appears the operating system has been entirely removed" from one of those laptops. *Id.* Defendants Cenci, Hale, Olson, and other unidentified officers executed the search warrant on the Paul home, but without further discovery it remains unclear who handled the destroyed property. *See* Dkt. ##31 ¶4, 34 ¶7, 38 ¶9-18.

---

[9] Not long after Mr. Paul and Mr. Shopbell filed their respective replevin cases against DFW, the agency began shopping their various criminal theories against Plaintiffs to prosecuting attorney offices. *See* Galanda Decl., Ex. 49.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

From the Shopbell Home, Defendants seized but never returned their children's $300 black Galaxy Samsung tablet. Galanda Decl., Ex. 22 ¶¶4-5; Ex. 26 ¶5; Ex. 27 ¶2. Defendants also seized—and destroyed—a $1,200 Dell laptop. *Id.*, Ex. 26 ¶5. After Defendants copied that laptop's hard-drive, it too is "no longer in working condition. It appears to be stuck in re-boot mode and displays only a black screen." *Id.* Defendants Clementson, Jaros, Maurstad, Peters, Vincent, and other unidentified officers executed the search warrant on the Shopbell home, but without further discovery it remains unclear who handled the destroyed property. *See* Dkt. ##32 ¶6, 35 ¶8, 36 ¶4, 39 ¶4, 43 ¶8.

Exclaiming Defendants' mishandling of Plaintiffs' belongings, on September 23, 2016, Defendant Willette stored Plaintiffs' computer evidence **in a previously used evidence bag— which contained methamphetamine "crystals" and "powder" from a completely unrelated DFW case**. *Id.*, Ex. 55. According to Defendant Golden: "Wendy called me and said we had a 'big big problem' and then told me she was packaging up a PSSD hardrive copies and heard a grinding noise in the evidence bag. She opened the bag and found what appeared to be meth loose in the bottom of the bag. She tested with a NIK kit and showed positive." *Id.* Defendant Myers "admonished Wendy for testing the drugs at the customer service area. He had tried to get her to move to the back but she was not listening." *Id.* It appears "Wendy was exposed to the drug due to the language she used." *Id.* Defendants' incompetence continues.

**D. DEFENDANT WILLETTE REFERRED PLAINTIFFS ANTHONY AND NICOLE PAUL TO CPS; THREATENED THEIR TAX PREPARER WITH DEPORTATION.**

On August 19, 2016, Mr. and Mrs. Paul received an unannounced visit at the Paul Home from a Washington State Department of Social and Health Services Child Protective Services ("CPS") Social Service Specialist. *Id.*, Ex. 32 ¶¶3-4. Defendant Willette had falsely informed CPS that the Pauls' two children were in danger, causing CPS to perform the welfare check and interview both children. Dkt. #44 ¶13. The Paul and their children were forced to meet with CPS

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

twice, subjecting them to numerous "demeaning, insulting, and culturally insensitive" comments. Galanda Decl., Ex. 32 ¶¶3-7. CPS never took any action against the Pauls.

On November 22, 2016, Defendant Willette executed a search warrant on Rushmore Tax Services, Inc. *Id.*, Ex. 57 at 1. After she "rapped" her badge on front office window, Defendant Willette entered the premises, introduced herself, and served a search warrant on Anthony P. McAleer, Rushmore's CEO and Anthony and Nicole Paul's personal tax preparer. *Id.* While interrogating Mr. McAleer and, as with Mr. Park, refusing to believe his explanation that he "knew nothing about Puget Sound Seafood" and that he only "handle[s] his personal taxes," Defendant Willette confiscated the Pauls' 2014 and 2015 tax files. *Id.* at 1-2.

After Mr. Paul called him for tax purposes days later, Mr. McAleer could not avoid mentioning that he "no longer had a copy of his taxes in [his] office anymore." *Id.* at 4. Explaining he "could not answer" why, Mr. McAleer said he "was issued some paperwork that demanded it." *Id.* Not knowing what to do, Mr. McAleer faxed the warrant to Mr. Paul's lawyer, which caused Defendant Willette to return, along with "several officers in uniform," and serve a second search warrant on April 28, 2017. *Id.* Defendant Willette threatened him with obstruction of justice charges for faxing the warrant to Mr. Paul's lawyer, which Mr. McAleer interpreted as meaning he and his family could be deported to Australia because he violated the unconstitutional "gag order" in the search warrant. *See id.* at 1, 5.

