The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HAZEN SHOPBELL, TIA ANDERSON, ANTHONY PAUL, NICOLE PAUL,

Plaintiffs,

v.

WASHINGTON STATE DEPARTMENT OF FISH AND WILDLIFE; WENDY WILLETTE, *et al.*,

Defendants.

NO. 2:18-cv-1758

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.    INTRODUCTION

This case involves certain federal civil rights and state tort claims asserted by Plaintiffs against the Washington State Department of Fish and Wildlife, Defendants named in their individual and official capacities, and John Does 1-20. Defendants' Motion for Partial Summary Judgment, currently before the Court, seeks summary judgment as to certain claims and certain Defendants, and/or of all constitutional claims on qualified immunity grounds. Having reviewed the parties' briefs on the motion and the record related thereto, the Court finds and rules as follows.

*///*

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 1

## II.   BACKGROUND

**A. Factual Background**

*1. Parties and Complaint Overview*

Plaintiffs in this matter are Washington residents Hazen Shopbell, an enrolled member of the Tulalip Tribes and owner and/or manager of Puget Sound Seafood Distributors ("PSSD") and his wife, Tia Anderson; and Anthony Paul, also an enrolled member of the Tulalip Tribes and owner of PSSD, and his wife Nicole Paul (collectively, "Plaintiffs"). Sec. Am. Compl., ("SAC"), ¶¶ 7-10, Dkt. No. 28.

Defendant Washington State Department of Fish and Wildlife ("WDFW") is a state agency, the Law Enforcement Program of which is charged with, among other duties, enforcing RCW Title 77, Washington's Fish and Wildlife code. The fourteen Defendants named individually and in their official capacity are, or were, law enforcement officers and/or employees of WDFW, having varying degrees of involvement in the events described below. The Complaint also purports to assert claims against "John Does 1-20."

Plaintiffs have asserted multiple causes of action, including for "false imprisonment" and "false arrest" under 42 U.S.C. § 1983; for "conspiracy to violate Plaintiffs' civil rights" under 42 U.S.C. § 1988; and for negligent and intentional infliction of emotional distress under Washington law. *Id.*, ¶¶ 62-96.

*2. WDFW Investigation of Plaintiffs and PSSD*

Plaintiffs' claims arise out of events related to a WDFW investigation into the activities of PSSD, a wholesale seafood buyer and distributor. SAC, ¶ 32. The investigation began in the spring of 2015, after WDFW Sergeant Erik Olson learned, in connection with an unrelated matter, about an alleged shellfish sale involving PSSD. Specifically, Olson was told that PSSD had

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 2

purchased 444 pounds of crab on May 23, 2015, one day after the season ended, and had back-dated documentation related to the sale. *See* Decl. of Erik Olson, ¶ 4, Dkt. No. 38. Olson passed on information about the transaction to a colleague, WDFW Detective Wendy Willette, who then initiated an investigation into PSSD.

Beginning with inquiry into this alleged crab purchase, Willette's investigation expanded to include other activities involving PSSD, and included Willette's audit of PSSD's fish receiving tickets—paperwork documenting the purchase and sale of fish, required by law—that revealed alleged "discrepancies between the amount of fish purchased by PSSD and the amount accounted for in its required paperwork." Decl. of Wendy Willette, ¶ 3, Dkt. No. 44. Willette also uncovered evidence of PSSD having apparently underpaid fisherman for product, which she believed could indicate trafficking in illegally harvested fish. *See id.*, ¶¶ 3-4.

Willette's investigation spanned several jurisdictions, including Pierce, King, and Snohomish Counties, and the Tulalip Tribal Court, and over the course of approximately two years involved warranted searches of PSSD-related "bank records, tax records, electronic information, cell phone records, physical searches, and others." *Id.*; *see also* Exs. 1-3 to Willette Decl. The investigation eventually led to criminal charges being brought against Plaintiffs Anthony Paul and Hazen Shopbell in both Skagit County and Pierce County Superior Courts. Ultimately, however, all but one charge was either dismissed or dropped. Decl. of Gabriel Galanda, Dkt. No. 48, Ex. 6; Second Decl. of Gabriel Galanda, Dkt. No. 72, Ex. 75.[1]

---

[1] On March 13, 2020, a Pierce County jury convicted Anthony Paul of possession of hydrocodone without a prescription, related to pills discovered during the searches described below, but with no apparent connection to PSSD and presumably not within WDFW's jurisdiction. Decl. of Eric Mentzer, Ex. 1, Dkt. No. 69. The conviction is on appeal.

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 3

### 3.  Search Warrants and Affidavits

Approximately one year into the investigation, on June 13, 2016, Detective Willette coordinated simultaneous searches of three locations: (1) a former PSSD warehouse/office located in Tacoma; (2) the Shopbell/Anderson residence on Tulalip Tribal land; and (3) the Paul residence, located in Lake Tapps, Washington. Willette Decl., ¶ 9. On the same day, WDFW agents also detained Anthony Paul and Shopbell for questioning. These actions are the central focus of Plaintiffs' Complaint.

The searches were conducted pursuant to warrants that Willette obtained from both the King County Superior Court and the Tulalip Tribal Court, based on essentially identical affidavits. *See* Willette Decl., Exs. 2, 3; Galanda Decl., Exs. 7, 13. The warrants authorized searches of the three locations and of certain vehicles, computer equipment, and cell phones belonging to Plaintiffs or PSSD. The warrants also authorized seizure of records or other documents related to the investigation, including computer equipment, and unlawfully possessed fish or shellfish. *See., e.g.*, Galanda Decl., Ex. 13.

