1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HON. BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HAZEN SHOPBELL, ANTHONY PAUL,

Plaintiffs,

v.

WASHINGTON STATE DEPARTMENT OF
FISH AND WILDLIFE; *et al.*,

Defendants.

NO. 2:18-cv-1758-BJR

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' THIRD[1] MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Defendants Alan Myers, Shawnn Vincent, and Anthony Jaros' ("Individual Defendants") latest qualified immunity assertion should be rejected, as it relitigates their prior immunity assertion and offers "missing factual details" that were available previously on summary judgment.[2] Dkt. # 86 at 1. Under Fed. R. Civ. P. 56 and the Court's Standing Orders, summary denial is appropriate. Dkt. # 25 at 5. Individual Defendants *now* claim to have known "about the Plaintiffs at the time of the arrest" in order to now assert that they had probable cause to arrest Plaintiffs, but there is zero evidence circa June 13, 2016, that they had probable cause for arrest <u>at that pivotal time</u>. Dkt. # 86 at 1. In truth, Individual Defendants knew almost nothing about Plaintiffs when they arrested them, as revealed in their contradictory declarations, now four years after the fact. To the extent Individual Defendants read any search warrant affidavit prior to

---

[1] *See* Dkt. ## 30, 68. Defendants' prior two dispositive motions were similar but not identical, given the new Section III, Part 4 to their second motion titled, "Everett Boat Launch." *Compare* Dkt. # 68 at 5-6, *with* Dkt. # 30 at 5.

[2] As Plaintiffs' third amendment *deleted* two Plaintiffs and certain claims given the Court's prior ruling and added no new allegations, it is false for Defendants to cite it as reason to relitigate qualified immunity. Dkt. # 86 at 1.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

arresting Plaintiffs—they did not—it was not objectively reasonable for them to have arrested Plaintiffs, given the false statements made by Detective Wendy Willette in her warrant affidavits.

For Defendant Washington State Department of Fish and Wildlife's ("DFW") part, Individual Defendants and other involved officers were negligent throughout their results-driven investigation of Plaintiffs.  After Det. Willette's initial allegations of Plaintiffs' "reverse racism" and "price-fixing or antitrust violations," she and DFW stopped at nothing and no one in their investigation.  Throughout the process, DFW officers ignored and violated agency policy and established practices.  In addition, Det. Willette's supervisors failed to contain her as she did the same, indicating a severe failure to train on their part.  Summary judgment is again inappropriate.

## FACTS

### A.    DETECTIVE WILLETTE MISLEAD THE COURTS THROUGH FALSE STATEMENTS.

Detective Wendy Willette alone filed over 50 search warrants and affidavits in three courts and obtained over 30 search warrants against Plaintiffs—most notably from the Thurston County Superior Court on May 13, 2016; the King County Superior Court on June 7, 2016; and the Tulalip Tribal Court on June 9, 2016.  Exs. A, B; Dkt. ## 44-1, 48-13, 48-56.[3]  Det. Willette failed to seek review of each warrant paper from her supervisor Lieutenant Paul Golden, in violation of DFW policy.  Ex. C at 46-47; Ex. D at 12-13.  Det. Willette failed to seek review of her King County or Tribal Court warrant papers, also in violation of DFW policy.  Ex. C at 51; Ex. D at 18; Ex. E at 80-81. This is because DFW does not train its officers in search warrant protocol, and Det. Willette is inadequately supervised.  Ex. F at 43.

Det. Willette further violated DFW policy by failing to seek legal review of jurisdictional issues associated with executing a warrant on the Tulalip Reservation.  Ex. D at 18.  Mistakenly believing that "a superior court judge can issue a warrant for anywhere . . . including to an Indian Reservation," Det. Willette failed to even "ask whether the King County Superior Court had

---

[3] Each Exhibit referenced herein ("Ex.") is appended to the accompanying Declaration of Gabriel S. Galanda.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 2

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   jurisdiction to issue a search warrant at a residence within a subdivision of the Tulalip Tribes."

2   *State v. Clark*, 178 Wn.2d 19, 308 P.3d 590 (2013); Ex. E at 222, 227.  Det. Willette also failed

3   to appreciate that, according to *United States v. State of Wash*., 19 F. Supp. 3d 1126, 1149 (W.D.

4   Wash. 1994) ("Rafeedie"), DFW lacked investigative power over Plaintiffs (as discussed *infra*);

5   and according to agency policy, DFW also lacks authority to enforce the Tulalip theft law she

6   inserted into the Tribal warrant papers.  Ex. D at 70; Dkt. # 48-13 at 1; Dkt. # 44-3 at 1.  This is

7   also because DFW does not train its officers in Indian Country warrant protocols.  Ex. F at 48.

8          Det. Willette is correct that the June 7, 2020, King County and June 9, 2020, Tribal Court

9   warrants and affidavits are "mostly identical," although neither affidavits were truthful.  Ex. G.

10  In each affidavit, Det. Willette alleged Plaintiffs illegally purchased 444 pounds of crab on May

11  23, 2015.  Dkt. # 44-2 at 5-7;  Dkt. # 44-3 at 5-7.  The Tulalip Tribes sanctioned that purchase,

12  most notably on November 3, 2015, when Tulalip Shellfish Technician Rocky Brisbois told

13  DFW Detective Natalie Hale that the purchase was "okay" by the Tribes. Dkt. # 74 at 16; Dkt. #

14  48-1; *see also* Ex. H. at 1-2. In its first summary judgment ruling, the Court questioned whether

15  there is any "evidence Hale shared with Willette information concerning her interview of Rocky

16  Brisbois, or that Willette was aware by any other means that the Tribes had apparently

17  sanctioned the purchase."  Dkt. # 74 at 17.  Deposition testimony revealed that Det. Willette in

18  fact knew of Det. Hale's report regarding Mr. Brisbois, prior to June 13, 2020. Ex. E at 185.

19         Det. Willette admits she read Det. Hale's report.  Sergeant Erik Olson also discussed that

20  report with her, explaining: "I'm sure I talked about this piece with Detective Willette." *Id.*; Ex.

21  I at 32, 35-36.  Det. Willette was aware that Tulalip sanctioned the purchase, but ignored that

22  fact because she "wholeheartedly believe[d] that the 444 pounds of crab was illegal, period."  Ex.

23  E at 185.  Despite acknowledging the state/tribal shellfish co-management relationship, Det.

24  Willette refused to consult with either Tulalip or the Northwest Indian Fish Commission

25

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 3

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    regarding the legality of the purchase (or other aspects of her investigation).  *Id*. at 186; Dkt. #

2    44-2 at 3; Dkt. # 44-3 at 3.  Nor did she advise the King County or Tulalip courts that Tulalip

3    sanctioned the purchase.  *See id*. Det. Willette concealed that material fact, especially to the

4    Tulalip Court, in order to allege the crab was "harvested illegally." Dkt. # 44-2 at 7; Dkt. # 44-3

5    at 7.  She violated DFW's policy of being "truthful and honest at all times and in all things," as

6    well as the most basic tenant of standard police practice. Ex. J at 66; Ex. D at 81.

7            In each affidavit, Det. Willette also alleged that Plaintiffs' purchase of clams in 2015 was

8    illegal for want of a shellstock shipper license. Dkt. # 44-2 at 5, 8-9; Dkt. # 44-3 at 5, 8-9.

9    According to Tulalip, that shellfish also was legally harvested by Tulalip fishers and purchased

10   by Plaintiffs within Tulalip's usual and accustomed fishing areas, as per the Point Elliott Treaty,

11   Article V. 12 Stat. 927 (Jan. 22, 1855), and the Boldt Decision.  *United States v. State of Wash*.,

12   384 F. Supp. 312, 333 (W.D. Wash. 1974); Dkt. # 48-1 at 1; Ex. H at 1-2.  Tulalip is a designated

13   self-regulating tribe and "bear[s] primary responsibility for enforcement of shellfish sanitation

14   laws against its members . . . within its reservation, any tribal trust lands, or within the tribe's

15   usual and accustomed areas," under Rafeedie.  *Id.* at 1149. Despite proclaimed knowledge of

16   Rafeedie, Det. Willette was unaware of any "distinction between self-regulating and non-self-

17   regulating tribe[s]"—a distinction that dictates whether state sanitation laws apply, according to

18   DFW policy.  Ex K at 82; Ex. L at 1-2.  That is because DFW does not adequately train its

19   officers on state shellfish enforcement.  In fact, DFW's Rule 30(b)(6) agency training designee

20   could not recall any recent training on Rafeedie. Ex. F at 55.

21           Further, Det. Willette failed to follow *any* of the specific enforcement protocols for

22   alleged violation of state sanitation laws, delineated in Rafeedie.  19 F. Supp. at 1149-1152.