E. **DEFENDANT WILLETTE INITIATED SECOND SET OF RELATED CRIMINAL CHARGES AGAINST PLAINTIFFS.**

On August 15, 2016, Defendant Willette placed a "hold" on 3,340 pounds of PSSD's fishing bait—clams, squid, and mackerel—which was stored at the Marine View Cold Storage facility in Burlington, Washington. *Id.*, Exs. 29, 30, 32 ¶15, 33. PSSD purchased the clam bait from Tulalip and Swinomish Tribal members who had harvested the clams within usual and accustomed fishing areas according to the Point Elliott Treaty. 12 Stat. 927 (Jan. 22, 1855); Ex. 3

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  at 122-125.  PSSD purchased the bait for resale to Tulalip Tribal members for fishing use within

2  Treaty-reserved usual and accustomed areas ("U&A.").  *Id.*

3      On August 23, 2016, Defendant Willette went to Marine View Cold Storage and

4  conducted another warrantless seizure, this time of PSSD's stored bait.  *Id.*, Exs. 29, 30, 33.  She

5  understood that the bait was harvested, bought and sold, and intended for resale, by and between

6  Tribal members engaged in Treaty-protected commercial fishing activities within the U&A; and

7  as such, is not subject to Washington State fishing regulation.  *Id.*, Ex 3 at 122-125; *see also id.*, at

8  125 ("Q. Do you have a belief that Washington State Fishing Law applies to those transactions

9  between, for example, Swinomish, Tulalip, and then other Tulalip tribal members? A. From treaty

10  Indian to treaty Indian? Q. Correct.  A. Within U&A?  Q. Correct. A. I don't think so.").  Also

11  without seeking advice from any DFW AAG, she seized 1,180 pounds of clam bait without

12  PSSD's consent, any court order, or exigent circumstances, and disposed of that $2,665 in bait at

13  the Skagit County dump.  *Id.*, Ex. 3 at 135-136; *id.*, Exs. 29, 30, 32 ¶15, 33.

14      Nearly two years later, on June 15, 2018, the Skagit County Prosecutor—at Defendant

15  Willette's referral and urging—filed a second Information against Mr. Paul, and also named Mr.

16  Shopbell, alleging five felony counts of shellfish buying and trafficking in relation to the 1,180

17  pounds of destroyed clam bait.[10]  *Id.*, Ex. 3 at 250; *id.*, Exs. 34, 35, 36.  Underscoring the

18  retaliatory nature of the Skagit County charges after Pierce County had dismissed the first

19  Information against Mr. Paul, Defendant Willette elicited a "commitment to enforcing WDFW

20  laws" from the Skagit County Prosecutor, which she felt was "quite heartening to hear . . . after

21

22  [10] Since 2017, DFW, including Defendants Willette and Olson, has "shopped" various manufactured criminal charges
    against Mr. Paul and Mr. Shopbell to at least five state prosecuting attorney's offices: King, Snohomish, Pierce, and

23  Skagit Counties, and the Washington State Attorney General ("AG").  *See id.*, Ex. 3 at 46-49, 250-251; *id.*, Ex. 6 at 1;
    *id.*, Ex. 70 at 1; *id.*, Ex. 35; *id.*, Ex. 48; *id.*, Ex. 49; *id.*, Ex. 57; *id.*, Ex. 58.  Pierce County presented a
    DFW lawyer with "the option of being designated a special deputy prosecutor on the case since they claimed it was

24  important," but DFW "declined that option first saying he would have to check with the elected AG [and] then
    sa[ying] that he did not think his unit had time to do it." *Id.*, Ex. 6 at 1.  Snohomish County also "believe[d] the case
    is best-serve at the AG's office." *Id.*, Ex. 57.  It is telling that the AG will not bring charges for DFW.

25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

the disappointing outcome in Pierce County." *Id.*, Ex. 37. Similarly, given Plaintiffs' malicious prosecution allegations in this action, the AG's Office—including defense counsel of record here—has taken an "earnest" role in sustaining the retaliatory criminal charges filed against Mr. Paul and Mr. Shopbell in Skagit County. *Id.*, Exs. 38, 39. Still today, Defendants Golden and Willette are also working directly with Skagit County to sustain those charges, in *de facto* defense of this lawsuit. *Id.*, Exs. 40, 41, 42.