Because Plaintiffs challenge the sufficiency of probable cause underlying the search warrants, the allegations in Willette's affidavits submitted with the warrant applications are of particular importance. Specifically, in the 22-page affidavits, Willette alleged that PSSD failed to submit 16 fish receiving tickets ("FRTs") between 3/12/14 and 01/08/16, in violation of RCW 77.15.630, Unlawful Fish and Shellfish Catch Accounting. *See* Willette Decl., Exs. 2, 3 at 5. In an apparent reference to the purchase of 444 pounds of crab that had initiated the WDFW investigation, the affidavits stated that PSSD "back-dated an FRT and company check to a closed-season fisher to conceal an illegal purchase of Dungeness crab on May 23, 2015." *Id*.

Willette also asserted that "[d]espite not being licensed to buy or sell bivalve shellfish, I

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 4

saw multiple instances of [PSSD] engaging in the industry," also in violation of Washington law. *Id*. at 8; *see also id.* at 5, citing RCW 69.30.110. In support of this allegation, she cited, among other things, several checks to Anthony Paul notated "geoduck," and FRTs related to tribal clam harvesters in 2015. *Id*. at 8-9.

In addition, Willette alleged that PSSD had underpaid fishermen approximately $244,000 in 2015, which she claimed "may indicate possible illegal harvests being paid less than what the fish ticket states as financial incentive for assuming risk" associated with out-of-season harvesting, potentially in violation of RCW 77.15.260, Unlawful Trafficking in Shellfish. *Id*. at 6. Willette stated she had conducted an FRT audit, which indicated that "there were vast gaps between what [PSSD] had reported they paid the fishers versus what they actually paid their fishers." *Id*. at 8.

Willette's affidavits also cited a "Report from Anonymous Source," identified as a "state-licensed wholesale dealer" "knowledgeable about the commercial crab industry." *Id*. at 9. The anonymous source had been referred to her by WDFW biologist (and Defendant) Don Rothaus. Decl. of Donald Rothaus, ¶¶ 4, 5, Dkt. No. 40. The source had described to Willette several examples of PSSD underpayments to tribal fishermen, an allegation that she stated in the affidavits "was consistent with the check record that [she] had reviewed from the previous financial search warrants." Willette Decl., Exs. 2, 3 at 11. The affidavits contained several pages of analysis of PSSD's financial records, including FRTs and check records, which Willette claimed indicated discrepancies and underpayments that she believed were consistent with illegal activity.

   *4.   The June 13, 2016 Searches of Plaintiffs' Residences and PSSD Office*

Willette coordinated the searches to take place simultaneously on June 13, 2016,

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 5

beginning on that day with a briefing of the law enforcement officers who would be participating in the searches. Galanda Decl., Ex. 3, p. 178. Each search that followed is briefly described herein:

Residence of Anthony and Nicole Paul. On June 13, 2016, Defendants Willette, Olson, Cenci, Hale, and approximately ten additional WDFW officers (not named as defendants) served the search warrant on the Paul residence. Willette Decl., ¶ 9. No one was home when the search began, and the officers were able to gain access to the locked home. *Id*. During the course of the search, the Pauls returned home. *See* Decl. of Erik Olson, ¶ 11, 18. The officers recovered some personal property from the Paul residence, including paperwork, two laptops, and a locked safe. Mr. Paul declined to give WDFW the combination. Olson Decl. ¶ 18. WDFW later obtained a supplemental warrant and broke open the safe, retrieving several items including cash and a firearm, and hydrocodone pills, which Anthony Paul was later convicted of possessing without a prescription. Galanda Decl., Ex.3 at 259; Decl. of Eric Mentzer, Ex. 1, Dkt. No. 69. Plaintiffs claim the two laptops and the safe were damaged or destroyed. SAC, ¶ 41.

Residence of Hazen Shopbell and Tia Anderson. On the morning of June 13, 2016, Defendants Maurstad, Clementson, Vincent, Jaros, Peters, and other WDFW agents executed the King County and Tulalip Tribal Court search warrants on the Shopbell/Anderson residence, located in Tulalip, Washington, on Tulalip Tribal land. Willette Decl., ¶ 9. Plaintiff Tia Anderson arrived home after the search began. WDFW agents recovered personal property, including a tablet and a laptop. Plaintiffs claim those items were destroyed. Galanda Decl., Ex. 26, ¶¶ 5-7.

Former office of PSSD. The same day, Defendants Golden, Fairbanks and several other WDFW officers served the warrant on what was believed to be a PSSD warehouse or office, gaining access by cutting a lock on a gate. Willette Decl., ¶ 9. The officers searched the premises

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 6

and vehicles located at the property, interviewed a business owner of another seafood company, and did not retrieve any property. *Id*. Plaintiffs claim that PSSD had vacated the premises approximately six months earlier. Pls.' Resp. at 11.

### 5. Detentions of Paul and Shopbell

On June 13, 2016—the same day as the searches described above—Defendants learned that Plaintiffs Anthony Paul and Hazen Shopbell were at the Port of Everett boat launch. Decl. of Anthony Jaros, ¶ 5, Dkt. No. 35. WDFW officers Jaros, Vincent, and Clementson went to the boat launch, and detained the two Plaintiffs for questioning, telling them they were not free to leave. *Id*. Defendants placed Plaintiffs, in handcuffs, in marked WDFW vehicles for transport to the Marysville Police Department. Midway to the station, the officers were advised by superiors that Plaintiffs were to be informed that the questioning was voluntary, and both Plaintiffs asked to be returned to the boat launch. *Id*. ¶¶ 6-7. Shopbell then agreed to be taken in for an interview, but Paul declined and was released. Decl. of Chris Clementson, ¶ 5, Dkt. No 32.

### 6. Additional WDFW Actions Related to the Investigation

In addition to the searches and seizures outlined above, WDFW agents also took several actions referenced in the Complaint. The first is Willette's report to Washington Child Protective Services ("CPS") regarding the care of the Pauls' children. According to Willette, she was concerned, based on information gathered during her investigation, including a photo of one of the children in front of what appears to be a marijuana plant, "unsecured firearms and fireworks on the floor of the living area [and] Nicole Paul's failure to use seat belts for the kids." Willette Decl. ¶ 13. CPS apparently followed up with an investigation but took no further action.