23   Believing that Plaintiffs violated either state and Tulalip law for want of a shellstock shipper

24   license, Det. Willette was obliged to contact a Tulalip officer and allow *Tulalip* to take action

25

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 4

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   "regarding the offender and any associated evidence or forfeitable property as he or she deems

2   appropriate, including arrest, citation [or] det[ention.]"  *Id.* at 1150 §§ B, E; Dkt. # 44-2 at 1;

3   Dkt. # 44-3 at 1; *see also* Dkt. # 48-41.   Det. Willette was authorized to "hold or seize any

4   shellfish" she believed was illegal, but also needed to furnish to Tulalip and "not destroy[]" any

5   such seized physical evidence.  *Id*. §§ E-F.  Det. Willette instead destroyed shellfish.  Dkt. #72-0

6   at 3.  She was ultimately required to refer potential criminal charges to *Tulalip* for investigation

7   and prosecution.  *Id*.   Det. Willette lacked jurisdiction with which to seek any warrant against

8   Plaintiffs for alleged violation of state sanitation laws.  *Id*.  But neither she nor her supervisors

9   ever discussed jurisdictional issues prior to June 13, 2016.  Ex. E at 222, 227.

10          In each affidavit, Det. Willette further alleged that Plaintiffs engaged in an underpayment

11  scheme that constituted state shellfish trafficking and federal "price-fixing or antitrust

12  violations."  Dkt. # 44-2 at 5-6, 10-13; Dkt. # 44-3 at 5-6, 10-13.  Det. Willette based her theory

13  on a February 28, 2016, email she received from Don Rothaus about his conversation that day

14  with Jonathan Richardson, as well as her own March 1, 2016, conversation with Richardson.  *Id*.

15  at 10-11.  But she misrepresented Rothaus and Richardson's words.  *See id*.  Det. Willette

16  misstated that Richardson "told Rothaus that several tribal crab fisherman had been underpaid by

17  Puget Sound Seafood Dist. LLC ["PSSD"] during the course of the last crab season . . . Rothaus

18  noted that this season was the October through December 2015 season." *Id*. at 10.  Richardson

19  testifies that he "[n]ever said underpaid"—explaining: "That's not words I would say," and

20  Rothaus did not note anything about any particular season or timeframe.  Ex. M; Ex. N at 70.

21          Det. Willette further misstated that Richardson "told Rothaus that the fishers had

22  contacted Tulalip Tribal Council to complain of the underpayments . . . and the tribe then

23  demanded that [PSSD] pay back the crab fisherman that they had shorted."  Dkt. # 44-2 at 10;

24  Dkt. # 44-3 at 10.  Rothaus did not write the words "Tulalip Tribal Council" or "demanded"; he

25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   instead said that Richardson "didn't specify" how Tulalip "intervened." Ex. M.  Rothaus never

2   used the words "Tulalip Tribal Council." Ex. N at 73.  According to Det. Willette's handwritten

3   notes, he said he "**doesn't know** if crabbers got council involved." Ex. O (emphasis added).  Det.

4   Willette misrepresented Rothaus and Richardson's words to fit her narrative.

5          Det. Willette started their conversation by saying, "I heard [from Rothaus] you had

6   Tulalip guys saying they were getting underpaid." Ex. N at 50. But "[t]hat's not . . . that's not

7   what [he] said" to Rothaus; Richardson "never used the word underpaid"—and Det. Willette's

8   notes also do not reflect that word.  *Id.* at 50; Ex. O.  Nor is it true that Richardson "volunteered

9   [PSSD] without [her] prompting him," as Det. Willette averred.  *Id.*; Dkt. # 44-2 at 10; Dkt. # 44-

10  3 at 10.  Nor is it true that Richardson said, "the fisherman were then outraged to find that they

11  had not been paid what was promised by 'their own,'" as she also testified. Dkt. # 44-2 at 11;

12  Dkt. # 44-3 at 11.  Those words, particularly "their own," are not Richardson's words.  Ex. N at

13  85-86.  Nor is it true that Richardson "stated that his company was only one of a few left that had

14  not succumbed to the apparent monopoly of [PSSD] was attempting to create," as she further

15  averred.  Dkt. # 44-2 at 11; Dkt. # 44-3 at 11.  Richardson never used the word "monopoly."  Ex.

16  N at 53; *see also id.* at 51.  According to Willette's contemporaneous handwriting, she

17  considered Plaintiffs' economic success, "reverse racism."  Ex. O.

18         Nor is it true that Richardson "said that there was an air of intimidation" about Plaintiffs

19  while on the docks. Dkt. # 44-2 at 11; Dkt. # 44-3 at 11.  According to Richardson: "I didn't use

20  air of intimidation. . . . I didn't say that." Ex. N at 86-87.  Det. Willette's notes also do not reflect

21  any such concern. Ex. O. In fact, Richardson "didn't feel any intimidation regarding [Plaintiffs]."

22  Ex. N at 89.  Nor did Richardson tell Det. Willette what is attributed to him in this paragraph

23  from both affidavits:

24

25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

> The man would not name the fishermen that had told him of the retro payments. He described that when Puget Sound Seafood Dist. LLC had first come into the marketplace, the tribal fishermen had expressed the desire to sell their catch to their own, claiming that since Puget Sound Seafood Dist. LLC was owned by tribal members, they would pay fair market value for the product. The man stated that the fishermen feel there is bias-based pricing for their crab. He said that the tribal members feel they are often underpaid for their product versus what non-tribal crab fishermen are paid by dealers for the same product. The man said that the fishermen were then outraged to find that they had not been paid what was promised by "their own".

When confronted with that paragraph in deposition, Richardson was almost speechless:

> Q. What's your reaction to that paragraph?
> A. I don't have a reaction.
> Q. Does it strike you as accurate or inaccurate?
> A. It's -- it's not my words.
> Q. Do you feel like she's putting words into your mouth here?
> A. It's -- yeah. This is – yeah.

*Id.* at 84. What Richardson did explain to Det. Willette, in detail, was how both "'retro' payments" and bait advances operate at Tulalip and "everywhere," including how "the fish tickets and the checks aren't matching up" due to bait advances to fishers and same-day price adjustments—"that's generally how this industry operates." *Id.* at 40-47; Ex. O. He explained that shellfish financial accounting is imperfect due to the dynamic, multi-party "system of bait advance and receipt, fish ticket transaction, check, potentially a retro check." *Id.* at 46. Det. Willette—who "was learning how the market worked" as she went—disregarded Richardson's explanation because it did not fit her monopolization and price-fixing/antitrust narrative. Ex. K at 59, 62-63. Det. Willette's warrant affidavit testimony violated DFW's truthfulness policy and, again, the most basic tenant of policing. Ex. J at 66; Ex. D at 81. According to Richardson himself, he was "used to advance her case against [Plaintiffs]." Ex. N at 105.[4]

**B. INDIVIDUAL DEFENDANTS *NOW* MANUFACTURE "PROBABLE CAUSE."**

DFW's multi-location search operation began on Monday, June 13, 2016 with an 8:00 AM briefing. Ex. P at 39. DFW officers gathered at two locations: Mill Creek and Fife. *Id.*

---

[4] More troubling, when Richardson confronted Det. Willette about how her misrepresentations hurt him and his business, he told him to "you need to get over it." Ex. N at 106. Further unbecoming of a law enforcement professional, Det. Willette "hysterically" told him—*her informant*—that *Plaintiffs' counsel* "GPSed her car [and] tapped her phone [and] put her family in harm's way," as well as testified here to her belief that counsel was "setting up an ambush" of her in connection with her deposition in 2018. *Id.* at 17; *see also id.*, at 22-23; Ex. E at 110.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  Defendant Vincent, then a probationary DFW officer, and his supervisor Sergeant Jennifer

2  Marstaud each arrived late to Mill Creek, at 8:15 AM and 8:34 AM, respectively. Dkt. # 48-19;

3  Ex G 6; Ex. P at 39. Det. Willette, the operation's "lead" who was in Fife, had planned a

4  PowerPoint briefing for Mill Creek via WebEx videoconference, but her technology failed,

5  causing her to relay the day's plans by phone. Ex. P at 19-20; Ex. Q at 6, 31.  Defendants Jaros

6  and Myers were also in Mill Creek, where nobody could see the briefing. *Id.*; Dkt. # 48-19; Ex.

7  R at 1; Ex. S.  As detailed below, Individual Defendants' recollections of the briefing—if any—

8  vary widely.  Individual Defendants had no previous knowledge about Plaintiffs.  Ex. K at 16-18.

9           Defendant Vincent *now* declares as follows[5]:

10         On June 13, 2016 at approximately 0800 hours, I attended a pre-search warrant
           meeting at the Tulalip Police Department briefing room. Prior to entering the
11         briefing room, I reviewed the **affidavit** in support of the search warrant relating to
           the search of the Shopbell residence on the Tulalip tribal reservation. I reviewed the
12         **documents** electronically in my WDFW assigned vehicle. I carefully reviewed the
           **affidavit and search warrant** supplied to us by Detective Wendy Willette. I was
13         focused particularly on the **warrant and affidavit for the Shopbell residence**,
           because I was assigned to participate in searching that location, with other teams
14         going to other locations. I do not recall how long I examined the search warrant and
           affidavit in terms of the number of minutes but I gave the warrant careful
15         consideration and examined it closely. . . . After examining the **warrants** and
           listening to the briefing it was abundantly clear to me we had abundant probable
16         cause to make arrests of the subjects listed in those **warrants**.