On August 8, 2018, Tulalip Chairwoman Zackuse wrote Skagit County, also objecting to the latest Tulalip fisheries related charges against Mr. Shopbell and Mr. Paul. *Id.*, Ex. 41 at 1. Again citing DFW's violation of the MOU and *United States v. Washington*, 384 F.Supp. 312, Chairwoman Zackuse explained:

> These cases involve shellfish harvested from Tulalip treaty usual and accustomed places and sold to Tulalip buyers for bait. Given that the facts of these cases revolve around tribal fisherman and treaty fishing activity, we believe these matters are within the purview of the Tulalip justice system . . . . [W]e also don't believe a bait clam violation rises to the level of a felony or that WDFW should be attempting to exercise State jurisdiction in this matter.

*Id.* She concluded: "These cases are just the latest in a string of WDFW-referred criminal cases filed in State court against Tulalip fishers. These continued actions against Tulalip fishers and fish buyers have increased our community's perception that WDFW is disproportionately targeting tribal members for enforcement action." *Id.*[11]

Defendants Golden and Willette handled DFW's "response" to Tulalip's objection, which was to ignore it as political "tactic," and successfully cause Skagit County to do the same. *Id.*, Exs. 40, 68. Motions to suppress and dismiss are pending in the Skagit County Superior Court, with trial set for August 5, 2019. *Id.*, Exs. 43, 44, 45, 46.

---

[11] The Tribes' perception is consistent with a letter written to DFW that former DFW agent Todd Vandivert has published online, alleging that Defendant Mike Cenci has directed DFW "investigators to find crimes committed by tribal members to embarrass the tribes publicly." *Id.*, Ex. 57 at 7.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**F.   DEFENDANT WILLETTE INITIATED THIRD SET OF CRIMINAL CHARGES.**

On December 31, 2018, the Pierce County Prosecutor—also at Defendant Willette's referral and urging—filed a third Information against Mr. Paul, arising from the warrantless seizure of the Pauls' safe on June 13, 2016. *Id.*, Ex. 3 at 47-48, *id.*, Ex. 50; *id.*, Ex. 51. A motion to suppress and dismiss is pending before the Pierce County Superior Court. *Id.*, Exs. 73, 74. Trial is scheduled or April 15, 2019. *Id.*, Ex. 52.

**E.   DEFENDANTS DISPLAYED ANIMUS TOWARDS PLAINTIFFS.**

Defendants are focused on slandering Mr. Paul and Mr. Shopbell and their wives as "dirty" criminals engaged in "drug trafficking," "money laundering," and "counterfeit[ing] bills" and otherwise breaking the rules—like "fail[ing]to use seat belts." *See* Dkt. #44 ¶¶9(a), 15; Galanda Decl., Ex. 53; *id.*, Ex. 54. Defendants are blind to the reality of Native American and Indian Reservation life, in which hunting "firearms and fireworks" are part of tribal culture and commerce, and nice things like "high-end furniture and décor" are few and far between. Dkt. #44 ¶15; Galanda Decl., Ex. 53 at 16. Defendants behave as if it is peculiar for a Native American man to have a "vast collection of Nike Air Jordan shoes for both himself and his son" or "a large collection of sports team ball caps," or a Native woman to have "several designer hand bags in her closet, as well as numerous pairs of designer shoes." *Id.* Defendants otherwise refer Mr. Paul and Mr. Shopbell as greedy ("[l]ikes money") and dumb ("[n]ot so smart"), respectively—although "greedy" Indians do not shared the proceeds of higher salmon and crab prices with other Tulalip fisherpersons and "dumb" Indians do not monopolize any market. *Id.*, Ex. 54; *id.*, Ex. 15; *id.*, Ex. 8 ¶5. At least one former DFW agent has confessed that Defendants profiled Native Americans for enforcement action. *Id.*, Ex. 57 at 7. As a result, PSSD has been out of business since soon after Defendants' June 13, 2016, "multi-faceted operation." *Id.*, Ex. 8 ¶6.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

# III. LAW AND ARGUMENT

## A. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "[W]hen properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

"[S]ummary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits." *Liston v. Cty. of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997). On summary judgment, courts "must assume the nonmoving party's version of the facts to be correct." *Id.* at 977. A defendant is not entitled to qualified immunity if "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and that right was "clearly established at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232.