In August 2016, Defendant Willette and a team of officers seized and destroyed approximately 1,185 pounds of PSSD bait clams, held at the Marine View Cold Storage in

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 7

Burlington, WA. Relying on information provided by a former PSSD fish buyer, the officers seized and destroyed the clams without a warrant, pursuant to RCW § 77.15.085 (2016), which authorizes officers to "seize without a warrant shellfish . . . they have probable cause to believe have been taken, transported, or possessed in violation of this title or rule of the commission or director." *See* Willette Decl., ¶ 14. The seized clams were the basis for shellfish trafficking charges later brought by the Skagit County Prosecutor against Paul and Shopbell. Mentzer Decl., Ex. 1. On July 17, 2019, on a motion by Paul and Shopbell, Skagit County Superior Court Judge Brian Stiles dismissed that case, finding that WDFW's destruction of the clams was an unconstitutional denial of Plaintiffs' right to "useful and exculpatory evidence." *See* Second Galanda Decl., Ex. 75, Findings of Fact and Conclusions of Law, *Washington v. Paul and Shopbell*, No. 18-1-00622-29, p. 3.

In the spring of 2017, Willette and/or other WDFW officers served search warrants on several businesses believed to be associated with Anthony Paul, including Rushmore Tax Services; NW Regional Accounting Services, Inc.; and DM Tax and Bookkeeping. Willette Decl. ¶¶ 15, 16. In total, Plaintiffs claim WDFW served over 30 warrants on Plaintiffs, PSSD, and associated entities. SAC, ¶ 5.

### B. Causes of Action and Defendants' Motion for Partial Summary Judgment

The Complaint lists seven causes of action: two under 42 U.S.C. § 1983, for false imprisonment and false arrest; one under 42 U.S.C. §1988 for "conspiracy to violate civil rights;" three under Washington law tort theories, including negligent infliction of emotional distress; and one for "negligent supervision and training." *See* SAC, ¶¶ 62-96. More specifically, Plaintiffs claim that the search warrants underlying the searches outlined above lacked probable cause; that Plaintiffs Paul and Shopbell were detained and/or arrested without legal justification; and that the

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 8

supervisory Defendants, who otherwise were not personally involved in the events described above, failed to properly train and supervise WDFW agents, resulting in violation of Plaintiffs' constitutional rights. Plaintiffs also claim that Defendants unlawfully destroyed the property seized during the searches, including computer equipment and the safe, and the clam bait seized at the Marine View Cold Storage site.

Defendants' Motion seeks partial summary judgment on several grounds, both alternative and overlapping. First, Defendants seek dismissal of the three Defendants who claim not have been directly involved in any of the events outlined above: WDFW biologist Rothaus, former WDFW Director Unsworth, and current WDFW Director Susewind. Second, Defendants seek dismissal of claims against Defendants whose only apparent involvement was in the detention of Plaintiffs Paul and Shopbell: Defendants Myers, Cenci, Clementson, Vincent, and Jaros. Third, Defendants seek dismissal of all constitutional claims on the grounds of qualified immunity, including claims against Defendants involved in Plaintiffs' detention, Defendant Willette, who sought and obtained the search warrants, and Defendants who aided in the execution of those warrants. Finally, Defendants ask the Court to dismiss John Does 1-20.

## III.   DISCUSSION

### A. Standard on a Motion for Summary Judgment

Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Fed.R.Civ.P. 56(a). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  In evaluating summary judgment for qualified immunity cases, viewing the evidence in the light

ORDER RE MOTION FOR
SUMMARY JUDGMENT
 - 9

1    most favorable to the non-moving party "usually means adopting ... the plaintiff's version of the

2    facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

3        **B. Supervisory Defendants Susewind and Unsworth; Defendant Rothaus**

4        The summary judgment motion first seeks dismissal of three Defendants who claim to

5    have had minimal or no involvement in the events giving rise to Plaintiffs' claims: WDFW

6    biologist Rothaus, former WDFW Director Unsworth, and current WDFW Director Susewind.

7    Defendants assert that the only involvement Rothaus had in the events giving rise to Plaintiffs'

8    claims was referring the confidential informant to Officer Willette, and providing her a

9    spreadsheet related to certain crab harvest data. Decl. of Donald Rothaus, ¶¶ 3, 4. Dkt. No. 40.

10   Defendants Susewind and Unsworth, Defendants claim, had no direct participation in the

11   investigation of Plaintiffs, and Susewind did not become Director until after the events giving rise

12   to this lawsuit. Decl. of Kelly Susewind, ¶ 4, Dkt. No. 41; Decl. of Jim Unsworth, ¶ 3, Dkt. No.

13   42.

14       Plaintiffs argue that Rothaus was more involved in this case than Defendants admit. They

15   claim that the confidential informant with whom Wendy Willette had contact regarding PSSD's

16   alleged under-payments to tribal fisherman was a "personal friend" of Rothaus, and that he and

17   Rothaus together "conspired . . . to fabricate and repeat lies" in a scheme to ensnare PSSD in a

18   criminal investigation. Pls.' Resp. at 27.

19       Defendants deny both the personal nature of the relationship, and that Rothaus had any

20   involvement in "fabricating" the anonymous source's allegations. *See* Sec. Decl. of Donald

21   Rothaus, ¶¶ 2, 5, Dkt. No. 55 ("My only relationship with that person has always been through

22   my responsibilities managing the State commercial Dungeness crab fishery. . . . I am not a

23   'personal friend' of the person who provided me the information. I have never met with him

24
25   ORDER RE MOTION FOR
     SUMMARY JUDGMENT
     - 10

socially. I have no concept of where he lives, whether he is married, or whether he has kids.").