17  Dkt. # 89 at 2.  In deposition, Defendant Vincent testified that just prior to 8:15 AM, he received

18  the Tribal Court warrant affidavit via email, which he read on a computer from his patrol vehicle

19  while parked outside the Tulalip Police Department.  Ex. T at 21-23.

20          Defendant Vincent's latest testimony cannot be true.  First, at 8:00 AM Defendant

21  Vincent attended the briefing in Mill Creek, not Tulalip.  Ex. U.  He did not arrive to Tulalip for

22  a second briefing until 9:40 AM.  *Id.*  Second, having *never* received the Tribal Court warrant

23  affidavit by email, Defendant Vincent could not have reviewed that information on his computer

24
   ─────────────────
25  [5]  The following details are absent from Defendant Vincent's June 14, 2016, incident report as well as the first
   declaration he signed in this case on February 27, 2019. Dkt. # 48-19; Dkt. # 43.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'          **Galanda Broadman PLLC**
THIRD MOTION FOR SUMMARY JUDGMENT - 8                      8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

immediately prior to the Tulalip briefing.  *See* Ex. V. The only relevant paper Defendant Vincent received by email was a safety plan—not a warrant or affidavit—which Det. Willette sent him on June 8, 2016—before the Tribal Court warrant issued.  *Id.*  Det. Willette offered to "forward a copy of the [Superior Court] affidavit" to Defendant Vincent (and Jaros) by email on June 8, 2016, but he (they) never took her up on the offer.  Ex. II; Ex. T at 50.  Third, Defendant Vincent vacillates from having read a single "affidavit," to multiple warrant "documents," to the Tribal Court "warrant and affidavit for the Shopbell residence," to both the King County and Tribal Court "warrants." Dkt. # 89 at 2. Again, he could not have read *any* warrant papers because he was never emailed any warrant papers. *See* Exs. V, U; Ex. T at 50. Fourth, Defendant Vincent's June 14, 2016, incident report says nothing about "listening to" anything at either briefing, and says nothing about ascertaining probable cause. Dkt. # 48-19.  The truth is that on June 13, 2016, Defendant Vincent knew only that he was "serving a warrant on Hazon [sic] Shopbell and his residence."  *Id.*  As he confessed to Mr. Shopbell that day, that's all he knew.  Ex. W. at 15.

Defendant Jaros *now* declares that:[6]

> On June 13, 2016, at approximately 7:40 am, I arrived at the WDFW Mill Creek Office for a briefing on executing **warrants** at three different locations that same day. On the morning of the briefing, I carefully reviewed the **affidavit and search warrant** provided at the search warrant briefing . . . To my knowledge, everyone who was assigned to attend the briefing received copies of the same search **warrant or warrants and the affidavit or affidavits**. After examining the **affidavits**, listening to the briefing, and speaking with other officers before, during, and after the briefing, it was clear to me we had abundant probable cause to search the locations listed and possibly make arrests of the subjects listed in those warrants.

Dkt. # 88 at 1-2 (emphasis added).  Defendant Jaros' latest testimony is untrustworthy and deserves factfinder scrutiny.  First, in his June 14, 2016, incident report, he discusses a single "search warrant" for the Shopbell Tulalip residence. Ex. R at 1.  Defendant Jaros says nothing of having reviewed *any* warrant paper or *any* "affidavit or affidavits"—because he never read any

---

[6] The following details are similarly lacking from Defendant Jaros' incident report as well his first, February 27, 2019, declaration.  Dkt. # 36; Ex. R.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

warrant papers. *Compare id., with* Dkt. # 88 at 2.  Second, he testified in deposition that he received a copy of a single "superior court warrant" at Mill Creek; he does not recall ever receiving the Tribal Court warrant. Ex. Q at 6-7, 9, 12. Nor does Sgt. Marstaud—DFW's Tulalip "scene supervisor"—recall any Tribal Court warrant.[7]  Ex. P at 14-15; Ex. E at 143.

Defendant Myers *now* testifies that[8]:

> At 1000 hours I left Mill Creek and drove to Tulalip Police Department for an additional meeting and staging of personnel, that I arrived to at 1030 hours. At the Tulalip Police Department briefing room, I was given and reviewed the affidavit and search warrant supplied to us by Detective Wendy Willette. I do not recall exactly how long I examined the search warrant and affidavit but I believe it was approximately one hour.

Dkt. # 87 at 4.  In deposition Defendant Myers testified that Det. Willette "handed out copies of the relevant search warrants" to him and others at the Tulalip briefing[9] before telling him that "there was sufficient probable cause to detain, arrest, and interview" Plaintiffs and that they were "to be taken into custody **and transported** to the Marysville Police Department (MPD) to be interviewed." Dkt. # 87 at 4 (emphasis added); *see also* Ex. X at 37-38.  Defendant Myers further testified that he and Det. Willette "were both at Tulalip," where she advised him Plaintiffs "were to be detained **and arrested** and moved to Marysville PD."  Ex. X at 37-38 (emphasis added). His testimony is not only contradictory, it is plainly false.  First, since he was not at Tulalip from 10:00 to 11:00 AM, he could not have "examined the search warrant and affidavit" there for "approximately one hour."  Ex. S.  According to his June 13, 2016, duty log, he arrived at 10:00 AM and left Tulalip by 10:30 AM.  *Id.; see also* Dkt. # 48-19 at 1.  Second, Det. Willette was

---

[7] Only the Tribal Court warrant was of force on the Tulalip Reservation on June 13, 2016.  *State v. Clark, supra*; Tulalip Tribal Code Section 2.25.030, *available at*: https://www.codepublishing.com/WA/Tulalip/html/Tulalip02/Tulalip0225.html#2.25.030.

[8] The following details are likewise lacking from Defendant Myers' first declaration in this case on February 28, 2019, as well as the incident report he belatedly filed on August 29, 2016. Dkt. # 37; Ex. JJ.  .

[9] Defendant Myers also attended the earlier Mill Creek but does not recall any materials other than a safety plan being handed out there.  Ex. X at 27.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 10

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

never at Tulalip that day.  Dkt. # 44 at 4. She was in Fife and Lake Tapps and thus could not have discussed probable cause with him while they "were both at Tulalip." *Id*.; Ex. M at 37-38.

On the morning of June 13, 2016, Defendants Myers, Vincent, and Jaros did not believe they had probable cause for arrest.  *See e.g.,* Exs. R, S U, Y; Dkt. # 48-19.  They manufactured that narrative years later for this case—specifically the motion at bar.  Dkt. ## 87-89.

## C.   DUE TO ADMITTED "MISCOMMUNICATION," INDIVIDUAL DEFENDANTS FALSELY ARRESTED AND IMPRISONED PLAINTIFFS FOR NEARLY TWO HOURS.

Defendants originally planned that Plaintiff Shopbell "be preliminarily interviewed" by Detective Chris Clementson; there was no stated plan for Plaintiff Paul.  Dkt. # 48-18 at 10, 13.  According to Defendant Myers: "the original plan was to allow them to give voluntary statements, voluntarily – [to] be voluntarily interviewed. There was no discussion of whether or not they could be arrested or not." Ex. X at 57.  That is because there was no probable cause then; nor is there a scintilla of contemporaneous documentary evidence—*e.g.*, circa June 13, 2016, PowerPoint slides, duty logs, or incident reports—suggesting that Individual Defendants believed probable cause existed then.  *See, e.g.,* Exs. R, S, U, Y; Dkt. # 48-19; Ex. R. Indeed, nobody even used the words "probable cause" until they became relevant to this litigation.  *Id.*

By 10:15 AM, Defendants convened for the second briefing at Tulalip and learned Plaintiffs were at the Everett Marina preparing for the Tulalip crab fishing opener. Exs. R, Y; Ex. X at 37-38; Dkt. # 48-19. Within five minutes of Defendants Vincent and Jaros' arrival at Tulalip, Sgt. Marstaud tasked them to "locate" and "contact" Plaintiffs. Exs. U, R, Y; Ex. P at 17; Dkt. # 48-19.  Defendant Vincent understood they "were to meet up [with Plaintiffs] if they were there, to meet them for the warrant, try and get the cell phone, and then stand by with them until a detective could come over and speak to them about the case." Ex. T at 21.