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. "[I]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law." *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002). Plaintiffs' right to be free from the unreasonable searches and seizures perpetrated by Defendants is clearly established, as set forth below.

### 1. Defendants Willette And Hale Are Not Entitled To Immunity Based On Their Conduct In Obtaining The Warrants.

"[I]t is clearly established that the Fourth Amendment requires a warrant application to contain a truthful factual showing of probable cause . . . ." *Hunter v. Namanny*, 219 F.3d 825, 381 (8th Cir. 2000). "A warrant based upon an affidavit containing 'deliberate falsehood' or 'reckless disregard for the truth' violates the Fourth Amendment." *Bagby v. Brondhaver*, 98 F.3d

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1096, 1098 (8th Cir. 1996) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

The standard for qualified immunity in a civil rights action of this type is governed by *Franks*, 438 U.S. 154. *Branch v. Tunnell*, 937 F.2d 1382, 1387 (citing *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991)). Accordingly, where a claim of judicial deception is made,

> if an officer 'submitted an affidavit that contained statements he knew to be false or would have known to be false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, . . . he cannot be said to have acted in a reasonable manner,' and the shield of qualified is lost.

*Branch*, 937 F.2d at 1387 (quoting *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985)).

By "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw," which is exactly what occurred in this case. *United States v. Stanert*, 762 F.2d 775, 781, *as amended*, 769 F.2d 1410 (1985). To allow a magistrate "to be mislead in such a manner could denude the probable cause requirement of all real meaning." *Id.* "Accordingly, a Fourth Amendment violation occurs where 'the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading.'" *Liston*, 120 F.3d at 973 (quoting *Stanert*, 762 F.2d at 781). In order for a plaintiff to survive a summary judgment motion on the qualified immunity grounds for the purposes of a § 1983 action, a plaintiff must (1) make a "substantial showing" of deliberate falsehood or reckless disregard for the truth; and (2) establish that, but for the dishonesty, the challenged action would not have occurred. *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995) (citing *Branch*, 937 F.2d at 1388). If a plaintiff satisfies these requirements, "the matter should go to trial." *Id.* at 789.

As a threshold issue, a Court must determine whether the alleged omissions in the affidavit were material to a finding of probable cause. *Liston*, 120 F.3d at 973. In reviewing the materiality of challenged omissions, a court must accept the facts alleged by plaintiffs as true. *Id.* Here, Defendant Willette falsely claimed that DFW possessed jurisdiction to enforce Washington

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

statutes and conduct searches on Tulalip reservation trust land. Galanda Decl., Ex. 7 at 1-2; *id.*, Ex. 71 at 1; *Boyd*, 109 Wn.App. at 247 n. 2. Without jurisdiction, there can be no determination of probable cause. Next, probable cause to issue the Superior Court and Tribal Court Warrants depended on the illegality of the 444-pound sale of Dungeness crab, which the Tulalip Tribes deemed entirely lawful—information that Defendant Willette and Hale knew before obtaining the warrants. Galanda Decl., Ex. 1; Dkt. #34 ¶¶4-6. Defendant Willette's affidavits also contained false information from Mr. Richardson; she failed to disclose that he was a PSSD competitor, his information was uncorroborated, and that he was a first time confidential informant. Galanda Decl., Ex. 7 at 10-11; *id.*, Ex. 71 at 10-11; *United States v. Wall*, 277 Fed.Appx. 704, 706 (9th Cir. 2008). A reasonable magistrate presented with this information would simply not have issued a warrant based on the lack of jurisdiction, facts regarding the *legality* of the crab sale, and circumstances surrounding Mr. Richardson's misinformation. *Liston*, 120 F.3d at 974.

The Court also must determine whether Plaintiffs have made a "substantial showing" that Defendant Willette intentionally or recklessly omitted the information. *Id.* "[O]missions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known … was the kind of thing the judge would wish to know" and that assertions are in reckless disregard of the truth if they are made "with a high degree of awareness of the statements' probable falsity." *Wilson v. Russo*, 212 F.3d 781, 787-88 (3d Cir. 2000). The question of intent or recklessness is "for the trier of fact." *Hervey*, 65 F.3d at 791. "[C]lear proof of deliberate or reckless omission is not required." *Stanert*, 762 F.2d at 781.