And indeed, the only evidence that Plaintiffs cite of any "friendship" between the two is a

screenshot of the following text conversation:

> Rothaus: It sounds like you had a chance to talk with Wendy and Lt. Golden regarding the situation? I hope you are feeling a little bit better about the situation.
>
> Anonymous Source: I guess.. should of never got to this..
>
> Rothaus: I understand.

Galanda Decl., Ex. 62. It is apparent that Rothaus had spoken with the source, and referred him to

Willette; as she stated in her warrant affidavits, Rothaus told her "he had had numerous

conversations with the man over the course of years and knew him to be knowledgeable about the

commercial crab industry." *See, e.g.*, Galanda Decl., Ex. 71 at 10. This is the extent, however, of

the evidence that Plaintiffs have submitted in support of their claim that Rothaus and the source

had "conspired" to "fabricate" allegations against the Plaintiffs. Even viewed in a light most

favorable to Plaintiffs, the allegations fall far short of supporting a reasonable conclusion that

Rothaus helped fabricate information about alleged under-payments, or even that he and the

source were friends. Furthermore, there is no allegation that Rothaus was present at or involved in

any of the searches or seizures, or was involved in any other aspects of the investigation on which

Plaintiffs base their claims.

　　　　Moreover, even if there were evidence that Rothaus had helped "fabricate" the source's

allegations, Plaintiffs' argument that Rothaus "precipitated" the events giving rise to their claims

would be an overstatement of the role that the confidential informant played in this case. The

probable cause supporting the search warrants, as discussed more fully below, was sufficient

without the informant's information. As Willette stated in her affidavits, the anonymous source's

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 11

story was merely "consistent with the check record that I had reviewed from the previous financial search warrants." *See, e.g.*, Willette Decl., Ex. 2 at 11. Furthermore, the alleged underpayments were only one aspect of Willette's investigation; the affidavits also alleged, for example, that PSSD was involved in unlicensed shellfish transactions—an allegation that was not related to the anonymous source's allegations. *Id.* at 5. Rothaus's lack of any direct involvement in this case, let alone involvement which might have led to a violation of Plaintiffs' constitutional rights, entitles him to dismissal.

Defendants also move for dismissal of current and former WDFW directors Susewind and Unsworth, citing a lack of factual allegations in the Complaint supporting a conclusion that they bear responsibility for Plaintiffs' alleged injuries. Plaintiffs oppose their dismissal, arguing that the two are liable for the actions of their subordinates, despite having not had any direct involvement in the facts outlined above, for a failure to train and supervise their officers. The Complaint, however, contains no allegations specifically relating to these two Defendants, other than that they are current and former WDFW directors, and are Washington residents.[2] SAC, ¶¶ 21, 22. Plaintiffs' response to Defendants' request for dismissal of these two Defendants is similarly insufficient, arguing only that "it is doubtful that much of any training, supervision, or control of the involved officers—particularly Defendant Willette—occurred on either Defendants Unsworth or Susewind's watch." Pls.' Resp. at 30. Plaintiffs fail to articulate even generally what policies or customs Unsworth and Susewind created or allowed to continue, or how such policies gave rise to Plaintiffs' claimed injuries. In the absence of any allegations—let alone evidence— supporting a failure-to-supervise theory, all of Plaintiffs' claims against Defendants Unsworth and

---

[2] The Seventh Cause of Action in the Second Amended Complaint, for "Negligent Supervision and Training," is explicitly only against DFW. SAC, ¶¶ 91-96.

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 12

1   Susewind are conclusory and speculative, and these two Defendants are hereby dismissed.

2   **C.  Whether Defendants Are Entitled to Qualified Immunity**

3       Defendants also seek dismissal of all constitutional claims against all Defendants, on the

4   grounds that they are entitled to qualified immunity, arguing as a "complete defense" that all of

5   Defendants' actions were supported by probable cause, or, at the very least, arguable probable

6   cause. Defs.' Mot at 18-22. Qualified Immunity is a doctrine that "protects government officials

7   from liability for civil damages insofar as their conduct does not violate clearly established

8   statutory or constitutional rights of which a reasonable person would have known." *Reese v. Cty.*

9   *of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223,

10  231 (2009)). In evaluating whether an officer is entitled to qualified immunity, courts consider (1)

11  whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2)

12  whether that right was clearly established at the time of the incident. *See Wilkinson v. Torres*, 610

13  F.3d 546, 550 (9th Cir. 2010) (*citing Pearson*, 555 U.S. at 223). Qualified immunity applies either

14  where there was no constitutional violation or where the constitutional violation was not clearly

15  established. *See id.* Courts have discretion to decide "which of the two prongs of the qualified

16  immunity analysis should be addressed first in light of the circumstances in the particular case at

17  hand." *Pearson*, 555 U.S. at 236.

18      In their response, Plaintiffs group their claims, and their opposition to Defendants'

19  assertion of qualified immunity, into two categories: the claims (1) against Defendants Willette

20  and Hale, for their roles in obtaining the search warrants; and (2) against unspecified Defendants,

21  for their involvement in handling Plaintiffs' seized and allegedly destroyed property, including

22

23

24  ORDER RE MOTION FOR
    SUMMARY JUDGMENT
25   - 13

1    computer equipment and a safe.[3] The Court addresses each in turn.

2        *1.   Qualified Immunity for Willette and Hale on Probable Cause Theory*

3        Plaintiffs first argue that Defendants Willette and Hale are not entitled to qualified

4    immunity on their claim that the search warrants lacked probable cause. Willette is the WDFW

5    officer and lead investigator who submitted sworn affidavits with the search warrant applications.

6    Plaintiffs claim her affidavits contained material falsehoods and omissions, without which

7    probable cause was lacking. It is less clear what Plaintiffs are alleging WDFW officer Hale's role

8    was in obtaining the warrants. The only allegation relating to Hale and the warrant process is that,

9    during the course of the investigation, she came into possession of information that may have

10   called into question whether PSSD had illegally purchased crab out of season, one of the crimes

11   referenced in the warrant affidavits. There is no allegation indicating that Hale took part in

12   preparing the affidavits or obtaining the warrants.