By 10:25 AM, Defendants Vincent and Jaros had instead "detained" and "arrested" Plaintiffs. Exs. U, R, Y; Ex. P at 18.  They made contact with Plaintiffs on the Everett Marina

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

boat ramp.  Ex. T at 30.  They first approached Plaintiff Shopbell and according to Defendant

Vincent, "asked him for his cell phone as we -- and advised him we had a search warrant for it,

and then we asked [him] to walk back with us to our -- to my patrol vehicle."  *Id.* at 26.  Plaintiff

Shopbell asked Defendant Vincent why he was arrested: "I said; Man, what's going on? He says;

I don't know. . . . I asked him; What's going on? He says; I couldn't tell you."  Ex. W at 15.

While Defendant Jaros detained Plaintiff Shopbell, Defendant Vincent approached

Plaintiff Paul and:

> advised him of the reason [he] was there, for the warrant, and then [he] asked him
> for his cell phone and his computer, if he had it, for the -- for the reason of the
> warrant, and he asked what was going on, and I advised him that we had a
> warrant, and that detectives would be coming down to give him more information.
> And I asked him to walk with me to my patrol vehicle.

Ex. T at 30-31.  Defendant Vincent testified that neither Plaintiff was uncooperative, hostile, or

armed; nor did they pose any concern of danger or flight; nor were they believed to be in the

process of committing any crime. *Id.* at 27-28, 31-32.  Defendants Vincent and Jaros did not in

any way advise Plaintiffs they had probable cause for their arrest.  *Id.* at 30-31.  They simply told

Plaintiffs they "had a warrant."  *Id.*  That is because Defendants Vincent and Jaros did not know

why Plaintiffs were being questioned, detained, or arrested. *Id.*; Ex. at 15, 27.

Defendants Vincent and Jaros frisked Plaintiffs, handcuffed their hands behind their

backs, and informed them they "were not free to leave." Ex. R; Dkt. # 48-19; Dkt. # 35 at 2; Dkt.

#88 at 3; Dkt. # 43 at 2; Dkt. #  89 at 3. Defendants Vincent and Jaros claim they "placed

Plaintiffs in handcuffs because WDFW policy does not allow [officers] to transport detained or

in-custody individuals in [patrol] vehicles unless they are in handcuffs." Dkt. # 35 at 2; Dkt. #88

at 2-3; Dkt. # 43 at 2; Dkt. #  89 at 3.  But that policy only applies to *prisoners*, for example,

when being transported to jail.  Ex. Z at 1-2.  That policy does not apply to "detained or in-

custody individuals." *Id.*  In deposition, Defendant Jaros admitted as much:

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Q. And what was Mr. Shopbell's status when you handcuffed and put him in the back of your patrol car? Meaning was he a suspect, was he a prisoner, was he a detainee; what was his status?

A. He was being detained for an investigative purpose. He was a suspect listed in the search warrant.

Q. So he wasn't a prisoner?

A. No.

Ex. Q at 20. In regard to Plaintiffs' exact status while in Defendants' custody, Defendant Myers, Det. Willette, and Sgt. Marstaud each admitted—as this Court has already ruled—that they were arrested.  Ex. X at 45; Ex. P at 18; Ex. EE at 191; Dkt. # 74, at 23.

Defendants Jaros and Vincent testified they did not *Mirandize* Plaintiffs, even though DFW policy provides: "*Miranda* warnings must be given once the Officer has probable cause to arrest [or] the person is not free to leave." Ex. T at 35; Ex. Q at 19; Ex. AA at 10.[10]  Defendants Vincent and Jaros' June 13, 2016, duty log entries do not say *anything* about probable cause for arrest; nor do their June 14, 2016, incident reports.  Exs. R, U, Y; Dkt. # 48-19.  If Defendants Vincent and Jaros in fact believed *on June 13, 2016*, that they had probable cause to arrest Plaintiffs—they did not—they needed to *Mirandize* Plaintiffs and document that they were read their rights within 72 hours of their arrest.  Ex. AA at 10; Ex. BB at 4.

At or about 10:30 AM, Defendant Myers and Det. Clementson deployed to the Everett Marina to assist with transporting Plaintiffs to the Marysville Police Department (MPD) for questioning. Exs. M, CC, JJ.[11]  Upon their arrival, Defendant Myers and Det. Clementson observed Defendants Vincent and Jaros "already had Hazen Shopbell and Anthony Paul detained" in handcuffs. Exs. N, CC, JJ. Defendant Myers "transferred [his] cuffs over" to Plaintiff Paul and frisked and placed him in the back of his vehicle. Ex. X at 45; Ex. N.

---

[10] *See also* Ex. AA at 10 ("Officers shall advise all physically arrested suspects, including those arrested for warrants, of their *Miranda* rights at the time of arrest.").

[11] Detective Clementson did not prepare a duty log that day, in violation of DFW policy. Ex. DD; Ex. BB at 6 ("For each duty day, Officers will determine how much time they spent on specific activities during that day, and create log entries to reflect the time spent on each activity.").

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   Defendant Jaros "double locked the cuffs" on Plaintiff Shopbell and placed him behind the cage

2   in the back of his vehicle. Exs. R, U, Y.  By 10:40 AM, both vehicles left for MPD.  *Id.*

3     At 11:50 AM, while en route to MPD, Defendant Myers received a call from Lt. Golden

4   (who was in Tacoma), who had received a brief call from Deputy Chief Mike Cenci (who was in

5   Fife). Ex. C at 28.  Chief Cenci asked Lt. Golden: "D[o] you know that . . . they have two people

6   in custody in the north location and are . . . taking them to I believe it was Marysville?" *Id.*  Lt.

7   Golden recalls Chief Cenci's "impression was like they were under arrest and they were going to

8   jail, like they were taking them to Marysville PD." *Id.*  Lt. Golden said he was unaware

9   Plaintiffs had been arrested. *Id.* Chief Cenci "didn't think they should be taken into custody." *Id.*

10    Lt. Golden called Defendant Myers and said: "Hey, I'm not sure what you guys are

11  doing, but just to be clear, these interviews are voluntary." *Id.* at 29. Defendant Myers recalls

12  being told "that the suspects were to be advised that their interviews were strictly voluntary and

13  that if they chose not to be interviewed, they would be returned and dropped off at the 10th street

14  boat launch where they were originally contacted." Ex. JJ. Defendant Myers was surprised,

15  saying: "What? . . . That's not what Wendy said. Wendy said -- asked us to go get these guys  . . .

16  when she found out where they were, and that's what we're doing." Ex. X at 55. Lt. Golden

17  disagreed: "that wasn't our plan, our initial plan." Ex. X at 55; Ex. JJ.  Defendant Myers asked

18  Plaintiff Paul if he wished to be voluntarily interviewed. *Id.*  Plaintiff Paul declined, and

19  Defendant Myers returned him to the Everett Marina and released him.  Ex. X. at 56.

20    At 11:53 AM, Defendant Myers relayed Lt. Golden's command to Defendants Vincent

21  and Jaros. Exs. R, U, Y; Dkt. # 48-19.  Officer Jaros recalls being "advised there had been a

22  change in plans." Dkt. # 48-19. Mr. Shopbell overheard Defendants' conversation: "[T]hey

23  wasn't supposed to arrest us. I heard it over the scanner. They were just supposed to talk to us."

24  Ex. W at 24.  Defendant Jaros asked Plaintiff Shopbell if he wanted to voluntarily speak with

25

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 14

DFW. Dkt. # 48-19; Ex. R. Plaintiff Shopbell also declined, explaining "he would rather go fishing and arrange to meet up after" with Det. Clementson. Dkt. # 48-19. Defendants Jaros and Vincent returned Plaintiff Shopbell to the marina, where they released him at 12:10 p.m.. *Id.*; Exs. U, Y. Individual Defendants' arrest and imprisonment of Plaintiffs for nearly two hours was an admitted "miscommunication." Ex. E at 216-217.

After Plaintiff Shopbell realized his boat had already left the marina, he agreed to voluntarily speak with Det. Clementson. Dkt. # 48-19. While at the marina, Plaintiff Shopbell recalls Det. Clementson also did not know why he was arrested: "He says; I don't know what you guys did, but I just got to interview you." Ex. W at 27. By 12:20 p.m., Plaintiff Shopbell got into Det. Clementson's vehicle and rode with him to MPD "voluntarily and uncuffed in the front seat" for a "non-custodial interview." Dkt. # 53 at 2; Ex. M at 2. Once at MPD, Det. Clementson finally *Mirandized* Plaintiff Shopbell, before interviewing him for three hours. Ex. M at 2. Plaintiff Shopbell recalls: "he just asked me a series of questions that I think somebody asked him to ask. Because like it was new to him or something . . . I remember they didn't make sense." Ex. W at 29. But he still voluntarily answered all of Det. Clementson's questions. *See id.*

**D.   DEFENDANTS BREACH DFW POLICY AND OFFICER STANDARDS OF CARE.**

In addition to all of the DFW policy/standard policing lapses identified above:

On June 13, 2016, all involved DFW officers were required to "timely and accurately" chronicle their day's activities in duty logs. Ex. BB at 1, 5-6; Ex. D at 49, 58-59. Det. Willette and Det. Clementson did not. Exs. FF, GG. By the end of that 2016 or soon thereafter, DFW policy required Det. Willette to convene an after-event briefing. Ex. D at 32-33. She did not— she was unaware of that policy. Ex. K at 74.