Again, Defendants Willette and Hale both had information that the crab sale was legal, and Willette was aware of the unethical circumstances surrounding Mr. Richardson's testimony. Galanda Decl., Exs. 1 at 1, 2 ¶4; Dkt. #34 ¶¶4-6. A reasonably well-trained officer in Defendant Willette and Hale's position would have known that her affidavit failed to establish probable

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

cause and that she should not have applied for the warrant given these issues without more evidence of wrong doing. *Malley*, 475 U.S. 335, 345 (1986).

Plaintiffs have made the required substantial showing that Willette intentionally or recklessly omitted these facts. A reasonable jury could find that Defendant Willette's affidavit, upon which both the Superior and Tribal Court Warrants relied, included "deliberate falsehood or reckless disregard for the truth." *Snell*, 920 F.2d at 698.

### 2. Defendants Are Not Entitled To Qualified Immunity Related To Their Execution Of The Superior and Tribal Court Warrants.

Unnecessary destruction of property is unconstitutional. *Liston*, 120 F.3d at 979. "[T]he destruction of property by state officials poses as much of a threat, if not more, to people's right to be 'secure in . . . their effects' as does the physical taking of them." *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds*, *Robinson v. Solano Cty.*, 278 F.3d 1007, 1013 (9th Cir. 2002) (citation omitted). "Reasonableness is the touchstone of any seizure under the Fourth Amendment." *San Jose Charter of Hells Angels Motorcycle Club v. San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). Courts look to the totality of the circumstances to determine whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties. *See Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). "A seizure becomes unlawful when it is 'more intrusive than necessary.'" *Ganwich*, 319 F.3d at 1122 (quoting *Florida v. Royer*, 460 U.S. 491 (1983)). To determine whether Defendants' destruction of Plaintiffs' property was reasonable, the Court must balance "the nature and quality of the instruction on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In this case the intrusion was severe. Defendants illegally seized and destroyed the Paul Plaintiffs' gun safe and their two laptops. Galanda Decl., Exs. G, M, Y ¶3, 3 at 259, 55. Defendants also seized and never returned Plaintiff Anderson and Shopbell's Galaxy Samsung

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Tablet, as well as seized and destroyed their Dell laptop. *Id.*, Ex. V ¶ 4-5, 2 ¶ 5, 27 ¶ 5. Defendants further illegally seized and destroyed—without a warrant or court order—PSSD's clam bait from the storage locker in Burlington. *Id.*, Exs. 29, 30, 32 ¶ 15, 3 at 122-25, 136-37; *see also id.*, Ex. 41 at 1. In contrast, the government issue of safety was minimal given the regulatory nature of the alleged crimes and given the evidence, there can be no doubt the totality of Defendants' actions were disproportionate to the perceived or actual threat to officer safety, and therefore amounted to an unreasonable search. *Torre v. City of Renton*, 164 F.Supp.3d 1275, 1284 (W.D. Wash. 2016). Viewing the facts in the light most favorable to the Plaintiffs, the seizures and destruction of Plaintiffs' properties were unreasonable, and in violation of the Fourth Amendment. *See, e.g., Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992) (destruction of "a can of soda pop" actionable).

This determination does not, however, end the inquiry in this case. A § 1983 claim "requires a precise determination of which specific acts amounted to unreasonable conduct, which actors engaged in that conduct, and what damage each unreasonable act caused." *Torre*, 164 F.Supp. at 1284. "The Ninth Circuit has repeatedly stressed that such findings are reserved for the trier of fact." *Id.* (citing *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002)). In this case, although it is undisputed that the property seized from Plaintiffs' homes by Defendants was destroyed, which Defendants actually destroyed the property remains unclear. *See* Dkt. ##31 ¶4, 34 ¶ 7, 38 ¶ 9-18, 32 ¶ 6, 35 ¶ 8, 36 ¶ 4, 39 ¶ 4, 43 ¶ 8. This is another issue of material fact that precludes summary judgment in this case.