13       It is settled law that "if an officer 'submitted an affidavit that contained statements he

14   knew to be false or would have known were false had he not recklessly disregarded the truth and

15   no accurate information sufficient to constitute probable cause attended the false statements, ... he

16   cannot be said to have acted in an objectively reasonable manner,' and the shield of qualified

17   immunity is lost." *Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995), *citing Branch v. Tunnell*,

18   937 F.2d 1382, 1387 (9th Cir.1991). In this context, to survive a defendant's motion for summary

19   judgment based on qualified immunity, a plaintiff "must 1) make a 'substantial showing' of

20   deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty,

21   the challenged action would not have occurred." *Liston v. Cty. of Riverside,* 120 F.3d 965, 973

22

23   ───────────────
     [3] Presumably, as to the remaining claims, Plaintiffs do not deny that the Defendants *are* entitled to qualified
     immunity.

24   ORDER RE MOTION FOR
     SUMMARY JUDGMENT
25   - 14

(9th Cir. 1997). In other words, "the plaintiff must establish that the remaining information in the affidavit," once the falsehood or omission is cured, "is insufficient to establish probable cause." *Id*.

In arguing that Willette and Hale are not entitled to qualified immunity from liability for their role in obtaining the search warrants, Plaintiffs first cite a putative legal error in Willette's affidavits. Plaintiffs argue that Willette failed to state in the affidavits that WDFW lacks jurisdiction to enforce Washington statutes or conduct searches on Tulalip reservation trust land, on which the Shopbell/Anderson home is apparently located.

This claimed omission cannot be the basis for denying Defendants qualified immunity, not least because the affidavits make clear that one of the locations to be searched is on Tulalip land, citing a Tulalip, Washington address and noting "the property is owned by the Tulalip Tribe." *See, e.g.*, Willette Decl., Ex. 2 at 2. Plaintiffs fail to demonstrate that Willette, a non-lawyer, had an obligation to outline the complex jurisdictional law applying to the warrants. Indeed, Plaintiffs' position that WDFW lacked jurisdiction to conduct the search appears to be contested, even now, years after the warrants were issued. While Plaintiffs claim a lack of jurisdiction, Defendants counter that WDFW does in fact have jurisdiction where, as here, violations of Washington law are alleged to have occurred outside reservation boundaries; where the affidavit claims violation of tribal laws; where the searches involve participation by the Tulalip Tribal Police; and where the warrants in question are issued by the Tulalip Tribal Court. Given this dispute, the Court concludes that Plaintiffs have failed to make the requisite "substantial showing" that any omission regarding WDFW jurisdiction was either reckless, or material to issuance of the warrants.

Plaintiffs also claim there are two factual falsehoods/omissions contained in the affidavits. First, Plaintiffs argue, PSSD's purchase of 444 pounds of crab on May 23, 2015, one day after the

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 15

season had ended, was not illegal, and Defendants were aware it was not. In support of this

charge, Plaintiffs point out that in November 2015, approximately seven months before Willette

obtained the warrants, Hale had interviewed the Tulalip Tribes Shellfish Technician Rocky

Brisbois, who told Hale that the purchase was "okay" from the Tribes' standpoint. *See* Galanda

Decl., Ex 1, Officer's Report of Natalie Vorous [Hale]. Brisbois' boss Mike McHugh apparently

disagreed, telling Hale "no one from the tribe has authority to give a company permission to

purchase crab after the closure, but that companies are free to do so if they wish." *Id*. In the spring

of 2018, based on the purchase, Pierce County charged Anthony Paul with illegal trafficking, but

the case was dismissed when the prosecutor learned, among other things, that Paul had obtained

"permission" from Brisbois to make the purchase, which "would be a complete defense in the

case." Galanda Decl., Ex. 6, Dismissal Memo of the Pierce County Prosecutor's Office. Second,

Plaintiffs claim that Willette's search warrant affidavits contained false information based on her

anonymous source. Reliance on the source was flawed, according to Plaintiffs, because Willette

failed to disclose that the source was a PSSD competitor and a first-time informant, and because

Willette failed to corroborate his information.

Even crediting Plaintiffs' position on these two claimed falsehoods/omissions, the Court

concludes that Defendants are entitled to qualified immunity from Plaintiffs' claims that the

search warrants lacked probable cause. First of all, to defeat Defendants' entitlement to qualified

immunity on a claim related to probable cause, the claimed flaw(s) in a search warrant affidavit

must be material. *Hervey*, 65 F.3d at 788. Even without the information provided by the

anonymous source, or the claim that PSSD had illegally purchased crab in May 2015, the June

2016 search warrants had probable cause to issue. Willette outlined in her affidavits several

violations that Plaintiffs have not challenged—specifically, that PSSD "has failed to submit 16

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 16

Fish Receiving tickets," in violation of RCW 77.15.630-Unlawful Fish and Shellfish Catch Accounting, and that PSSD "is not licensed as a Shellstock Shipper," but "has engaged in the commercial buying and selling of bivalve shellfish" in violation of RCW 69.30.110-Possession or Sale in Violation of Chapter a. *See, e.g.*, Willette Decl., Ex. 2 at 5. This information was based on Willette's audit of PSSD's fish receiving tickets and other documentation obtained through unchallenged search warrants, and Plaintiffs do not call either of these alleged violations into question. *See* Galanda Decl., Ex. 10, April 6, 2017 Willette Decl. in Supp. of Mot. for Prot. Order, ¶ 5 ("The anonymous source was not the source of probable cause in this investigation. Direct evidence obtained via search warrants provided me with the financial records referenced in the affidavit filed in Tulalip Tribal Court."). Standing alone, the allegations related to just these two offenses were sufficient probable cause for the search warrants to issue.