By June 16, 2016, Defendant Myers was required to file his incident report detailing his involvement in Plaintiffs' arrest and the search of the Shopbell residence. DFW officers must file reports for any "physical arrest(s)" within 72 hours, in order "to give the information to the

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   case officer in a timely fashion" and "to ensure freshness of memory . . . or help provide for

2   freshness of memory in those cases." Ex. BB at 2, 4.  Defendant Myers did not—until ten weeks

3   later, on August 29, 2020.  Ex. JJ; Ex. E at 48.

4          By June 23, 2016, Det. Willette needed to file a warrant return with the Tribal Court.  Ex.

5   E at 47.  She did not—until six weeks later, on July 26, 2020. Dkt. # 48-13 at 3; Dkt. # 48-17;

6   Ex. E at 76-77.[12]

7          On September 23, 2016, Det. Willette comingled computer evidence seized from

8   Plaintiffs with a methamphetamine crystal that was left in an evidence bag from another DFW

9   case, and tested those illicit drugs at the customer service station of DFW's Mill Creek office. Ex

10   S; Ex. HH at 28-29.  The admitted cross-contamination of evidence epitomizes the incompetence

11   of Det. Willette's investigation.  *Id.*

12          By 2017, Defendants "shopped various potential criminal charges against [Plaintiffs]"—

13   according to the Skagit County Superior Court—to six local, state, and federal prosecutors.  Dkt.

14   # 72-0 at 3 n1; Dkt. # 72-1 at 3 n1; *see also* Dkt. # 72-3 at 29.  DFW does not have a policy that

15   requires an officer to seek supervisory approval before referring potential charges for

16   prosecution, including when multiple prosecutors decline DFW's referral.  Ex. D at 61, 64.

17   There is no DFW policy to prevent what the Skagit County court called a "troublesome" agency

18   practice of "shopping the prosecution." Dkt. # 72-3 at 29. Plaintiffs' expert Timothy T. Williams,

19   Jr., a twenty-nine-year veteran Senior Detective Supervisor of the Los Angeles Police

20   Department, called DFW's "prosecutorial 'shopping' . . . [an] egregious practice. Ex. FF at 6.

21   **E.     DFW OFFICERS WERE NOT PROPERLY TRAINED BY 2016.**

22          In addition to DFW training lapses identified above:

23

24

---

25   [12]   This   gaffe   caused   the   Tulalip   Tribes   to   amend   their   search   warrant   laws.
     https://www.codepublishing.com/WA/Tulalip/html/Tulalip02/Tulalip0225.html#2.25.030.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    DFW officers do not receive implicit bias training either in the basic law enforcement

2   academy or the agency's in-house program. *See* Dkt. # 72-3 at 29; Ex. F at 54-55 (in 2015 and

3   2016, the agency offered a "single class . . . on biased-based policing"—a one-hour prerecorded

4   video produced elsewhere). Nor do DFW officers receive training regarding interaction with

5   tribal law enforcement agencies or Treaty fishers. *Id.* at 51-52.  DFW admits that its 140-person

6   "commissioned staff is majority white males." *Id.* at 56.[13]  The agency has failed to diversify its

7   ranks—according to a DFW Rule 30(b)(6) designee, "it is what it is." *Id.* at 41.  What training is

8   furnished to DFW officers is taught predominately by white men.  *Id.* at 56.  DFW's self-

9   regulated training program is taught by 30 to 35 training officers; all but one are white. *Id.* at 38.

10  DFW has no Indigenous training officers.  *Id.* at 50-51.  DFW's training program is not reviewed

11  or approved by any regional or national law enforcement regulatory body.  *Id.* at 9.

12    DFW is, therefore, unable to realize its racial bias towards Plaintiffs, who its officers

13  have called "dirty," "greedy," and "not so smart." Dkt. # 48-54.  Only Lt. Golden admitted in

14  deposition how an Indigenous man might view such comments as racist or prejudicial. Ex. C at

15  87-88.  Det. Willette testified that race was not at issue in her investigation; she considers

16  Plaintiffs' concerns about racial bias and prejudice "a crutch." Ex. E at 167.  She is blind to her

17  bias. In her March 1, 2016 conversation with Richardson, she called Plaintiffs' efforts to

18  "monopolize" the Tulalip shellfish market, "reverse racism." Ex. O.  The agency also views

19  Plaintiffs' smoke shops and fireworks stands—prevalent enterprises in Indian Country—as

20  nefarious. Dkt. # 48-54. DFW investigated Plaintiffs' other businesses as part of its federal price-

21  fixing/antitrust investigation despite DFW's "Referrals to Other Agencies" policy, which dictates

22  that "Fish and Wildlife Officers shall focus on the primary mission of enforcing the Fish and

23  Wildlife Code (RCW Title 77)." Ex. KK at 1.  Despite that policy mandating referral of non-

24

25  [13] *See also* https://wdfw.wa.gov/about/enforcement.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 17

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   fishing matters to other authorities, Det. Willette, Lt. Golden, and Chief Cenci conspired to

2   investigate every financial aspect of Plaintiffs' lives. Ex. K at 80-81, 101.  When asked why in

3   deposition, Det. Willette smugly testified "Well, we have kind of this mantra in the Department

4   of Fish and Wildlife which is you catch it, you clean it . . . ." Ex. K at 92. Mr. Williams called

5   these "racial" practices "unreasonable," opining that "implicit bias training is absent and should

6   be addressed affirmatively by DFW."  Ex. FF at 7.

7                                    **LAW AND ARGUMENT**

8   **A.   THE COURT HAS ALREADY FOUND QUESTIONS OF MATERIAL FACT PRECLUDE
      SUMMARY JUDGMENT AS TO WHETHER PLAINTIFFS WERE LAWFULLY ARRESTED.**

9            In its Order on Defendants' second summary judgment motion, the Court found that it

10  "cannot conclude based on Defendants' declaration testimony that if the detention did rise to the

11  level of a (warrantless) arrest, it was supported by probable cause to believe that an offense had

12  been committed by Plaintiffs, as required by the Constitution." Dkt. # 74 at 11.  Now, in a *third*

13  motion for summary judgment, Defendants cite to much the same evidence, make the same exact

14  arguments, and ask for the opposite result. Dkt. # 86 at 6-11 (citing Dkt. ## 32, 35, 37, 43).[14]

15           The Court's Standing Orders are clear that "[m]otions that reassert prior arguments or

16  raise new arguments that could have been made earlier will be summarily denied." Dkt. # 25 at 5;

17  *cf. United States v. Bernard*, 21 F.3d 425 (4th Cir. 1994) (denying "the Government's second

18  motion for summary judgment" where "the Government relied on the same evidence that it had

19  relied upon in its first motion"); *Peasley v. Spearman*, No. 15-1769, 2018 WL 4468823, at *8

20  (N.D. Cal. Sept. 18, 2018) (denying a "second summary judgment motion" that "relie[d] on the

21  same evidence and same legal arguments as the other defendants' summary judgment motion");

22  *Short v. USAA Cas. Ins. Co.*, No. 10-766, 2014 WL 11531761, at *2 (N.D. Okla. Mar. 28, 2014)

23  ("[A]ny second motion should not simply re-hash the same arguments on the same evidence

24

25  _____
    [14] The Court should more properly treat this portion of Defendants' motion as one for reconsideration.  *See, e.g.,*
    *Polidori v. Joy*, No. 06-6004, 2008 WL 697690, at *1 (W.D.N.Y. Mar. 12, 2008).

    PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'                    **Galanda Broadman PLLC**
    THIRD MOTION FOR SUMMARY JUDGMENT - 18                               8606 35th Avenue NE, Ste. L1
                                                                          Mailing: P.O. Box 15146
                                                                          Seattle, WA 98115
                                                                          (206) 557-7509

1   presented in the initial motion for summary judgment, as the Court has no intention of

2   considering identical arguments multiple times in this litigation.").  Individual Defendants earlier

3   declarations lacked the detail necessary to enable the Court to conclude that "'a reasonable

4   suspicion that criminal activity [was] afoot,'" and they lack the same now.  Dkt. # 74 at 11

5   (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Defendants have not presented any

6   evidence that was unavailable earlier.  Their latest motion should be denied on this basis alone.

7   **B.    INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.**

8          Defendants Myers, Vincent, and Jaros summarily submit that they are entitled to qualified

9   immunity because they "examined the warrant affidavits from the June 13, 2016, operation and

10  formed the belief they had probable cause." Dkt. # 86 at 10-11.  The question in not, however,

11  whether these Defendants "formed the belief they had probable cause," but whether they formed

12  that belief at the moment of Plaintiffs' arrest and whether that belief was "'objectively

13  reasonable'" then.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Baribeau v. City of Minneapolis*, 596

14  F.3d 465, 478 (8th Cir. 2010) (citing *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)); *see*

15  *also United States v. Clark*, 31 F.3d 831, 835 (9th Cir.1994) (same).