**B.      DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT RELATED TO THE UNLAWFUL DETENTION OF PLAINTIFFS HAZEN SHOPBELL AND ANTHONY PAUL.**

Issues of material fact preclude summary judgment on the issue of whether Defendants' conducted a lawful investigatory stop or unconstitutional detention and arrest of Plaintiffs.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

There is no "bright line rule for determining when an investigatory stop crosses the line and becomes an arrest." *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995). A court determining whether a seizure is a temporary detention or an arrest must consider the totality of the circumstances. *Id.* Each case must be decided on its own facts. *United States v. Parr*, 843 F.3d 1228, 1231 (9th Cir. 1988). For instance, when a plaintiff is fully cooperative, no evidence suggests that he was dangerous or that safety considerations required intrusive methods of restraint, a detention may constitute an arrest. *United States v. Del Vizo*, 918 F.2d 821; *United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990). "[I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning. *United States v. Pinion*, 800 F.2d 976, 978-79 (9th Cir. 1986).

Whether a detention constitutes an arrest depends on a variety of factors, including the length of Plaintiffs' detention, whether they were handcuffed, placed in a patrol vehicle or subsequently transported in that vehicle, whether the officers believed probable cause to arrest existed, and whether the plaintiff was free to leave. *See, e.g., Washington v. Lambert*, 98 F.3d 1181, 1188 (9th Cir. 1996); *Meredith v. Erath*, 342 F.3d 1057, 1061-62 (9th Cir. 2003); *Benite-Mendez v. INS*, 760 F.2d 907, 909 (9th Cir. 1983); *Dubner v. City of San Francisco*, 266 F.3d 959 (9th Cir. 2001); *Bradford v. City of Seattle*, 557 F.Supp.2d 1189, 1199-1200 (W.D. Wash. 2008) (citing cases); *Del Vizo*, 918 F.2d 821; *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984). There are genuine issues of material fact regarding all of these factors present in this case. *See* Dkt. ##31, 32, 33, 35, 37, 43.

Although Plaintiffs are unable to provide a sworn account of what transpired during their unlawful detention on June 13, 2016, given the Fifth Amendment issues in this case, the

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

numerous material fact issues raised by Defendants' own account of those events preclude summary judgment. Crucially for the purposes of determining whether a detention constituted an arrest and whether the detention or arrest was lawful, Defendants offer differing accounts as to whether: (1) Plaintiffs were handcuffed, Dkt. ##35 ¶6, 32 ¶5, 37 ¶5, 43 ¶5; (2) Plaintiffs were free to leave, Dkt. ##33 ¶5, 35 ¶5, 32 ¶4; (3) probable cause to arrest did not exist, Dkt. ##31 ¶5, 35 ¶6; (4) where the interviews occurred, Dkt. ##35 ¶7, 2 ¶5; as well as (5) the nature of the instructions given before and during the incident, when exactly those instructions were given and which Defendants gave them, Dkt. ##31, 32, 33, 35, 37, 43.

Further, "the reasonableness of the detentions does not turn on the total amount of time involved but on when a reasonable officer would have known that a serious error had occurred and that the search should be terminated." *Liston*, 120 F.3d at 978. The facts are clear that Defendants all realized that a serious error had occurred during their unlawful detention of Plaintiffs. *See* Dkt. ##31, 32, 33, 35, 37, 43. "At the moment that the degree of certainty reached such a level that a reasonable officer would have realized these facts," continued detention of Plaintiffs became unlawful and a reasonable officer could not reasonably have believed that further detention was proper. *Liston*, 120 F.3d at 978. Further, Defendants Cenci, Clementson, Golden, Jaros, Myers, and Vincent implicitly acknowledge this conclusion in their versions of events that transpired on June 13, 2016. Dkt. ##31, 32, 33, 35, 37, 43. In sum, these Defendants continued to detain Plaintiffs although a reasonable officer would have known their detention was unlawful. Plaintiffs have presented evidence sufficient to support the conclusion that an unreasonable detention occurred. *Liston*, 120 F.3d at 979. Plaintiffs have demonstrated facts upon which a reasonable jury could properly conclude that a reasonable officer would have known those Defendants' actions were unlawful. *Id.*

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Officers may, however, use intrusive means of effecting a stop such as handcuffing or detaining a plaintiff in a vehicle in special circumstances, including (1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; (2) where the police have information that the suspect is currently armed; (3) where the stop closely follows a violent crime; and (4) where the police have information that a crime that may involve violence is about to occur." *Washington*, 98 F.3d at 1189. None of these factors were present on June 13, 2016. Plaintiffs were not uncooperative and did not attempt to flee the scene. *See* Dkt. ##31, 32, 33, 35, 37, 43. Defendants had no information that Plaintiffs were armed. *Id.* Defendants' stop did not follow a violent crime and they did not have information that Plaintiffs were about to commit a violent crime. *Id.*

When reviewing this case in the light most favorable to Plaintiffs, a rational jury could find that this incident exceeded the limits of an investigative detention under *Terry* and constituted an unlawful detention or arrest, and that Defendants' tactics were extremely intrusive, yet none of the *Washington* factors justifying such tactics were present. Thus, summary judgment cannot be granted to Defendants as a matter of law.