Furthermore, Plaintiffs have failed to make the requisite "substantial showing of deliberate falsehood or reckless disregard for truth"—the second element required to defeat qualified immunity. *Hervey*, 65 F.3d at 788. The Fourth Amendment requires only that information contained in an affidavit be "truthful," meaning "that the information put forth is believed or appropriately accepted by the affiant as true." *Franks v. Delaware*, 438 U.S. 154, 165 (1978) ("This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily."). Plaintiffs assert that Willette was aware that the crab purchase in May 2015 was legal, but there is no evidence Hale shared with Willette information concerning her interview of Rocky Brisbois, or that Willette was aware by any other means that the Tribes had apparently sanctioned the purchase. Nor is there an allegation that Hale had any

1    involvement in obtaining the warrants. Contrary to Plaintiffs' assertions, Willette also did not

2    conceal from the issuing courts that the anonymous source was a PSSD competitor, clearly stating

3    that her informant was a "state-licensed wholesale dealer" who "still buys crab from tribal

4    members." *See, e.g.*, Willette Decl., Ex. 2 at 10-11.

5          Plaintiffs are asking the Court to speculate that the claimed falsehoods and omissions in

6    the affidavits were deliberate or reckless; but they fail to make any factual allegations that would

7    support such conclusion. Thus, even if some of the information in the affidavit was not

8    "necessarily correct," Plaintiffs have failed to demonstrate that for purposes of the Fourth

9    Amendment, it was not "truthful." For these reasons, the Court concludes that Defendants

10   Willette and Hale have qualified immunity from suit based on Plaintiffs' probable cause theory.

11         *2.   Qualified Immunity for Defendants Involved in Alleged Deprivation of Property*

12         Plaintiffs next respond to Defendants' assertion of qualified immunity by arguing that it is

13   not available to those officers involved in the alleged destruction of Plaintiffs' property.[4] The

14   property in question includes the items seized and allegedly destroyed during the searches of the

15   two residences—the Pauls' two laptops and their safe, and the Shopbell/Anderson's laptop and

16   tablet—and PSSD's clam bait seized at the Marine View Cold Storage. Pls.' Resp. at 24. As

17   discussed above, to defeat Defendants' assertion of qualified immunity from claims related to the

18   allegedly destroyed property, Plaintiffs have the burden of demonstrating: 1) that Defendants

19   violated their constitutional rights, and 2) that those rights were clearly established at the time of

20   the violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

21         Defendants do not dispute that wanton destruction of Plaintiffs' property would be a

22

23   _____
     [4] Plaintiffs do not specify at which Defendants this claim is directed, but for purposes of this motion, the Court
     assumes the Defendants who conducted the seizures.

24   ORDER RE MOTION FOR
     SUMMARY JUDGMENT
25   - 18

1   violation of Plaintiffs' constitutional rights. Courts have stated, however, that "[i]t is plain that

2   while the destruction of property in carrying out a search is not favored, it does not necessarily

3   violate the fourth amendment. . . .. The standard is reasonableness; 'destruction of property that is

4   not reasonably necessary to effectively execute a search warrant may violate the Fourth

5   Amendment.'" *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991) (citations omitted).

6          Plaintiffs have failed to meet even the first prong of their burden regarding qualified

7   immunity, that a constitutional violation took place, let alone the second, that the rights violated

8   were clearly established. Plaintiffs' arguments are limited to "there can be no doubt the totality of

9   Defendants' actions were disproportionate to the perceived or actual threat to officer safety," and

10  "[v]iewing the facts in the light most favorable to the Plaintiffs, the seizures and destruction of

11  Plaintiffs' properties were unreasonable, and violated the Fourth Amendment." These are

12  conclusory and unsubstantiated assertions that do not meet the prescribed burden. Plaintiffs

13  neither allege any facts, nor cite any law, supporting a conclusion that the claimed destruction of

14  the equipment was unreasonable. They do not posit how, when, or where the items were

15  destroyed, or who destroyed them, or if some less destructive means could have been employed,

16  or in what way Defendants' handling of the items was unreasonably careless.

17         Furthermore, seizure of computer equipment and, at least arguably, the safe, was explicitly

18  authorized in the warrants. *See, e.g.*, Galanda Decl., Ex. 7 at 3, 4 (search warrant authorizing

19  seizure of "any locked storage areas" and "[a]ny computer equipment and storage device").

20  Caselaw on which Plaintiffs rely that states, "where items that were clearly not the subject of the

21  search or even related to the search have been destroyed . . . courts in this circuit have refused

22  qualified immunity," is therefore inapposite. *See* Pls.' Resp. at 24. If anything, it supports an

23  inference that at least in some circumstances, a defendant may be immune from claims related to

24  ORDER RE MOTION FOR
    SUMMARY JUDGMENT

25   - 19

destruction of items that *are* the subject of a search.

Finally, as to destruction of the bait clams, Defendants argue the seizure and destruction was authorized by Washington law, even in the absence of a warrant, because Plaintiffs lacked a valid shellfish license. *See* Defs.' Rep. at 13, citing RCW § 77.15.085 ("Fish and wildlife officers and ex officio fish and wildlife officers may seize without a warrant wildlife, fish, shellfish, and covered animal species parts and products they have probable cause to believe have been taken, transported, or possessed in violation of this title or rule of the commission or director."). Plaintiffs have not argued that probable cause was lacking to seize the bait clams, and have not disputed Defendants' application of this law, and thus have not met their burden of demonstrating unreasonableness.

Because Plaintiffs have failed to allege facts supporting a conclusion that constitutional violations took place, they are unable to demonstrate any rights violated were clearly established. Defendants are entitled to qualified immunity from Plaintiffs' destruction-of-property claims.