16         As Defendants correctly maintained in their earlier motions: "Probable cause exists if '***at***

17  ***the moment the arrest was made*** . . . the facts and circumstances within [the officers'] knowledge

18  . . . were sufficient to warrant a prudent man in believing that [the suspect] had committed or was

19  committing an offense.'" Dkt. # 30 at 14; # 68 at 14-15 (quoting *Beck v. Ohio*, 379 U.S. [at] 91

20  (citations omitted) (emphasis added; brackets in original).  In Defendants latest motion, they are

21  also correct that the Court must "decide 'whether . . . ***historical facts***, viewed from the standpoint

22  of an objectively reasonable police officer, amount to' probable cause."  Dkt. # 68 at 15 (citing

23  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (emphasis added). According to the Ninth Circuit:

24         An officer has probable cause to make a warrantless arrest when the facts and
           circumstances within his knowledge are sufficient for a reasonably prudent person to
           believe that the suspect has committed a crime.  The analysis involves both facts and

25

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'       **Galanda Broadman PLLC**
THIRD MOTION FOR SUMMARY JUDGMENT - 19                   8606 35th Avenue NE, Ste. L1
                                                         Mailing: P.O. Box 15146
                                                         Seattle, WA 98115
                                                         (206) 557-7509

law.  The facts are those that were known to the officer ***at the time of the arrest.***

*Rosenbaum v. Washoe Cty.,* 663 F.3d 1071 (9th Cir. 2011) (citing *Crowe v. County of San Diego,* 608 F.3d 406, 432 (9th Cir.2010), *cert. denied,* 131 S.Ct. 905, 907 (2011).).  At the moment of Plaintiffs' arrest, Individual Defendants had not read any warrant affidavit and did not otherwise believe there was probable cause for arrest, according to contemporaneous evidence. *See e.g.*, Exs R, S, U. Y; Dkt. # 48-19.  They are not entitled to qualified immunity.

In addition, their objective reasonableness is to be determined not only with respect to the officers who made the arrest, but also to the officer who provided the affidavit upon which the arrest was purportedly based.  *Clark*, 31 F.3d at 835.  There are four circumstances in which the good faith exception does not apply because reliance is *per se* unreasonable:

(i)  where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement;

(ii) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official;

(iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or

(iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

*United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (citing *United States v. Leon*, 468 U.S. 897, 923-26 (1984)).  As outlined above, Det. Willette mislead the King County and Tribal Courts by making false statements and recklessly disregarding the truth in making other statements, throughout her affidavits.  Det. Willette's averments regarding: (1) Richardson and Rothaus' attributed words of an "underpayment" scheme; (2) the 444-pound crab purchase; and (3) the claim transactions, were all false or reckless.  Therefore, assuming Individual Defendants read Det. Willette's affidavits prior to arresting Plaintiffs—they did not—they could not have reasonably relied upon her affidavit testimony in good faith.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nor did what Det. Willette know about Plaintiffs by June 13, 2016, get communicated to Individual Defendants pre-arrest, as required by the "collective knowledge doctrine." *United States v. Ramirez*, 473 F.3d 1026 (9th Cir. 2007).   Individual Defendants had no knowledge of Plaintiffs before June 13, 2016; the PowerPoint presentation failed that morning; and none of them read any warrant papers prior to arresting Plaintiffs.  Plaintiffs' expert agrees:

> [I]f there was probable cause to arrest the Plaintiffs, Detective Willette should have obtained arrest warrants when she obtained the search warrants in this matter.  This was not done. Also, if there was probable cause to arrest the Plaintiffs, Officers Vincent and Jaros and Captain Myers should have noted that in their June 13, 2016, incident reports.  This also was not done.  I have reviewed no evidence that would lead me to conclude that, at the time of Plaintiffs' arrest, the arresting officers had probable cause for arrest.  Based on the information that they had at the time, a reasonable officer would not have had probable cause.

Ex. FF at 6. Individual Defendants' probable cause determination was not objectively reasonable. They are not entitled to qualified immunity, and their latest motion must be denied.

**C.    PLAINTIFFS STATED VIABLE CIVIL CONSPIRACY CLAIMS.**

There are two statutes under which a Plaintiff might prove a civil rights conspiracy case, 42 U.S.C. § 1983 and 42 U.S.C. § 1985.  To prevail on a claim for conspiracy to violate one's constitutional rights under § 1983, Plaintiffs must show specific facts to support the existence of the claimed conspiracy.  *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989).   The elements of a cause of action for § 1983 conspiracy are: (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement.  *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991). In addition, there must be an agreement or meeting of the minds to violate his constitutional rights.  *Woodrum v. Woodward Co.*, 866 F.2d 1121, 1126 (9th Cir. 1989).  A formal agreement is not necessary; one may be inferred from the defendants' acts and or other circumstantial evidence. *United States v. Clevenger*, 733 F.2d 1356, 1358 (9th Cir. 1984).

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 21

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Title 42 U.S.C. § 1985(3)[15] provides, in relevant part:

> If two or more persons in any State or Territory conspire . . . , for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To state this cause of action Plaintiffs must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (citing *United Brotherhood of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 828-29 (1983)). To plead a deprivation of equal protection, the second element of a § 1985 claim, Plaintiffs must allege "a deprivation of [a] right motivated by some racial, or . . . other[ ] class-based" animus. *Sever*, 978 F.2d at 1536.

Det. Willette admitted to her, Lt. Golden, and Chief Cenci's scheme to deprive Plaintiffs' constitutional rights—*i.e.,* to clean whatever they caught in her "reverse racism" investigation—but the Court previously dismissed those three defendants from this action.[16]

C.   **PLAINTIFFS' NEGLIGENT TRAINING CLAIM MUST PROCEED TO A JURY.**[17]

1.   **The Historical Impact Of An Employer's Admission Of Vicarious Liability**

The decision of the Maryland Supreme Court in *Houlihan v. McCall* was one of the earliest cases where a court adopted the "preemption rule." 78 A.2d 661 (Md. 1951). The reasoning of *Houlihan* was that, if an employer admits agency, evidence of its own previous

---

[15] Defendants are correct that 42 U.S.C. § 1985, not 42 U.S.C. § 1988, govern a portion of Plaintiffs' civil conspiracy claims. Dkt. # 86 at 11.

[16] Defendants did not previously seek dismissal of Plaintiffs' federal conspiracy claims, but it appears the Court dismissed those claims against several originally named individual Defendants, including Det. Willette, Lt. Golden, and Chief Cenci, *sua sponte*. Dkt. # 74 at 18, 26.

[17] Plaintiffs hereby voluntarily dismiss their negligent supervision claim; it is enveloped in their negligence claim.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   misconduct serves no purpose except to inflame the jury.  *Id.* at 140.  Since then, under common

2   law contributory negligence schemes, it made little sense for the employer's fault to be separately

3   determined if they admitted vicarious liability.  First, the employer and employees were each

4   totally (100%) liable for the fault of each other.  Second, the plaintiff had to have zero (0%) fault.

5   Thus, when an employee admitted vicarious liability, any direct negligence the employer had was

6   eliminated by the admission.  *Phillips v. Kaiser Alum.*, 875 P.2d 1228, 1234 (Wash. App. 1994).

7       Importantly, though, at the time of the *Houlihan* decision in 1951—and still today—

8   Maryland was a contributory negligence state under an "all or nothing" framework.  In this

9   framework, a jury never needs to determine the percentage of the total fault attributable to every

10  entity that caused the claimant's damages because there is no need to apportion relative fault.  To

11  the extent that pure contributory negligence schemes still exist, the preemption rule continues to

12  make sense.  *See generally* J.J. Burns, *Respondeat Superior as an Affirmative Defense: How*

13  *Employers Immunize Themselves from Direct Negligence Claim*, 109 MICH. L. REV. 657 (2011).

14      With the adoption of comparative fault in states like Washington, however, the

15  preemption rule no longer makes sense.  Although a plaintiff's damages are the same regardless

16  of who caused them, the apportionment of fault changes dramatically if the employer is allowed

17  to whitewash its action by an admission of vicarious liability to hide its damage contribution.  In

18  comparative fault states, in other words, allowing a defendant employer to avoid responsibility for

19  its own negligent acts[18]—by stipulating that it will be vicariously liable for its employee's

20  negligent acts—upsets the primary purpose of a comparative fault regime (i.e. holding every

21  negligent entity liable for their proportionate share of fault and no more).  RCW 4.22.070; *Kottler*

22  *v. State*, 963 P.2d 834 (Wash. 1998).  As explained by the District of Illinois:

23

24  _____

    [18] An employer's negligent training is otherwise known as a "direct liability" claim—it seeks to hold the employer
    *directly liable* for *its own* negligence, not the negligence of its employee.  *See* RESTATEMENT (SECOND) OF AGENCY
    § 213 (1958) ("In a given case the employer may be liable both on the ground that he was personally negligent and
    on the ground that the conduct was within the scope of employment.").