**C. PLAINTIFFS' § 1983 CLAIMS AGAINST DEFENDANTS ROTHAUS, UNSWORTH, AND SUSEWIND CANNOT BE DISMISSED.**

**1. Defendant Rothaus Is Not Entitled to Qualified Immunity.**

Defendant Rothaus argues that he should be dismissed because he did not personally participate in the events that give rights to Plaintiffs' civil rights claims.[12] This claim is disingenuous as best. The evidence indicates that Defendant Rothaus conspired with his personal friend and DFW confidential informant, Mr. Richardson, to fabricate and repeat lies about Plaintiffs—lies that served as the basis for DFW's unlawful warrants, the unreasonable searches of Plaintiffs and their homes, the illegal detention of Plaintiffs, and the subsequent destruction of

---

[12] Defendants' Motion For Partial Summary Judgment, at 9.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 28

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

their property.  *See* Galanda Decl., Exs. 11 at 3, 7 at 10-11, 8 ¶3, 3 at 112, 62, 64,  65, 66, 67, 63.

DFW eventually recanted all of the facts fabricated by Defendant Rothaus and his confidential-informant friend, admitting the information provided had no factual basis once challenged in court and causing them both to lament to each other "the situation" they caused together.  *See e.g.*, Exs. 10 ¶5, 18 at 3, 12 ¶7, 3 at 108, 114-15, 62.   The now debunked information invented by Defendant Rothaus and Mr. Richardson, which served as part of the basis for Defendants' unconstitutional conduct, was either known to be false or known to be false if the truth had not been recklessly disregarded, and thus violative of the Fourth Amendment.  *See Myers v. Morries*, 810 F.2d 1437, 1457 (8th Cir. 1987).  Unlike the circumstances present in *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980), Plaintiffs have alleged facts that, when taken as true on summary judgment, show that Defendant Rothaus precipitated the deprivation of Plaintiffs' constitutional rights.  He therefore cannot be dismissed from this litigation.

### 2.      Defendants Unsworth And Susewind Are Not Entitled to Qualified Immunity.

Defendants Unsworth and Susewind argue they should be dismissed from this litigation because they did not have any personal participation and cannot be held liable under § 1983 based on a theory of respondent superior.  Defendant Unsworth is the former director of DFW and Susewind is the current director.  Plaintiffs allege that these Defendants failed to adequately train and supervise the Defendant DFW officers, and ratified their unlawful actions.

"A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).  A supervisor is liable for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivation,

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

or for conduct that showed a reckless or callous indifference to the rights of others. *Starr*, 652 F.3d at 1208. Thus, Defendants' claim that a supervisor cannot liable for § 1983 violations when they were not personally involved is wrong.

**D. THE COURT SHOULD NOT DISMISS THE JOHN DOE DEFENDANTS.**

Discovery will lead to the identification of the John Doe Defendants who, among at least 30 officers, were involved in the execution of the Superior Court and Tribal Court Warrants. Dkt. #44 ¶4. Courts find that plaintiffs should be given that opportunity unless it is clear that discovery would not uncover the identities. *Gillespire v. Civiletti*, 629 F.2d 637, 643 (9th Cir. 1980). In a § 1983 case, it is inappropriate for a District Court to dismiss unidentified defendants prior to the start of discovery. *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999). The Court should therefore not dismiss the John Doe Defendants.

## IV.     CONCLUSION

As a result of each of their incompetence and defiance of the law, Defendants are not entitled to wear the cloak of qualified immunity. Defendants' motion should be denied.

DATED this 21st day of March 2019.

GALANDA BROADMAN, PLLC

s/Gabriel S. Galanda

Gabriel S. Galanda, WSBA #30331
s/Bree R. Black Horse

Bree R. Black Horse, WSBA #47803
Attorneys for Plaintiffs
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: gabe@galandabroadman.com
Email: bree@galandabroadman.com

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 30

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509