### D. Summary Judgment and/or Qualified Immunity for Officers Involved in Plaintiffs' Detention

Defendants argue that Officers Jaros, Vincent, Myers, Clementson, Golden and Cenci—all WDFW law enforcement agents of varying rank—are entitled to summary dismissal and/or qualified immunity, their only objectionable involvement in this case being in the June 13, 2016 detention of Plaintiffs Shopbell and Anthony Paul. That detention, Defendants argue, was a valid investigatory stop under *Terry v. Ohio,* supported by "reasonable suspicion" that criminal activity was afoot; or, in the alternative, was a legal arrest supported by probable cause. Plaintiffs counter that a reasonable jury could conclude the detention went beyond a traditional *Terry* stop, and rose to the level of an arrest exceeding the limits of the Fourth Amendment to the Constitution.

Based on Fifth Amendment concerns, the two Plaintiffs have not submitted declarations describing the detention. According to all other accounts, however, on the morning of the WDFW searches, Defendants were advised that Anthony Paul and Hazen Shopbell were at the Port of Everett boat launch. Defendants Vincent and Jaros went to that location, and Defendant Myers arrived several minutes later. On making contact with the Plaintiffs, Vincent and Jaros advised them "they were being detained pending questioning from detectives and were not free to leave at that time." Decl. of Anthony Jaros, Dkt. No. 35, ¶ 5; Decl. of Shawn Vincent, Dkt. No. 43, ¶ 5. Defendants also claim they never placed Plaintiffs under arrest. *Id*. Myers arrived after Jaros and Vincent had made contact, and the three Defendants placed Plaintiffs in separate cars for transport to the Marysville Police Department ("MPD") for questioning: Shopbell traveling with Vincent and Jaros, and Paul with Myers. Jaros Decl., ¶ 6; Decl. of Alan Myers, Dkt No. 37, ¶ 5. Defendants placed both of the Plaintiffs in handcuffs for transport, "because WDFW does not allow us to transport detained or in-custody individuals in our vehicles unless they are in handcuffs." Myers Decl., ¶ 5.

Midway to the station, Defendants Cenci and Golden contacted Myers and told him to advise the Plaintiffs that the detention and questioning were voluntary. Myers Decl., ¶¶ 6-7. Defendants did so, and in response both Plaintiffs requested to be, and were, returned to the boat launch. Shopbell subsequently agreed to questioning, and traveled, not in handcuffs this time, to the MPD with Defendant Clementson. Clementson Decl., ¶ 6. Paul declined, and was then released. Myers Decl., ¶ 6.

### *Defendants Jaros, Vincent, and Myers*

The Court concludes that the Defendants who participated in the initial detention—Jaros, Vincent, and Myers—are not entitled to summary judgment on claims related to Plaintiffs'

detention. First, the allegations here create a dispute of fact as to whether the detention was a *Terry* stop or an arrest. "Precisely when in each case an arrest has occurred is a question of fact which depends on an evaluation of all the surrounding circumstances." *United States v. Richards*, 500 F.2d 1025, 1028 (9th Cir. 1974). Based on the facts alleged here, a jury could conclude that from the time the officers made contact with Plaintiffs at the boat launch, until the time Plaintiffs were returned to and released at the boat launch after transport partway to the MPD, Plaintiffs reasonably believed the detentions were not voluntary, particularly given that Plaintiffs were told at the outset that they were not "free to leave." *See, e.g.*, Jaros Decl., ¶ 5. Further, there is no allegation that Plaintiffs were uncooperative, or posed a reasonable possibility of danger or flight, or that the Defendants had information that Plaintiffs were about to commit a crime, yet Plaintiffs were handcuffed and placed in law enforcement vehicles for transport to the police station. Absent exceptional circumstances, such impositions are more often associated with an arrest than a valid *Terry* stop.  *See Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014) ("[W]e have only allowed the use of especially intrusive means of effecting a stop in special circumstances."); *Johnson v. Bay Area Rapid Transit Dist.,* 724 F.3d 1159, 1176 (9th Cir. 2013) (recognizing "some circumstances in which it is appropriate for an officer to use a level of force that would ordinarily bring to mind arrest, *i.e.*: (1) 'where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight;' (2) 'where the police have information that the suspect is currently armed;' (3) 'where the stop closely follows a violent crime;' and (4) 'where the police have information that a crime that may involve violence is about to occur.'" *Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir.1996)) (citations omitted). Given that Plaintiffs were told they were not free to leave, the length of time of the detention, the handcuffs, the placement in WDFW marked vehicles, the transport to another

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 22

location, and Plaintiffs' request to be returned to the boat launch on being advised the questioning was voluntary, a reasonable jury could well conclude the detention amounted to an arrest. *Green*, 751 F.3d at 1067 ("[B]ecause this inquiry is fact specific, it is often left to the determination of a jury.").

In addition, the Court cannot conclude based on Defendants' declaration testimony that if the detention did rise to the level of a (warrantless) arrest, it was supported by probable cause to believe that an offense had been committed by Plaintiffs, as required by the Constitution. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Courts have often reiterated that "the probable-cause standard is a practical, nontechnical conception that deals with the *factual and practical considerations* of everyday life," and that "probable cause is a fluid concept—turning on the assessment of probabilities in *particular factual contexts*—not readily, or even usefully, reduced to a neat set of legal rules. . . . The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the *totality of the circumstances*." *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) (internal citations omitted, emphases added).

Here, the facts that Defendants have presented to the Court are remarkably sparse. Each of the three detaining Defendants declares only some version of "from everything I knew about the investigation relating to these two individuals, I knew we had ample probable cause to place both of them under arrest at that time." *See, e.g.*, Myers Decl., ¶ 5.[5] Given the law's emphasis on "factual and practical considerations," "particular factual contexts," and the "totality of the circumstances" cited above, this statement is insufficient to allow the Court to determine whether

---

[5] Strangely, although not material to the Court's holding, the declaration of Anthony Jaros differs, asserting that "from everything I knew about the investigation relating to these two individuals, I knew we had ample probable cause to place Plaintiff Shopbell under arrest at that time." Jaros Decl., ¶ 5 (emphasis added).