25  PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
    THIRD MOTION FOR SUMMARY JUDGMENT - 23

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1
2
3

The rationale of [the preemption rule] is very powerful in a contributory negligence jurisdiction . . . . The rationale for the rule . . . loses much of its force, however, under comparative negligence. Under comparative negligence, it is necessary for a trier of fact to determine percentages of fault for a plaintiff's injuries attributable to the negligence of the plaintiff, the negligence of each defendant, and . . . the negligence of other non-parties.

4
5

*Lorio v. Cartwright,* 768 F. Supp. 658, 660 (N.D. Ill. 1991).

6
7
8
9
10

In light of this drawback, at least twenty-six comparative negligence states have explicitly rejected the "preemption rule" and allowed juries to apportion fault to employers for their own direct negligence in training their employee, even if they admit that they will be vicariously liable.[19]   In this case, too, to rule that Plaintiffs may not present their direct negligent training claim against DFW would violate and otherwise obstruct the jury's role to apportion fault to *all* entities, as required by RCW 4.22.070.

11

### 2.      The "Preemption Rule" Is Incompatible With RCW 4.22.070.

12
13

The jury will be instructed to apportion fault to all parties and nonparties in this action. RCW 4.22.070(1) provides, in relevant part, as follows:

14
15
16

In all actions involving fault of more than one entity, **the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages** except entities immune from liability to the claimant under Title 51 RCW . . . the sum of the percentages of the total fault attributed to the at-fault entities shall equal one hundred percent.

17
18
19
20
21
22
23

(emphasis added). Thus, in *Amend v. Bell*, the Washington Supreme Court held that a defendant cannot exclude evidence of defendant's conduct on comparative negligence while seeking to introduce all evidence of plaintiff's conduct: "The essential question is whether, in a comparative negligence setting, a defendant can shield his total alleged acts of negligence from the jury by admitting to one act of negligence while exposing all of the blameworthy conduct of the plaintiff. We think not."  570 P.2d 138 (Wash. 1977).   Very recently, the Georgia Supreme Court held likewise in *Quynn v. Hulsey*, No. S19G1612, 2020 WL 6385781, at *1 (Ga. Nov. 2, 2020).

24
25

_____

[19] *See e.g., Erickson v. Christenson*, 781 P.2d 383 (Or. App. 1989); *Quinonez v. Andersen*, 696 P.2d 1342, 1346 (Ariz. Ct. App. 1984); *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1048 (Utah 1991).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

In this case, the DFW alleges comparative negligence against Plaintiffs. Dkt. # 29 at 12. The jury must therefore weigh all evidence of negligence by all entities, including DFW. Dismissing a direct negligent training claim against DFW makes no sense in a comparative fault jurisdiction like Washington, where a jury is asked to weigh and apportion fault among all responsible parties.  If a jury must assign percentages of fault to each entity having fault, including Plaintiffs, then all other entities, including employers, must also be apportioned.

Consider the following: the jury may well conclude that the Plaintiffs and Defendant Jaros, for example, were each 50 percent at fault.  If DFW's fault also is considered, however, the jury may well conclude each was 1/3 at fault and both the Plaintiffs' and Defendant Jaros' fault each decrease by 16.78 percent—from 50 percent to 1/3 (50%-16.78% = 33.3%). Not allowing Plaintiffs' direct negligence claim against DFW to proceed would result in the unfair shielding of negligent acts of DFW.  This would, in turn, unfairly allow the jury to assign a much greater share of fault to Plaintiffs, thereby substantially reducing Plaintiffs' damages.

### 3.    The Authority Cited By DFW's Is Inapplicable And Distinguishable.

DFW's reliance on *LaPlant v. Snohomish County*, is misplaced.  271 P.3d 251 (Wash. App. 2011).  *LaPlant* did not involve claims of comparative fault and RCW 4.22.070 was not injected into *LaPlant*.  *Id.*  In contrast, the Washington Supreme Court decided *Amend*, discussed above, which DFW ignores.  It is the Washington State Supreme Court's decision in *Amend* that has binding precedential value under the facts of this case—not *LaPlant*.  Nor is *James v. City of Seattle* instructive.  No. 10-1612, 2011 WL 6150567, at *1 (W.D. Wash. Dec. 12, 2011).  The extent of the discussion in *James* is as follows, in relevant part:

> Defendants also have moved for dismissal on summary judgment of Plaintiff Demetrius James's claims against the Department for negligent training and supervision.  In his response, Mr. James concedes that these claims should be dismissed . . . .  Accordingly, the court dismisses Mr. James claims for negligent training and supervision against the Department.

*Id.*, at *1 n.1 (citing *LaPlant*, 271 P.3d 251).  Plaintiffs here concede nothing of the sort.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

### 4.     Refusing To Allow A Jury To Apportion Fault To Employers For Their Own Negligence Violated The Substantial Rights Of Others.

In Washington, as is the case in most other jurisdictions with comparative fault, a Plaintiff has a substantial right to assert "alternative claims seeking compensation for the same damages." *Jacob's Meadow Owners v. Plateau 44*, 162 P.3d 1153 (Wash. App. 2007).  In the case of *James v. Kelly Trucking*, also a comparative fault jurisdiction, the South Carolina Supreme Court held:

> In our view, it is a rather strange proposition that a stipulation as to one cause of action could somehow "prohibit" completely the pursuit of another. A plaintiff may, in a single lawsuit, assert many causes of action against a defendant. The considerations limiting a plaintiff's available causes of action in the typical case are that the plaintiff must be able to demonstrate a *prima facie* case for each cause of action and that a plaintiff may ultimately recover only once for an injury.

661 S.E.2d 329 (S.C. 2008).  In other words, a defendant employer should not be allowed to unilaterally stipulate away from the jury's consideration relevant evidence of its own direct negligence that caused a plaintiff's damages simply by admitting vicarious liability.  If the jury assigns any percentage of fault, or a higher percentage of fault to the plaintiff and/or nonparties because it cannot assign any percentage of fault to the defendant employer for its independent acts of negligence, the plaintiff's recovery of damages will be reduced accordingly.  Such a result would be unfair and inconsistent with Washington's comparative fault statute.

### 5.     Plaintiffs Have Made A *Prima Facie* Case Of Negligent Training.

> [T]o prove a defendant is liable for negligent training, a plaintiff must prove (1) the defendant owed the plaintiff a duty to properly train its employees, (2) the defendant breached that duty, *i.e.* did not exercise reasonable care in its training, and (3) the plaintiff's injury was proximately caused by the defendant's failure to properly train its employees.

*Dawes v. Motel 6*, No. 04-3120, 2006 WL 276928, at *12 (E.D. Wash. Jan. 31, 2006); *see also Kessack v. Walla Walla Cty.*, No. 13-5062, 2014 WL 7344016, at *7 (E.D. Wash. Dec. 23, 2014) (citing *Degel v. Majestic Mobile Manor*, 914 P.2d 728 (Wash. 1996)) (same).

### a.     *DFW Owed Plaintiffs A Duty To Adequately Train Its Employees.*

As a matter of law, DFW "had a duty to adequately train its officers." *Kessack*, 2014 WL

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

7344016, at *8; *see also, e.g., Pan-Alaska Fisheries v. Marine Const. & Design Co.*, 402 F. Supp. 1187, 1188 (W.D. Wash. 1975), *vacated on other grounds*, 565 F.2d 1129 (9th Cir. 1977) (holding that airline was negligent when "[i]t failed to train the crew in firefighting techniques"). The scope of DFW's duty to adequately train its employees is established by expert testimony. *Moore v. Dist. of Columbia*, 79 F.Supp.3d 121, 142 (D.D.C. 2015) (citing cases); *Gurno v. Town of LaConner*, 828 P.2d 49 (Wash. App. 1992).  According to Mr. Williams:

> Law enforcement agencies have a duty to exercise reasonable care to train their employees through continuing education.  The scope of this duty to train is well established in light of the duties assigned to officers, particularly with regard to implicit bias training; training on how to author search warrants; training on what laws the law enforcement agency is to enforce; training on the laws that the law enforcement agency is to enforce; training on how to interact with other law enforcement agencies and jurisdictions, including tribal law enforcement agencies and jurisdictions; and training on warrant protocols of other jurisdictions they are likely to come into contact with, including tribal jurisdictions.  DFW failure to train in these areas falls below law enforcement standards.

Ex. FF at 7.