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 23

the officers had probable cause for an arrest. Defendants fail to provide any basis for independently evaluating whether the officers' belief was reasonable, failing to specify what, exactly, constituted "everything" Defendants knew about the Plaintiffs at the time. Defendants do not state what crimes were implicated, or any facts within their knowledge suggesting Defendants had committed them, or otherwise supply facts that would have supported arresting Plaintiffs without a warrant. It is therefore impossible for the Court, at this time, to conduct an assessment of the "factual and practical considerations" supporting probable cause, as required by the Fourth Amendment. Indeed, the declarations lack the detail necessary to enable the Court to conclude even that the officers had a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" as required for a *Terry* stop—"articulable facts" being precisely what is lacking here. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) quoting *Terry v. Ohio*, 392 U.S. at 30.

Perhaps the implication is that the officers believed they had probable cause to arrest the Plaintiffs based on information reviewed in the search warrants. But the probable cause standard supporting a search warrant—to wit, a "fair probability that contraband or evidence of a crime will be found in a particular place"—does not necessarily support an arrest, and Defendants make no effort to explain how information contained in the search warrants here might have done so. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The warrants, on their face, do not contain any specific allegations that either of the two Plaintiffs had committed a crime. *See, e.g.,* Galanda Decl., Ex. 7. In fact, it is not even clear from the declarations whether these three Defendants actually reviewed the warrants specific to the June 13, 2016 searches; Defendants aver, ambiguously, only that they had "examined the warrants relevant to the investigation," of which there are many. *See, e.g.*, Jaros Decl., ¶ 4. Because the Court cannot confirm whether Defendants'

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 24

purported belief that they had probable cause to arrest was reasonable, summary dismissal of Defendants Jaros, Vincent, and Myers is not appropriate.

For the same reason, the Court is unable to evaluate whether the claimed probable cause was even "arguably reasonable" and thus, whether these three detaining officers are entitled to qualified immunity. In asserting the privilege against Plaintiffs' false arrest claims, Defendants argue only that "[i]n a false arrest case challenging probable cause for a warrant, the arresting officer enjoys qualified immunity unless 'the warrant [application] is so lacking in indicia of probable cause as to render official belief in its existing unreasonable. . . .'" Defs.' Mot. at 18, citing *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (bracketed word in original, omitted without explanation from Defendants' brief). But there is no arrest warrant (or arrest warrant application) at issue in this case, and given the lack of factual or legal argument supporting the claim of probable cause to arrest, the Court cannot conclude that qualified immunity from the false arrest claims applies.

### *Defendants Clementson, Cenci, and Golden*

Three other Defendants who were also tangentially involved in the detention, however, are entitled to dismissal of claims related to that detention. Defendant Clementson submitted a declaration stating that he did not arrive at the boat launch until after Plaintiffs were returned from the aborted trip to the MPD. By the time Clementson arrived, "neither Plaintiff Hazen Shopbell nor Anthony Paul were being detained nor under arrest – both men were free to leave at that time," and there are no allegations that would suggest otherwise. Decl. of Chris Clementson, Dkt. No. 32, ¶ 5. Clementson's role was limited to transporting Shopbell, unhandcuffed, to the MPD for voluntary questioning, to which Shopbell had undisputedly agreed. Clementson interviewed Shopbell, and returned him to the boat launch. *Id*. Based on these undisputed facts—and there are

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 25

no other material allegations relating to Clementson—his actions do not make out a constitutional violation of any discernable kind, and he is entitled to dismissal of these claims against him.

Similarly, Defendants Cenci and Golden were not present at the boat launch during the initial detention. Decl. of Mike Cenci, Dkt. No. 31, ¶ 4; Decl. of Paul Golden, Dkt. No. 33, ¶ 5. Their participation in the detention is apparently limited to directing the officers to tell the Plaintiffs that the interviews were voluntary, and that "if [Plaintiffs] did not want to be interviewed, they should be returned to the Port of Everett boat launch." *Id.*, ¶ 5. Plaintiffs fail to explain how these facts amount to a constitutional violation, and the civil rights claims against Defendants Cenci and Golden related to the detention of Shopbell and Paul are therefore also dismissed.

### E. Defendants John Does 1-20

Finally, Defendants seek dismissal of all John Doe defendants. The original Complaint in this case was filed in October 2018; the events giving rise to the claims therein began in the spring of 2015. Although this case was stayed between May 2019 and February 2020, Plaintiffs have been involved in other criminal and civil proceedings arising from these events, and have had ample time to conduct investigation into the events related to their claims. Nevertheless, in response to Defendants' motion to dismiss the John Doe defendants, Plaintiffs make no effort even to suggest who these unknown parties might be, or what role they may have played, let alone why Defendants have been unable to identify and serve them. The Court therefore GRANTS Defendants' request related to John Does 1-20 and hereby dismisses those Defendants.

### IV.    CONCLUSION

For the foregoing reasons, Defendants Rothaus, Susewind and Unsworth, and John Does 1-20, are hereby DISMISSED.

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 26

As to the remaining Defendants, given the relatively complex and overlapping intersection of Defendants, events, theories of liability, proposed grounds for dismissal, and objections thereto, and that neither side has provided the Court with a comprehensive articulation of which claims and Defendants should or should not be dismissed, the Court hereby orders the parties to meet and confer, and within 21 days of issuance of this Order, submit a Joint Status Report outlining what claims, if any, remain in light of this Order, and against which Defendants. The Joint Status Report shall not contain substantive re-argument of the underlying issues raised by the motion, only a factual recitation of the effect of this Order on the status of this case.

DATED this 14th day of July, 2020.


Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER RE MOTION FOR
SUMMARY JUDGMENT
- 27