Citing the "public duty doctrine," Defendants disagree, submitting that "[t]he duty of a public law enforcement agency to . . . train . . . its officers is owed to the public at large, not to any potential plaintiff individually . . . and not to Plaintiffs as individuals . . . ." Dkt. # 86 at 15. Defendants are mistaken—the public duty doctrine does not apply to common law causes of action, such as negligence.  While it is true that "some statutes impose on government a duty owed to a particular class or category of individuals, such that the failure to enforce those statutes breaches a duty that can sustain an action in tort," Plaintiffs are not asserting any statutory right. *Ehrhart v. King Cty.*, 460 P.3d 612, 619 (Wash. 2020).  The public duty doctrine only comes into play when a statutory violation is at issue.  *Id.*; *see also Beltran-Serrano v. City of Tacoma*, 442 P.3d 608, 614 (Wash. 2019).  As the State Supreme Court recently articulated in *Beltran-Serrano*:

> [T]he public duty doctrine comes into play when special governmental obligations are imposed by statute or ordinance.  As to common law negligence, . . . this court has never held that a government did not have a common law duty solely because

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

of the public duty doctrine.   To apply the doctrine so broadly would inappropriately lead to a partial restoration of immunity by carving out an exception to ordinary tort liability for governmental entities.   This would undermine the value of tort liability to protect victims, deter dangerous conduct and provide a fair distribution of risk of loss.

442 P.3d at 614 (quotation omitted).  Plaintiffs' common law negligence claim is not precluded by the public duty doctrine.

<i>b.      DFW Did Not Exercise Reasonable Care In Its Training.</i>

As Mr. Williams indicated above, DFW failed to train on the requisite topics. Ex FF at _.

<i>c.      Plaintiffs' Injury Was Proximately Caused By DFW's Failure To Properly Train Its Employees.</i>

Proximate cause subdivides into "legal cause" and "cause in fact." *Gall v. McDonald Indus.*, 926 P.2d 934 (Wash. App. 1996).  A cause is "proximate" only if both of these elements are fulfilled.  *Id.*  In determining legal cause, the court must ask, "was the defendant under a duty to protect the plaintiff against the event which did in fact occur?"  *Hartley v. State*, 698 P.2d 77 (Wash. 1985).  If the answer is yes, legal cause is established.  *Gall*, 926 P.2d 934.  To show cause in fact, a plaintiff must establish that the damages would not have occurred but for the defendant's negligence. *Id.*

Here, genuine issues of material fact exist that preclude summary judgment on Plaintiffs' negligent training claim.   As indicated by Mr. Williams, DFW's failure to train to prevent Defendants' "egregious practice[s] . . . falls below law enforcement standards." Ex. FF at 6-7; *see, e.g., Groom v. Safeway*, 973 F. Supp. 987, 992 (W.D. Wash. 1997) (declining summary judgment where plaintiff submitted that the defendant "caused her to be subjected to a deprivation of her constitutional rights through its . . . training policies, or the lack thereof, and Plaintiff presented evidence based on which the jury could have agreed."). The resulting harm Defendants caused Plaintiffs includes both diagnosed emotional trauma and economic injury. Declaration of Hazen Shopbell (Nov. 6, 2020) ¶¶5-6; Declaration of Anthony Paul (Nov. 6, 2020) ¶¶5-6.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 28

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

C.    PLAINTIFFS' NEGLIGENCE CLAIM MUST PROCEED TO A JURY.

Law enforcement officers possesses a "duty to exercise that degree of skill and knowledge normally possessed by members of their profession." *Whaley v. State, Dep't of Soc. & Health Servs.*, 956 P.2d 1100 (Wash. App.1998) (citing RESTATEMENT (SECOND) OF TORTS, § 299A (1965)); *see also Young Han v. City of Folsom*, 695 F. App'x 197, 199 (9th Cir. 2017) ("[P]eace officers have a duty to act reasonably . . . . In assessing the standard of care, it is universally accepted that the standard of care in a particular industry may be established by its practitioners."); *Duran v. City of Maywood*, 221 F.3d 1127, 1132 (9th Cir. 2000) ("[R]easonable care is that care which law enforcement officers of ordinary prudence would use . . . .").

Again, the scope of this duty is established by expert testimony.  *Moore*, 79 F.Supp.3d at 142; *see also Young Han v. City of Folsom*, 695 F. App'x 197, 199 (9th Cir. 2017) (relying on "expert evidence that the police actions were not reasonable under the totality of the circumstances under generally accepted police practices"); *Woods v. Gutierrez*, No. 11-1082, 2012 WL 6203170, at *13 (D. Or. Dec. 12, 2012) (granting summary judgment where plaintiff did "not offer any evidence such as expert testimony from which a rational juror could conclude" that the defendant "did not act as a reasonable police officer of ordinary prudence under all of the circumstances").  Here, Plaintiffs' police practices expert has testified that DFW employees acted unreasonably when they unreasonably arrested and haphazardly harassed Plaintiffs:

> In analyzing the investigative pursuits of Detective Willette in this matter, her investigative skillsets are very problematic. . . . Effective and competent supervision should have been exercised thus curbing her excessive search warrant focus on the Plaintiffs and their families and other businesses which is unreasonable, investigative harassment, and a major risk management issue. Further analysis of Detective Willette's unreasonable investigative skillsets reveals her prosecutorial "shopping."  In my analysis, Detective Willette would prosecutor "shop" to get criminal charges filed against the Plaintiffs.  Effective and competent supervision and training would have prevented this egregious practice and the courts' rejection of filed charges against the Plaintiffs.

Ex. FF at 6.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1     Defendants' argument that Plaintiffs' common law negligence claim is barred by "the

2     public duty doctrine" is, as discussed above, without merit.  Dkt. # 86 at 14; *Ehrhart*, 460 P.3d at

3     619; *Beltran-Serrano*, 442 P.3d at 614.  The cases cited by Defendants do not restrict the scope

4     of DFW officers' duty either. Dkt. # 86 at 12-13.  *Donaldson v. City of Seattle* held only that "the

5     Domestic Violence Protection Act . . . does not create an on-going mandatory duty to conduct an

6     investigation."  831 P.2d 1098, 1105 (Wash. App. 1992).  The other cases cited involve the

7     "general police duty to investigate crimes," *Jama v. United States*, No. 09-0256, 2010 WL

8     1980260, at *15 (W.D. Wash. May 17, 2010), and involved alleged failures to "conduct thorough

9     or proper interviews" or "to interview certain individuals who possessed information that could

10    have exculpated" the plaintiff.[20]  *Dever v. Fowler*, 816 P.2d 1237, 1239 (Wash. Ct. App. 1991).

11    Here, Plaintiffs assert, through expert opinion, that the scope of DFW's duty included a duty to

12    refrain from prosecutorial "shopping" and excessive search warrants against Plaintiffs.  Ex. FF at

13    6.  The "negligent investigation" cases cited by Defendants are inapposite.

## CONCLUSION

15    Individual Defendants are not entitled to qualified immunity, and Defendants are once

16    again not entitled to summary judgment.  A proposed Order accompanies this Response.

17    DATED this 6th day of November 2020.

18                                    GALANDA BROADMAN, PLLC

19                                    s/ Ryan D. Dreveskracht

20                                    Ryan D. Dreveskracht, WSBA #42593
                                      Gabriel S. Galanda, WSBA #30331
                                      Attorneys for Plaintiffs
21                                    P.O. Box 15146 Seattle, WA 98115
                                      (206) 557-7509 Fax: (206) 299-7690
22                                    Email: gabe@galandabroadman.com
                                             ryan@galandabroadman.com

23

---

24    [20] The portion of *Chambers–Castanes v. King County* that Defendants cite pertains to the "special relationship"
       exception to the public duty doctrine—a doctrine which, as discussed above, does not apply here.  669 P.2d 451
25    (Wash. 1983); *cf. Ehrhart*, 460 P.3d at 619; *Beltran-Serrano*, 442 P.3d at 614.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'                    **Galanda Broadman PLLC**
THIRD MOTION FOR SUMMARY JUDGMENT - 30                              8606 35th Avenue NE, Ste. L1
                                                                    Mailing: P.O. Box 15146
                                                                    Seattle, WA 98115
                                                                    (206) 557-7509

**CERTIFICATE OF SERVICE**

I, Wendy Foster, declare as follows:

1.      I am now and at all times herein mentioned a legal and permanent resident of the United States and the State of Washington, over the age of eighteen years, not a party to the above-entitled action, and competent to testify as a witness.

2.      I am employed with the law firm of Galanda Broadman PLLC, 8606 35th Avenue NE, Ste. L1, Seattle, WA 98115.

3.      Today I served the foregoing document, via CM/ECF and email on the following parties:

Eric A. Mentzer
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
EricM@atg.wa.gov
AliB@atg.wa.gov
Attorney for Defendants

The foregoing Statement is made under penalty of perjury and under the laws of the State of Washington and is true and correct.

Signed at Seattle, Washington, November 6, 2020.

_____
Wendy Foster

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
THIRD MOTION FOR SUMMARY JUDGMENT - 31

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509